DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

111

1      Q      This is what you submitted to the EEOC as

2   evidence supporting your claim of harassment and a

3   hostile work environment?

4      A      Yes, I did.

5      Q      And if you turn to the fifth page, you

6   state I will now list a few incidents which have

7   occurred to me in the past year.  So these are the

8   incidents that --

9      A      Were in that frame.

10     Q      In that time period?

11     A      Correct.

12     Q      Okay.  Now, take a look at those if you

13  would, please.  If you look at, I guess the page 5

14  and 6, read through that and tell me whether those

15  accurately reflect, as of the time you filed your

16  charge of discrimination, the things that had

17  happened to you at Bear that you contend were

18  harassment or the creation of a hostile work

19  environment.

20     A      Yes, yes.

21     Q      And you list -- I guess the easiest thing

22  to do --

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

112

1      A      Okay.

2      Q      -- if you look at that and compare that to

3  the interrogatory answers --

4      A      Okay.

5      Q      -- to number 6, interrogatory number 6.

6      A      Okay.  Misspelling right off the bat.

7      Q      That's okay.  These are incidents that you

8  attempted to report or reported?

9      A      Yes.

10     Q      And there's some overlap?

11     A      Yes.

12     Q      Okay.  Let's look at what you submitted to

13 the EEOC, and we can go back and forth if we need to

14 with the --

15     A      Okay.

16     Q      -- with the --

17     A      Interrogatories.

18     Q      -- interrogatory answers.  Okay.  Number 1.

19 While on 24 track, Mr. Koppel became angry of an

20 employee who gave you an item from his refrigerator.

21 Do you see that?

22     A      Yes, I do.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

113

1      Q      Tell me what happened.  Is the statement

2  here --

3      A      Yeah.  That's condensed, but that's

4  basically it, but let me tell you what happened.  Do

5  you want from beginning to end?

6      Q      Let me ask you some questions --

7      A      Yeah, ask me.

8      Q      -- and it will make it easier that way.

9      A      Okay.

10     Q      Somebody gave you an item from the

11  refrigerator Mr. Koppel had --

12     A      Yes.

13     Q      -- correct?

14     A      Yes.

15     Q      And it was his -- some of his stuff

16  apparently?

17     A      Yes.

18     Q      But you offered to pay for the item?

19     A      Yes.

20     Q      And you gave Mr. Koppel a dollar bill?

21     A      Yes.

22     Q      And then he lit it on fire and said here's

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

114

1    how I feel about your dollar?

2        A    Yes.

3        Q    And then he asked you if you know what FOAD

4    means?

5        A    Yes.

6        Q    Then he told you it meant fuck off and die?

7        A    Yes.

8        Q    Then he walked away?

9        A    Yes.

10       Q    Now, who is Mr. Koppel?

11       A    Mr. Koppel is a co-worker.

12       Q    And you went to Mr. Walters and --

13       A    Yes.

14       Q    -- told him about the incident?  Who's Mr.

15   Walters?

16       A    Mr. Walters at the time was upper

17   management, like a supervis -- like a

18   superintendent.  He was probably under -- I don't

19   know if Mr. McFadden had gotten there yet or not, but

20   he's kind of like mid -- you know, second level.

21       Q    Okay.  And Mr. Carlton was present?

22       A    That's my union rep, yes.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

115

1    Q    And he saw that happen?

2    A    Yes, he did.

3    Q    And Mike Farmer saw it happen?

4    A    Yes, he did.

5    Q    Do you think Mr. Koppel reacted that way to

6    you, burning the dollar and asking you if you knew

7    what FOAD meant, because you're an African-American

8    female?

9    A    Yes.

10   Q    Why?  What facts do you have to support the

11   fact -- that allegation?

12   A    Because while the incident took place, the

13   statement was made that you know they think all black

14   people steal.

15   Q    Now, you didn't put that in your statement

16   to the EEOC.

17   A    You know why I didn't put it in there?

18   Q    I do not.

19   A    Because a lot of times I was afraid that

20   Amtrak would get into this and start really picking

21   on me on the job for telling what's going on in the

22   building.  Do you understand what I'm saying?

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

116

1    Q    No.

2    A    So I kind of left it.

3    Q    So you submit something to the EEOC that

4    has what you claim to be a direct -- where you had

5    evidence of a direct racial statement, but you

6    didn't -- you didn't put that in your --

7    A    Well, the direct racial statement was if

8    I'm standing here myself, and two Caucasians, and

9    Frannie Koppel says Alvia, do you know what FOAD

10   stands for, he sure wasn't directing it to them.

11   Q    Well, that doesn't suggest any racial

12   overtone.  If somebody said to you there was a -- who

13   said all black people steal?

14   A    The person said you know he thinks all

15   black people steal.

16   Q    And who said that?

17   A    Bruce Carlton.

18   Q    So your union rep said --

19   A    You know he thinks --

20   Q    -- referring to Mr. Koppel?

21   A    -- that black people, yes.

22   Q    So it wasn't a statement that all black

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

117

1    people steal?  It was Mr. Carlton --

2         A    Saying that.  See, this is the thing at

3    Bear.  If you're racist, you're Caucasian, you know

4    I'm racist, but I might not know it.  You understand

5    what I'm saying?

6         Q    I do not.  I'm sorry.

7         A    Okay.  I know.

8         Q    Let's try that again.

9         A    Say, for instance, you don't like black

10   people, okay, and he knows you don't like black

11   people.

12        Q    Referring to Mr. Gray?

13        A    Yes.

14        Q    Using the two of us as an example?

15        A    As an example.  And I work with you, but I

16   think you're cool, you're all right.  I work with

17   you.  We get along.

18        Q    Because I, the individual who's racist,

19   have hidden from you --

20        A    Yes.  My true feelings, yes.

21        Q    Okay.

22        A    Or you may express them when the two of you

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

118

1   are together and I'm not around.

2        Q    Okay.

3        A    Okay.  So now we come up on an incident

4   where something goes down, and you're like -- your

5   mind is probably telling you I don't care who knows

6   that I'm racist, I'm going to put it out there now,

7   because Mr. Koppel actually went in Bruce Carlton's

8   face and screamed at him.  He actually went in

9   Farmer's face and told him step outside, and I'll

10  beat your ass.

11       Q    Now, is Mr. Carlton black or white?

12       A    He's white.

13       Q    And how about Mr. Farmer?

14       A    He's also white.  And Mr. Koppel's white.

15       Q    Now, the second incident.  A co-worker told

16  Mr. Gill he couldn't work with me, and I was a

17  problem for him.  The co-worker is white.  Who was

18  the co-worker?

19       A    Jerry White.  Isn't that appropriate?

20  Anyway --

21       Q    And how do you -- why do you think that

22  that reflects that he was making that statement

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

119

1   because of your race or sex?

2      A     Okay.   Two years prior to that, Jerry White

3   called Ladoris Wiggs an f'n bitch, and it was

4   documented.

5      Q     Okay.

6      A     Okay?  So --

7      Q     Any other reason why you think that comment

8   that he said he couldn't work with you was based on

9   your race or sex?

10     A     Well, when you watch a person interact in

11  the work environment, and they don't do a lot with

12  people that are not of their race -- not to say that

13  that's a definite given -- or if they make statements

14  that are derogatory towards a certain race, then you

15  kind of think that they have some issues with that

16  particular sector of people.

17     Q     And the employee that you're referring to

18  here two years before he told Mr. Gill he couldn't

19  work with you --

20     A     Yes.

21     Q     -- had called Ms. Wiggs an f'n bitch?

22     A     Not f'n.  Fucking bitch.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

120

1    Q    Okay.  Well, I didn't --

2    A    Yeah, I didn't want to --

3    Q    Well, okay.  Called her a fucking bitch.

4    A    It's a little difference though, you know?

5    Q    No, no, no.  All right.  That's fine.

6    Well, let's clarify that because you --

7    A    Yes.

8    Q    -- you had said f'n.

9    A    Yeah.  I didn't want to cuss.

10    Q    That's okay.  We need to clarify --

11    A    Okay.

12    Q    -- exactly what's going on here.

13    A    Okay.

14    Q    So let's try again.  There's an individual

15    who tells Mr. Gill he couldn't work with you.  How

16    did you learn about that?

17    A    Okay.  That was when I'm -- okay.  When

18    you're an airbrake person, you have to have a pipe

19    fitter with you because what you're doing is you're

20    sealing that car up to meet the standards for the

21    airbrakes to work.  Okay?  Now, as a car repairman, I

22    may put a J16 valve on, however, the piping to it may

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

121

1    be cracked or have a leak in it, so therefore, I have

2    to go to my pipe fitter, and he has to repair it.  So

3    they kind of work together.

4         Q    Was Mr. White a pipe fitter?

5         A    Yes.  And he was assigned to me.

6         Q    And how did you learn that he told Mr. Gill

7    he couldn't work with you?

8         A    Okay.  The way I do my airbrake, like, say

9    for instance, they --

10        Q    I'm sorry.  Just answer my question.  How

11   did you find out that he told Mr. Gill he couldn't

12   work with you?

13        A    I was standing there.

14        Q    Did someone tell you that?  Okay.

15        A    I was standing there.

16        Q    So you heard him say that?

17        A    Yeah.

18        Q    See, that's easy.

19        A    Oh, I'm sorry.

20        Q    That's an easy answer.

21        A    Okay.

22        Q    No, no, no.  That's okay.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

122

1    A    Okay.  I thought I stated that.  I don't

2  know.  Okay.

3    Q    That's okay.

4    A    Yeah.

5    Q    Again we can take a break if you want.

6    A    I'm all right.  I'm all right.

7    Q    You say -- let's start again with this.

8  Number 2.  A co-worker told Mr. Gill he couldn't work

9  with me, and I was a problem for him.  The co-worker

10  is white.

11    A    Yes.

12    Q    The co-worker was Mr. White?

13    A    Yes.

14    Q    You contend that was harassment or a

15  hostile work environment?

16    A    Well, the incident that followed with

17  that.  Okay?  So he said I can't work with her, and

18  I'm not going to, and he walked away.  I'm trying to

19  test my car.  I go to Mr. Gill and say look, he said

20  he can't work with me, then give me a pipe fitter.

21  Okay?  And he says all right, Alvia, I'll see what I

22  can do.  I go back.  I do some more work on the car.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

123

1   An hour passes.  I go back to Mr. Gill.  I said Mr.

2   Gill, where's my pipe fitter, or who are you going to

3   give me?  He says goddamn it.  What do you want me to

4   do?  Why don't you just go home, and I'll do your

5   fucking job.  Those are his exact words.  Now, is

6   that a hostile work environment?  To me it is because

7   I'm going to my supervisor asking him to give me the

8   person that's supposed to help me get my job done,

9   and it hasn't been done.

10      Q    So do you contend that Mr. Gill's comment

11   to you was harassment because of your sex or race?

12      A    I can't define why Mr. Gill talked to me

13   like that.  All I know is it's inappropriate, and to

14   me it's harassment, and it's a hostile work

15   environment.  Who wants to go to work every day, and

16   you're getting cussed at, and you're trying to do

17   your job?

18      Q    Would you say that you hear cussing going

19   on --

20      A    Yeah.

21      Q    -- at the Bear facility?

22      A    It's nothing for people to disrespect you

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

124

1    in there, you know.  Get up off your fat ass.  They

2    don't -- nothing's done.  Nobody --

3        Q    Do they behave that way toward other

4    people, or is it just you?

5        A    I don't know.  I know I express myself.

6    When something happens, I go over and tell someone

7    can you do something about it?  This happened to me.

8    Other people, I don't know.  Maybe they beat them up

9    after work, I don't know, but I know what I do.

10       Q    And then as a result of what you do, you

11   sometimes have people say things in response that you

12   perceive to be inappropriate?

13       A    Yes.

14       Q    Number 3.  This is the hourly employees

15   punching in or not punching in.

16       A    Okay.

17       Q    Okay.  Now, that was the incident involving

18   attendance?

19       A    Yes.  Okay.  You might not want to hear

20   this, but I got to tell it like it has to be told.

21       Q    I want you to tell me the truth, and I want

22   --

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

125

1    A    And that's what I'm going to do.

2    Q    -- you to tell me fully the allegations

3    that you're raising --

4    A    Okay.

5    Q    -- that you think support your lawsuit.

6    A    Okay.  First of all, Amtrak's policy at

7    Bear is if you receive three occurrences in 30 days,

8    you get a letter, and then there's a process.  It's a

9    letter, then a -- well, it's supposed to be verbal

10   warning, then a letter, then two days off or so

11   forth.  It's like a five-step process.  Okay.  Now,

12   the way it usually works is -- now, I had issues with

13   this because I, as an hourly wage employee, you come

14   to work, you punch in.  When you leave, you punch

15   out.  You get paid for the hours listed.  Okay?  Now,

16   there's hourly wage employees who don't have to punch

17   in.  They can come at 7:30, they can come at 8:00

18   o'clock, they can come at 7:10, and they're never

19   going to be listed as late.  Okay?  I have to punch

20   in.  I'm in that group of people that have to follow

21   the rules.  Okay?  So I come to work, and I don't

22   have a problem with it.  I'm supposed to punch in,

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

126

1    and I punch in.  Now, what normally happens is an

2    unexcused absence is something where you say well, I

3    got up, and I didn't want to come in, and I'm late.

4    That's unexcusable.  If you have a doctor's notice,

5    or if you have jury -- in other words, there's a

6    paper that Amtrak has, and it has all these codes for

7    different occurrences and whether or not they are

8    acceptable.  What has happened to me is I kept

9    getting letters, or I'd get called in and say Alvia,

10   you were late on Thursday, and then Friday two weeks

11   later you left early.  I say okay, that's a doctor's

12   appointment, I have documentation for that, so that's

13   not three occurrences.  So what they would do is they

14   would say well, okay.  Well, you bring the doctor's

15   note in, and I'll pull it, you know, I'll reverse it.

16   So I bring a doctor's note in that I probably already

17   brought in and gave to the foreman.  They're like

18   okay.  Well, don't worry about it.  I shouldn't have

19   issued it.  But it's in my file.  Okay?  Now, I put

20   in for a job in Washington or Phillie, and they call

21   and say we're going to interview Ms. Lacy.  Can you

22   pull her file?  What's in it?  They pull my file, and

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

127

1    they say oh, she just got a letter for her

2    attendance.  Can't consider her.

3        Q    Now, do you know that happens?

4        A    I know it happens.

5        Q    How do you know that happens?

6        A    And I know it happens because I have a

7    copy, even right here, where they were copying my --

8    here's a copy of my time card for every day that I

9    was on the foreman's program, and this is something

10   they don't do to anybody.

11       Q    And we're talking about 2004 and 2005.

12       A    Yes.  Well, this is going back to the --

13       Q    I want to focus on 2004 and 2005.

14       A    Okay.

15       Q    Let me show you a document.  Maybe this

16   will help us move along.

17            (Lacy Deposition Exhibit 10 marked for

18   identification and attached to transcript.)

19   BY MR. VANDEUSEN:

20       Q    Let me show you this document, Exhibit

21   10 --

22       A    Yes.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

128

1    Q    -- your time card.  Is that the kind of

2  situation you're referring to with respect to

3  attendance?

4    A    Yes.

5    Q    All right.  Three occurrences in 30 days --

6    A    Yes.

7    Q    -- gets you a attendance policy --

8    A    Yeah.  This --

9    Q    -- warning?

10    A    Yeah.  This is a written.  It says written.

11  So that means I'm on step 2, and I probably said

12  where's step 1?  So do you have step 1?

13    Q    Well, I'm just showing you the document

14  that I have here.

15    A    Okay.

16    Q    And there's a time card attached to it,

17  right?

18    A    Yes.

19    Q    And you refused to sign this document?

20    A    Yes.

21    Q    And you received it on the 28th of April?

22    A    Yes.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

129

1      Q    Now, let me show you a document we're going

2   to mark as 11.

3           (Lacy Deposition Exhibit 11 marked for

4   identification and attached to transcript.)

5   BY MR. VANDEUSEN:

6      Q    All right.  Let me show you a document

7   marked as Exhibit 11.  You complained about this

8   written warning?

9      A    No.

10     Q    No?

11     A    Okay.  Wait a minute.  Okay.  Go ahead.  I

12  thought you were going to take an old paper and

13  say --  go ahead.

14     Q    No, no, no.  I'm trying to --

15     A    Okay.

16     Q    But I appreciate your looking to make

17  sure --

18     A    Yeah, I'm looking.

19     Q    -- I'm doing it right.

20     A    Yeah, okay.

21     Q    So you receive a written warning?

22     A    Yes.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

130

1     Q     On April 28th of 2004?

2     A     Okay.

3     Q     And you refuse to sign it?

4     A     Yes.

5     Q     Because you have concerns about whether

6     it's appropriate?

7     A     I had a doctor's note for that day, yes.

8     Q     Okay.

9     A     Okay.  Go ahead.  I'm listening.

10    Q     Well, I want to have your full undivided

11    attention.

12    A     Okay.  Because I'm going to pull out

13    something that they used the same letter twice, but

14    go ahead.

15    Q     Hold on.  I'll give you an opportunity.

16    A     Okay.

17    Q     You complain about this because you don't

18    think it's appropriate, the letter that was Exhibit

19    10, the warning?

20    A     Yes.

21    Q     And you did that to the business diversity

22    department, right, the dispute resolution office?

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

131

1    A    When I contacted them -- let me say this

2    for the record.  When I contacted them, I initially

3    called diversity, and I said there's a problem here.

4    And my problem was it was not discriminatory.  My

5    problem was that people are allowed -- are forced to

6    punch in, and some are not, and I wanted them to

7    address that.  I did not make it a racial issue.

8    Q    Okay.

9    A    Okay.

10    Q    So just to be clear, that's the memo that

11    you see on Exhibit 11, right, and then if you turn to

12    the second page of Exhibit 11, the letter that you

13    got from the business diversity department about this

14    complaint?  This all relates to the same written

15    warning that was Exhibit 10, correct?

16    A    Yes.  Now, this right here was not given to

17    me.  This one that you're showing, the memo to

18    Jonathan Klein --

19    Q    I understand that.

20    A    -- that's not me.  I didn't see that.  I

21    got this in the mail.

22    Q    I understand that.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

132

1    A    This is all I got.  Okay.

2    Q    I understand that.

3    A    Okay.

4    Q    I'm making sure we're all talking about the

5    same --

6    A    Okay.

7    Q    -- incident.

8    A    Because that's the first time I saw that.

9    Okay.  But it is the same incident.  Okay.

10    Q    And that's what we were referring to, and

11    that's what you were referring to in your statement

12    to the EEOC about hourly employees not required to

13    punch in, and others must, some do, and some don't --

14    A    Okay.

15    Q    -- is that correct?

16    A    I was referring to the ongoing all the

17    time, all the time.  That was the one that I listed,

18    but it's ongoing, and it's always.  That's not just

19    one incident.

20    Q    I understand that.

21    A    Okay.

22    Q    I understand what you're saying.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

133

1    A    Okay.

2    Q    I just want to make sure I'm clear.

3    A    Yes.

4    Q    In your submission to the EEOC the example

5  you were giving --

6    A    Was that.

7    Q    -- involved which is those documents that

8  we have in Exhibit 10 and Exhibit 11?

9    A    Yes.

10   Q    Okay.   Thank you.

11   A    Okay.

12   Q    Now, as a result of that concern that you

13  raised, you were told in Exhibit 11 that Mr. Klein

14  was going to look into this.   See that in the last

15  paragraph of Exhibit 11 on the second page?

16   A    Yes.   This is the letter that I received.

17   Q    Right.

18   A    Uh-huh.

19   Q    And who is Mr. Klein?

20   A    Mr. Klein at the time was the chief

21  mechanical officer.

22   Q    And he would be at Bear?

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

134

1    A    No.  He would be in Wilmington.

2    Q    In Wilmington?

3    A    Yes.

4    Q    Okay.  But he would be responsible for

5    looking into --

6    A    The matter.

7    Q    -- the matter?

8    A    Yes.

9    Q    That's what they told you?

10    A    Yes.

11    Q    And then according to --

12    A    Interrogatory you mean?

13    Q    Well, your interrogatory and the deposition

14    exhibit that you submitted to the EEOC.  What is

15    that, 9?  Yeah.  According to Exhibit 9 where you

16    were listing all the things that had happened on page

17    6, that's when obviously somebody did look into these

18    things because then there were individuals who were

19    angry about being required to punch their time cards;

20    is that correct?

21    A    That's correct.

22    Q    And is that where there was the --

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

135

1    A    The little rat.

2    Q    -- little rat?  There's a fat letter

3  writing rat watching you punch your time card?

4    A    Yes, it was.

5    Q    And you thought that referred to you?

6    A    It did.  It was on my airbrake cart.

7  Everybody has their own airbrake.  It was on mine.  I

8  went to lunch, and someone taped it on my airbrake

9  cart.

10    Q    Did you see it anywhere else?

11    A    No, I didn't.  And when I received that, I

12  went upstairs, and there's -- upstairs is where Mr.

13  McDowell's office is.  Mr. Waters' office is there.

14  It's the administrative part of the facility of part

15  of it.  And I went upstairs, and there's a room

16  where the two people that are hourly wage employees

17  who are car -- well, one's a car repairman, and one's

18  a electrician, and he's pretty computer savvy, he's

19  pretty good.  Now, I'm not saying he did, but I

20  thought it may have came from his computer.  So I

21  went upstairs, and I knocked on the door, and when I

22  went inside, Fred Dutton was sitting there, who was a

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

136

1  foreman, Mike Skinner, Sport -- we call him Sport --

2  Ace McDowell, and a guy they call Skaddy was sitting

3  there.  And I took the picture of the rat, and I said

4  does anybody -- has anybody seen this?  I went just

5  like this.  Does anybody know where this came from?

6  And they all looked at me like -- so I said nobody

7  knows where it came from?  Nobody's seen this?  Okay.

8  Thanks.  Went downstairs, went back to work.  By the

9  end of the day I was like you know what?  Ace didn't

10 say oh, what happened, where did it come from?

11 Nothing.  He just sat there.  So I said well, let me

12 go find Mr. Waters.  I punch out.  I go upstairs.  I

13 find -- go in Mr. Waters' office.  He's sitting

14 there.  I said Mr. Waters, I'm getting ready to go

15 home, but I want you to know this was left by my

16 airbrake cart today.  And he said oh, my God.  He

17 said Alvia, I'll look into it.  I'll find out who did

18 this.  And I said fine, and I left and went home.

19      Q    Did anything further happen with respect to

20 that?

21      A    Nothing.  Nothing.

22      Q    So the people who you asked, they all said

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

137

1    they hadn't seen -- or they suggested they had not

2    seen that rat?

3         A    Well, they didn't say they did, and they

4    didn't say they didn't.  They just sat there with

5    blank faces.

6         Q    It was not posted anywhere as far as you

7    know other than on your own cart?

8         A    No, it wasn't posted anywhere else because

9    I even went to my co-worker Mike Curtis.  And he's on

10   26 track -- I mean 28 track.  And I said look, did

11   you see this?  And he went fat letter writing -- he

12   said who's that supposed to be?  That's you.  Excuse

13   me.

14        Q    Well, I'm glad you find it humorous.

15        A    I didn't at the time, but, you know --

16        Q    Years go by.  Let me ask you why -- you've

17   suggested to me that if you see something that you

18   think is inappropriate, you do not hesitate to raise

19   it.

20        A    Yes.

21        Q    This would be an example of that?

22        A    Yes.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

138

1    Q    And as a result, some of your co-workers

2   have found it difficult to like you?  Would that be

3   a --

4    A    That would be true.  Some have found it

5   difficult to like me, and some of them love me.  Kind

6   of works both ways.

7    Q    Understood.  But there are some who --

8   because you stand up for what you think should be

9   done or not done, and you make those thoughts known

10   to management, some co-workers don't like that so

11   much?

12    A    I think you're right.  I would say you're

13   right.

14    Q    That's what your -- that's what your --

15    A    Yes.

16    Q    I'm not testifying.

17    A    Oh, yes.

18    Q    I'm sorry.

19    A    I don't know what I need to say to let you

20   know yes.

21    Q    Here's what I'm trying to do.  I'm trying

22   to make sure that I get a clear question out, and an

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

139

1    answer, because it makes it easier later if we have

2    to use the transcript, whether at trial or some

3    place --

4        A    Okay.

5        Q    -- for that.  So that's what I'm trying to

6    ask.  So do you think that those co-workers who don't

7    like you don't like you because you call things to

8    the attention of management where they're trying to

9    get away with stuff or not punch in or that kind of

10   thing?

11       A    Yes.  And I'm also going to add not just

12   the co-workers, but management also.  They don't like

13   me to speak on those issues.

14       Q    You rock the boat?

15       A    Yeah.  I don't do it purposely.  If

16   everything's fine, it's okay.

17       Q    But if you think something's not fine --

18       A    Why would you put blinders on?  I don't

19   understand it.

20       Q    Do you do that regardless of whether you

21   think it's based on a racial issue or a gender issue?

22       A    It's a right or wrong.  That's the only --

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

140

1    Q    Regardless of --

2    A    Yeah.

3    Q    -- whether it has to do with race?

4    A    I don't use race for any -- I use it --

5    when I see it's race, it's a race issue.  I don't

6    just pick the race card.  I'm not one of those that

7    throw the race card out.

8    Q    You'll raise whatever issue you think is

9    inappropriate?

10    A    Yes.

11    Q    Is it correct for me to say if you think

12    something's not appropriate, regardless of what the

13    reason is, whether it's race or sex or just it's just

14    not appropriate, I don't like it --

15    A    Okay.

16    Q    -- you're going to raise that issue?

17    A    Yes.

18    Q    And you do raise that issue?

19    A    Yes, I do.

20    Q    And as a result, you believe, it's your

21    testimony, there are people who don't like you --

22    A    True.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

141

1    Q    -- because you rock the boat?

2    A    Yes.

3    Q    Some co-workers?

4    A    Yes.

5    Q    And some members of management?

6    A    Yes.

7    Q    Does that clear --

8    A    That's perfect.  That's perfect.

9    Q    Who told you to get up off your fat ass?

10   A    That would be Mr. Benson, Bill Benson.

11   Q    When did that occur?

12   A    That occurred -- that's out of the time

13   frame.  That was one of the incidents that I listed.

14   Q    That was before 2004?

15   A    Yes.  We were making car moves.

16   Q    That's fine.  If you'd turn back to the

17   interrogatory answers.

18   A    Can I make one point before we go on about

19   these notice -- this notice here --

20   Q    Sure.

21   A    -- the whole attendance thing?

22   Q    Referring to Exhibit 10.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

142

1    A    Okay.  I just lost my train of thought.  It

2    lost me.

3    Q    Okay.  Well, maybe it will come back.  If

4    it does --

5    A    Okay.

6    Q    -- we can address that.  Let's turn to

7    interrogatory number 18, page 11 of your answers at

8    the bottom.  Do you see that?

9    A    Yes, I do.

10    Q    Now, Ms. Lacy, you list a number of

11    individuals here who you contend will give you a

12    written or oral statement concerning the issues in

13    this case.  Who is M. Sheridan?

14    A    That's Mr. Michael Sheridan.  He was a

15    foreman at Bear at one time.

16    Q    Where is he now?

17    A    He works for a law firm.  I don't know if

18    he's an investigator or an actual, you know, member

19    of the law office.

20    Q    Do you know what the name of firm is?

21    A    No, I don't, not right off.

22    Q    When was the last time you spoke with Mr.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

143

1   Sheridan?

2       A    About probably three months ago.  Every

3   once in awhile I'll either call him, or he'll call

4   me.  And I'll say how you doing, Mike?  He was a good

5   foreman, he was a very good foreman, but they don't

6   like that.

7       Q    When did he leave Amtrak?

8       A    I don't know what year exactly.

9       Q    Was it before 2004?

10      A    Yes, yes, it was before 2004.

11      Q    So would he have had any direct knowledge

12  of events that happened to you at Amtrak from January

13  of 2004 forward?

14      A    No.

15      Q    Who is J. Riley?

16      A    That's our union president, James Riley.

17      Q    Okay.  Current union president?

18      A    Yes.

19      Q    What's his race?

20      A    Caucasian.  Mr. Sheridan is also Caucasian

21  for the record.

22      Q    Okay.  And Mr. Carlton we talked about.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

144

1      A      Yes.  He's a Caucasian.  He's our union

2  vice president.

3      Q      And Ladoris Wiggs we talked about.

4      A      Yes.

5      Q      Who is Ms. Brown?

6      A      She's also a co-worker.  She works in

7  material control.  She's an African-American.

8      Q      Now?

9      A      Yes.

10     Q      So she's another African-American working

11 in --

12     A      The Bear facility.

13     Q      -- Bear facility?

14     A      Yes.

15     Q      African-American female?

16     A      Yes.

17     Q      Just approximate if you can.  How many

18 African-American females do you think are working in

19 the Bear facility?

20     A      I'm going to push it and say maybe 25 or

21 30.  That's counting material control and car

22 repairmanwise.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

145

1    Q    Let me go back to the letter of warning

2    there.

3    A    Yes.

4    Q    When you got that, did you lose any pay --

5    A    Yes.

6    Q    -- in getting that letter?

7    A    The 72 minutes, the four hours, and the

8    eight hours.

9    Q    Because you weren't there?

10   A    Right.  That's what I wanted to say.  Okay.

11   Q    I'm sorry.

12   A    I got my --

13   Q    You weren't paid --

14   A    -- back.

15   Q    You weren't paid for the time you weren't

16   there?

17   A    Right.  That's -- you don't get -- yeah.

18   Q    That's usually the way it works when you

19   work by the hour, right?

20   A    Right.

21   Q    You don't work, you don't get paid?

22   A    Get paid.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

146

1    Q    Your contention was that the eight hours

2  that you missed on April 7th was for a doctor's

3  appointment?

4    A    No.  The four hours, because normally

5  like --

6    Q    On the 5th?

7    A    -- if you have -- if you have -- if I get a

8  doctor's appointment, the latest I can get it is like

9  1:00 o'clock or 2:00 o'clock.  So I go to work, and I

10  try to leave myself, I might leave at 11:00 or 12:00,

11  time to get home, take a shower and go to the

12  doctor's appointment.  So I'm going to lose some

13  time.  I don't -- I can't afford to lose a whole day

14  because we don't have sick leave.  So what happened

15  was that was a doctor's appointment, and had it been

16  listed as excused, it wouldn't have came as -- came

17  up as three occurrences in 30 days.  Now, what

18  happened was Mr. Butler came to the conclusion that

19  no -- according to Mr. Gill, no excuse was excusable.

20  And I said Rosie, it's a doctor's appointment.

21  That's excusable.  No.  According to Mr. Butler,

22  there's no excuses.  So now if you don't have any

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

147

1    excuses, you're going to get occurrences.

2        Q    Right.  And did you challenge this through

3    your union?

4        A    Yes, I did.  And that's why I refused to

5    sign this.

6        Q    Okay.  Well, hold on.  You challenged it

7    through the union?

8        A    I probably went to Bruce.  I can't -- I

9    have to go back and look at my paperwork.

10        Q    Do you recall now whether you challenged it

11    through your union?

12        A    I don't know, but I know I challenged them

13    twice.  Okay.

14        Q    Do you recall whether it was rectified

15    or -- and you were paid for those four hours, and the

16    warning was dropped --

17        A    Oh --

18        Q    -- or not?

19        A    -- never.  I ain't never got paid for no

20    lost time.

21        Q    So even if you went to your union and tried

22    to say I don't think this was appropriate, you

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

148

1    weren't satisfied with what had happened?

2        A    Okay.  When I -- in this incident had he

3    said okay, I don't -- I don't have a problem with not

4    being there for four hours and not getting paid.

5    Don't get me wrong.  I don't have a -- I wasn't

6    there, but my point is that had you given me

7    excusable absence from my doctor's note, this

8    wouldn't be a warning letter.

9        Q    And your concern was that some people --

10       A    Right.

11       Q    -- again some people can not have to worry

12   about it, and they're not going to get a warning

13   letter?

14       A    Right.

15       Q    You and other people who they don't like --

16       A    Have to.

17       Q    -- have to get, and are going to get, the

18   warning?

19       A    Correct.

20       Q    Again it's who they like?

21       A    Who they don't like.

22       Q    Who they don't like?

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

149

1     A    Who's on the you can list and who's not on

2  the -- yes.

3     Q    I'm sorry.  On the what list?

4     A    We call it you can, and you can't.

5     Q    Oh, I see.  You can do it, or you --

6     A    Yeah.

7     Q    -- can't do it?

8     A    Yes.

9     Q    I understand.  Ms. Brown, we talked about

10  her.

11     A    Yes.

12     MR. VANDEUSEN:  I would like to take a

13  break for about five minutes or so.  Would that be

14  okay with you?

15     THE WITNESS:  Sure.

16     (Recess 12:35 P.M. to 1:15 P.M.)

17  BY MR. VANDEUSEN:

18     Q    Ms. Lacy, before we took a lunch break, we

19  were talking about a variety of things, and I'm going

20  to spend a little more time doing that, and then

21  we'll talk about the promotion issues.

22     A    Okay.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

150

1   Q    If you would go back and look at Exhibit 7

2   I think, the interrogatory answers.  I think you may

3   have those right there in front of you.

4   A    Yes.  That's where we're at now.  Okay.

5   Q    And look at page 7, interrogatory 6 --

6   A    Yes.

7   Q    -- your response there.  We talked about

8   the issue with a co-worker telling you to get up off

9   your fat ass.  Then there's a second incident here

10  you say where a co-worker made a racial comment while

11  in line to punch time cards.  When did that occur?

12  A    I want to say 2004, around that time.  It

13  might have been 2003.  I'm not sure of the time

14  frame.

15  Q    Who was the co-worker?

16  A    The co-frame was -- co-worker was an

17  employee named Zigcraft.  We call him Ziggy.  And

18  that should be documented through diversity because

19  they came down, they did investigate it, because they

20  called me in for a statement.

21  Q    Did the co-worker make a racial comment to

22  you?

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

151

1     A    Okay.  What happened was we were in the

2    line to punch out.

3     Q    Well, can you just answer yes or no?

4     A    He made it to Ladoris, yes.

5     Q    And did Ladoris file a complaint?

6     A    Yes, she did.  Yes, she did.

7     Q    And business diversity came down and --

8     A    Yes.

9     Q    -- investigated it?

10     A    Yes.

11     Q    And do you know whether Ziggy was

12    disciplined in any way?

13     A    Not that I know of.  He didn't lose any

14    time off, so --

15     Q    Do you know what happened to him as a

16    result of the --

17     A    From what I know, nothing, nothing

18    happened.  They found no probable cause or

19    something.  I don't know.

20     Q    But it wasn't directed to you, the comment?

21     A    Well, when he said it, I was in the line.

22    And he said where we come from, we shoot niggers for

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

152

1    things like that.

2        Q      Things like that referring to what?

3        A      What happened was I was in line to punch

4    out.  Sometimes when you're in line to punch out, you

5    could have a friend come up when everybody starts

6    shuffling towards the time card -- I mean time

7    clock.  So what happened was I was in line waiting,

8    and Mr. Zigcraft and other people were behind me.

9    And Ladoris came up and stepped in front of me, which

10   is -- you know, it's okay.  You can let your friend

11   in the line.  It's not like elementary school.  And

12   that's when Mr. Zigcraft made that remark.  Then

13   everybody -- quite a few people heard him.

14       Q      Did other people complain?

15       A      Yes, they did.

16       Q      A number of people complained?

17       A      Yes.  Well, I know another -- a man named

18   Richard Brown complained, electrician, because he was

19   really offended also.

20       Q      And there was an investigation?

21       A      Yes, there was that I know of because I was

22   called in for --

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

153

1    Q    But you don't know --

2    A    -- questioning.

3    Q    But you don't know the results?

4    A    I don't know what the -- I never received

5    anything in writing or -- you know.

6    Q    Did you file a complaint about that

7    comment?

8    A    No, I didn't because I felt that --

9    Q    That's okay.

10   A    Okay.  No, I didn't.

11   Q    To make things move along now, I'll ask a

12   question, and if you can answer just the question I'm

13   asking, and then if we want to elaborate, we can work

14   on that.

15   A    Yeah, but sometimes you have to explain.

16   It's not -- you understand?  It sounds like I didn't

17   care about it.

18   Q    I didn't think that at all, ma'am.

19   A    Okay.

20   Q    Did you file a complaint?

21   A    No.

22   Q    Other people filed a complaint?

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

154

1    A    Yes, they did.

2    Q    And it was investigated?

3    A    Yes.

4    Q    And you don't know the results of the

5    investigation?

6    A    No, I don't.

7    Q    Stick with the interrogatory answers.  If

8    you would look at interrogatory 13.  We'd asked for

9    you to identify individuals who you think are

10    similarly situated to yourself, but who were treated

11    more favorably than you are.  And you've given me a

12    bunch of examples of situations, and here you give a

13    general statement of people who would be treated

14    differently.  Do you have names of anybody that you

15    would compare yourself to?

16    A    Well, when I did this question, I thought

17    about someone who had a college degree and was trying

18    to be promoted.  In that case I couldn't come up with

19    anybody because in my facility I'm the only one with

20    a college degree, including the managers, so I

21    couldn't compare myself to anyone on that.  So then I

22    looked at it from the perspective that employees that

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

155

1    started off as hourly wage employees per se, car

2    repairmen, electricians that wanted to move or

3    advance within the corporation, and that would be all

4    those that have made that initiative, and I didn't

5    put those names down.

6        Q    And were those the names of the people that

7    you referred to before, the list of all the white

8    males?

9        A    Yes.  We could go -- that would be a

10   definite example because they are -- yes.

11       Q    Other than those names, are there any other

12   people that you would identify specifically in the

13   2004, 2005 time frame who you would say I think were

14   treated more favorably than I've been because of race

15   or sex or in retaliatory -- for retaliatory reasons?

16       A    Okay.  Well, I'm going to say this.  I know

17   there were some females in the office who were

18   promoted during 2004, 2005.  So those names I would

19   have to know because usually what happens when a

20   position comes up, you don't know about it.  The

21   person gets promoted.  You don't know until somebody

22   says oh, guess who got the job, or guess who got so

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

156

1    and so's job?  So if I could actually have access to

2    that information, then I could give those persons'

3    names directly, but I don't have access to that.

4         Q    And were those females you're referring to

5    African-American or white?

6         A    White.

7         Q    All white?

8         A    Yes, Caucasian, because the women that have

9    been there, they've basically moved up.  I know they

10   get -- you know, you can tell, when you go through

11   the office, that they're in this office, you know,

12   they're being promoted by -- you understand?

13        Q    No, ma'am.  I'm sorry.  I don't.

14        A    Okay.  What I'm saying is, in other words,

15   when I first started there, say, for instance, Donna

16   Matlack, she was just a clerk, in other words, a time

17   clerk.  She's now head of the vehicle department.

18        Q    So in 23 years she's progressed?

19        A    No.  I've been there -- I've been at Bear

20   for 18 years, and I know of her being promoted at

21   least three times since I've been there.

22        Q    I'm sorry.  You were hired in 1983?

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

157

1      A     Yes.

2      Q     And where did you first work when you

3  worked in the --

4      A     I worked out of Perryville.

5      Q     Okay.  And then when you got the car

6  repair --

7      A     I went to --

8      Q     -- position --

9      A     -- Bear, Delaware.

10     Q     So for the time you've been in Bear?

11     A     Yes.  So in the time that I've been at

12 Bear, I know Donna Matlack has been promoted at least

13 three -- at least to three different positions right

14 there at the Bear facility.  There's another Donna.

15 I don't know her last name right now.  I'm drawing a

16 blank.  And then if you want to go by coach cleaners,

17 females that came in as coach cleaners that are now

18 holding formal positions or have been promoted, those

19 persons.

20     Q     Would that be like your foreman now?

21     A     Yes, yes, that would be the same thing

22 because you go from a car repairman to a promotion.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

A157

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

158

1    That is a promotion.

2         Q    So she was an African-American female?

3         A    Yes.

4         Q    Who was a car repairman?

5         A    Yes.

6         Q    And was promoted to a --

7         A    Yes.

8         Q    -- foreman position?

9         A    And what happened with that, Delisa did not

10   become a foreman until they kicked me off the

11   program.  The following week they went to her and

12   said you want to be a foreman, and everybody knows

13   that.  So they didn't do it out of here's your

14   opportunity per se.  I guess they did it to make it

15   look like -- which is what it looks like -- yeah, we

16   do promote African-Americans.  So if you actually go

17   back and look at the record, there has not been one

18   African-American promoted to a foreman's job since

19   then, and I know African-Americans who have applied

20   and been denied because they have come to me and

21   asked me what should they do for the record.

22        Q    Thank you.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

159

1    A    You're welcome.

2    Q    So you see your current foreman's promotion

3  to foreman as not based on her ability or --

4    A    She has told me that.  She said Alvia, the

5  only reason why I have this job is because of you, so

6  I can't look at it any other way.  And I don't have

7  anything against her, you know.  It's a promotion.

8    Q    Okay.  Anybody else who you've come up with

9  who might be similarly situated?

10   A    As far as being treated differently, yes.

11  Carol Kasoni, like I said, she was a coach cleaner,

12  and she's now a foreman, been a foreman.  A young

13  lady named Marrieta, she also was a coach cleaner.

14  She's a foreman.  That's all I can think of right

15  now.

16   Q    But you testified earlier I think that you

17  haven't -- since 1998, you haven't applied for

18  another foreman position in Bear?

19   A    No, I haven't.  I said that, yeah.  I don't

20  have any problems.

21   Q    No, no.  I just want to make sure we're

22  clear on that.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

160

1     A     Okay.  And also for the record it's not so

2   much as the opportunity there either because what

3   they claim they do is they acquire a foreman's list.

4   In other words, you say you want to be a foreman, and

5   they interview you, and they put you on the list, and

6   when a position comes available, that's when they

7   approach you.  So no one has neither approached me

8   and said well, Ms. Lacy, you were a foreman at one

9   time for 66 days.  Would you like to go back and try

10  it again?  No one has done that either.

11    Q     But you haven't expressed an interest in

12  doing that --

13    A     No.

14    Q     -- at Bear?

15    A     I haven't seen any motive -- I haven't seen

16  any notices either as far as if you want to say new

17  list of foreman perspectives or candidates.

18    Q     Let me show you a document we'll mark as

19  12.

20          (Lacy Deposition Exhibit 12 marked for

21  identification and attached to transcript.)

22  BY MR. VANDEUSEN:

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

161

1      Q     Ms. Lacy, do you recognize that document?

2      A     Yes.

3      Q     That was by Mr. McFadden?

4      A     Yes.  There's another page to this, isn't

5   there?  It's a two-page, isn't it?

6      Q     I don't believe I've seen --

7      A     Because I think they were stapled to our

8   checks.

9      Q     Well, let me ask the questions, and then we

10  can figure it out.

11     A     Okay.

12     Q     You recall receiving this, and you think

13  there's a second page?

14     A     I thought it was.

15     Q     That's okay.  But you recall receiving it?

16     A     Yes.

17     Q     And Mr. McFadden is now in charge of the

18  Bear facility?

19     A     Yes.

20     Q     Do you have any idea what prompted this

21  interoffice memo from Mr. McFadden?

22     A     From what I gather, he's making an

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

162

1  introduction to the employees at Bear to let them

2  know that I'm here, and I'm going to be taking over

3  this position, which you know most companies do that

4  conducted to management.

5       Q    Did it have any other significance to you

6  other than that?

7       A    For me, no.  I thought it was just a way of

8  -- I mean I seen them on the floor, and I think this

9  was -- I mean prior to the letter coming out, and I

10 think it was just a way for him letting everybody

11 know this is who I am, this is what I'm going to be

12 doing.

13      Q    I'm not suggesting there's anything more to

14 it than that.

15      A    Okay.

16      Q    I just want to know if you think there's

17 anything more to it than that.

18      A    No, I don't think there's anything more to

19 it.  It's just telling his background and where he

20 came from.  That's all.

21      Q    And have you found -- is it your opinion

22 that he's doing a good job at Bear, or a better job?

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

163

1      A      Well, I'll say this.  He's not harassed me

2   like Mr. Butler did.  How's that?  That's the way I

3   feel about it.  I'm not being harassed.

4      Q      I think that's fine.  Thank you.  Now I

5   would like to turn to dealing with some promotion

6   issues.

7      A      Okay.

8      Q      Well, before we do that -- lawyers always

9   do this.  Before we do that, let me ask you a couple

10  more questions.  Have we fully addressed all of the

11  issues about Bear in 2004, 2005 related to

12  harassment, hostile work environment, discrimination,

13  retaliation?

14     A      Now, when you say all, do you mean that

15  I've exposed every and every little incident or

16  just --

17     Q      Well, you've -- let me --

18     A      Yes.

19     Q      My job is to find out the basis for the

20  allegations that you've raised in your lawsuit.

21     A      Okay.

22     Q      The first half of today we talked about

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

164

1    issues at Bear, the Bear facility.

2        A    Yes.

3        Q    And we've talked about how your

4    complaint -- you're raising claims that you've been

5    subjected to harassment, hostile work environment,

6    because of your race and your sex, and some

7    retaliatory behavior for your previous complaints

8    about discrimination.

9        A    Yes.

10       Q    Is that correct?

11       A    Yes.

12       Q    And we've been talking about time periods

13   2004, 2005.  We've addressed a number of different

14   issues --

15       A    Yes.

16       Q    -- a number of different things that you

17   say here's examples of what I've gone through that

18   suggests discrimination, harassment, hostile work

19   environment.

20       A    Yes.

21       Q    Have we fully addressed all of those, or

22   are there more examples you would like to give me

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

165

1    beyond those that you put in your information to the

2    EEOC, beyond those that you put in your interrogatory

3    answers, that you believe supports your claims with

4    respect to Bear, 2004, 2005?

5         A    I think that covers the basis of them.  I'm

6    not -- I'm pretty sure, but if I actually sat down,

7    there may be -- because I have some calendars at

8    home, and when things happen, I either mark and make

9    notation of the incident on my calendar or my time

10   card.  And for a period of 2004, 2005, that's when I

11   did the time card thing where like if something

12   happened, I wrote on the back so and so, so and so,

13   because you can take the back copy home.  The other

14   one stays with the company.  But I tried for the most

15   part to list, you know, those items.

16        Q    So is it your testimony that you have the

17   back parts of time cards at home --

18        A    Yes.

19        Q    -- that might have information on them to

20   support your claim?

21        A    Yeah, there may be some incidents.  I'm not

22   a hundred percent sure.

DEPOSITION OF ALVIA LYNN LACY
CONDUCTED ON FRIDAY, OCTOBER 6, 2006

166

1    Q    In 2004 and 2005?

2    A    Yeah, there may be some.

3    Q    Well, I would ask you to -- that would be

4    responsive to the requests that we made for the

5    production of documents.

6    A    Okay.

7    Q    And I would ask you to look at those --

8    A    Okay.

9    Q    -- and supply copies of those to me.

10   A    Yes, I will.

11   Q    It's not my intent to have you come back

12   and be deposed more about those --

13   A    I understand.

14   Q    -- but in the event that there's things

15   there --

16   A    That need to be --

17   Q    -- that need to be addressed, I might have

18   to ask you to do that.

19   A    Okay.

20   Q    All right.  So within the next week or so

21   if --

22   A    Yes, yes.