01/08/04 THU 10:41 FAX 85807474    ☑001



**Amtrak®**

RECEIVED BY PERSONNEL

# Job Opportunity Application

**(For Use By Current Amtrak Employees Only)**

| | |
|---|---|
| Director CMS | |
| **TITLE OF POSITION DESIRED** | |
| 50124988 | |
| **POSTING NOTICE NUMBER** | |
| Wilmington, DE | |
| **LOCATION** | |

APPLICANTS POSSESSING THE BEST COMBINATION OF CURRENT SKILLS AND PAST JOB PERFORMANCE WILL BE INVITED TO INTERVIEW FOR AVAILABLE POSITIONS. ONLY CANDIDATES WITH AT LEAST ONE YEAR IN THEIR CURRENT POSITION WILL BE CONSIDERED FOR OTHER POSITIONS.

PLEASE PRINT OR TYPE ALL INFORMATION AND SUBMIT THIS FORM TO ARRIVE AT YOUR NEAREST PERSONNEL OFFICE ON OR BEFORE THE POSTING'S EXPIRATION DATE.

## PERSONAL INFORMATION

| NAME | | | SOCIAL SECURITY NO. |
|---|---|---|---|
| Theresa Santoro Berkey | | | 217 82 0504 |
| **STREET ADDRESS** | | | **HOME TELEPHONE NO.** |
| 2522 Perring Woods Road | | | 410 661 6258 |
| **CITY** | **STATE** | **ZIP CODE** | **WORK PHONE NO.** |
| Baltimore | MD | 21234 | 302 683 2120 |
| **WORK LOCATION** | | **ASSIGNED WORK DAYS** | **ASSIGNED WORK HOURS/SHIFT** |
| CNOC Wilmington, DE | | Various | Various |

## EDUCATION

| LEVEL | | DEGREE/MAJOR | SCHOOL NAME | LOCATION (CITY/STATE) |
|---|---|---|---|---|
| HIGH SCHOOL | X YES / NO | Business/Standa | Parkville Senior | Baltimore, MD |
| COLLEGE | YES / NO | | | |
| GRADUATE SCHOOL | YES / NO | | | |
| VOCATIONAL SCHOOL | YES / NO | | | |
| OTHER | YES / NO | | | |

## PRESENT JOB STATUS

| PRESENT JOB TITLE | BAND | LAST PERFORMANCE RATING | DATE OF LAST RATING |
|---|---|---|---|
| Manager CMS | C1 | | |
| **SUPERVISOR'S NAME** | | **SUPERVISOR'S TITLE** | |
| Milton Lundy | | Director CMS | |

MAY A PERSONNEL DEPARTMENT REPRESENTATIVE CONTACT YOUR SUPERVISOR REGARDING YOUR INTEREST IN THIS POSITION?
X YES    NO    SUPERVISOR'S TELEPHONE NO.   302 683 2279

### FOR PERSONNEL USE ONLY (DO NOT MARK)

| ENTERED | FORWARDED |
|---|---|
| DATE: _____ | BY: _____ DATE: _____ |
| BY: _____ | TO: _____ |

NOTE: IT IS THE POLICY OF THE NATIONAL RAILROAD PASSENGER CORPORATION TO OFFER ALL EMPLOYMENT OPPORTUNITIES WITHOUT REGARD TO RACE, COLOR, RELIGION, GENDER, AGE, NATIONAL ORIGIN, DISABILITY, OR VETERAN STATUS.
NRPC 1764 (7/97)

A427



/08/04  THU 10:42 FAX 85807474                                                    ☑002

**NOTE:  ATTACH ADDITIONAL SHEETS IF NECESSARY**

| AMTRAK EMPLOYMENT HISTORY (LIST CURRENT POSITION FIRST) | | | |
|---|---|---|---|
| **DATES FROM - TO** | **POSITION TITLE** | **SUPERVISOR & DEPARTMENT** | **MAJOR DUTIES** |
| | | | |
| | | See Attachment | |
| | | | |
| | | | |

| OTHER EMPLOYMENT HISTORY | | | |
|---|---|---|---|
| **DATES FROM - TO** | **POSITION TITLE** | **COMPANY** | **MAJOR DUTIES** |
| | | | |
| | | | |
| | | | |

### RELATIVES AT AMTRAK

Do you or your spouse have any relatives currently employed by Amtrak?  If yes, you    X YES        NO
must complete the following information about these relatives.

| NAME | RELATIONSHIP | POSITION/DEPARTMENT | LOCATION |
|---|---|---|---|
| Robert Brooks, II | Son | Crew Dispatch T&E | CNOC Wilm. DE |
| | | | |
| | | | |

### APPLICANT'S QUALIFICATIONS

Please explain how you fulfill the posted skills and experience requirements for this position?  (Ten lines of space available)
See Attachment

### SIGNATURE

PLEASE READ THIS CAREFULLY:  I certify that all information on this Job Opportunity Application is true.  I understand and agree that if employed in a nonagreement position my employment and compensation can be terminated with or without cause, and/or without notice, at any time, at the option of either the company or myself.  I have voluntarily submitted this form and consent to its processing according to Personnel Department procedures.

| | |
|---|---|
| _(signature)_ | 1/8/04 |
| **Applicant's Signature** | **Date** |

## *EMPLOYMENT HISTORY WITHIN AMTRAK*

CLERK STENOGRAPHER: 6/78 to 1/79 – Commissary/OBS – Hearing and Trial Transcripts. Payroll, budget & ordering of commissary supplies.

CLERK STENOGRAPHER: 1/79 to 8/79 – Transportation – Hearing and Trial Transcripts. Disciplinary Action & Scheduling.

CLERK STENOGRAPHER: 8/79 to 2/80 – Engineering MofW – Injury and Incident Reports, Ordering equipment parts for NEC. Payroll.

TICKET AGENT: 2/80 to 8/80 – Station Services – Selling of tickets, reports and scheduling.

SECRETARY: 8/80 to 7/81 – Safety Department – Meetings, agendas, safety reports, budgets.

SECRETARY: 7/81 to 8/82 – Accounting – Word processor, budgets, bills, unemployment, payroll, ledgers, graphs.

CLERK STENOGRAPHER: 8/82 to 5/91 – Heavy secretarial work, computer, transcripts, schedules, meetings, agendas, charts, blueprints, accounting ledgers, conference set-ups, negotiations, bidding of job transcripts, monthly reports, safety reports.

CLERK STENOGRAPHER: 5/91 to 2/93 – Trials, monitoring of payroll operations, budget reports, track usage and various force account and FELA reports. Monitoring of all personnel files and scheduling employees classes.

SECRETARY: 2/93 to 6/93 – CMC – Type internal & external correspondence from oral, written or dictated notes. Proofs same for syntax, spelling, punctuation, clarity and intent. Responsible for setting up and maintaining of general filing system. Confidentiality of all files and correspondence. Order office supplies, furnishings, and forms ensuring adequate supplies of each are maintained and secure. Develop database and spreadsheets for file and record storage and manipulation.

SUPERVISOR CMC: 6/93 to 7/99 – CMC Manage day to day operations of the Passenger Services CMC in a professional, efficient and cost effective manner and coordinate the activities and responsibilities of the center with those of the various crew base locations. Ensure that assignments are consistently made in accordance with the governing union agreements. Maintain staffing levels at the center and crew base locations. Provide instruction and support to passenger services personnel during emergency situations, while staffing trains for the entire country.

MANAGER CMS: 7/99 to present – CMC Manage 2 PLS and 22 Crew Management Representatives daily OBS staffing operation. Discipline, train, assist problem areas daily along with maintaining of schedules, entitlements, leaves, etc.

character and performance.

1/08/04   THU 10:43 FAX 85807474                                                                  001

### *Theresa S. Berkey*

I have enjoyed my employment with Amtrak for the past 25 years. My experience includes working with various departments such as Safety, Transportation, Station Services, Bridge & Building and Crew Management.

Over the past several years I have inquired in-depth knowledge of several union agreements, i.e. TCU, ARASA, ASWC, UTU-corridor, UTU-off corridor & BLE. I've worked closely with the Labor Relations department in the interpreting of contracts for time claims on the OBS side and fact sheets on the T&E side. I am hands on in creating and budgeting couplet turns and holiday schedules for time change twice a year. As the Administrator for our in-house OBS group, my responsibilities include training, monitoring, scheduling and the maintaining of discipline for 24 direct reports.

Over the past several years my knowledge has expanded from just the OBS department to the T&E Crew Dispatch, Verification & Assignment departments when reassigned as Manager for NEC over all departments.

I am involved with the day to day operation and decision making for manpower reports, costing, hiring, furloughing, bulletining, awarding, abolishing and disciplining of OBS employees for 16 crew base locations. I generate information through the DB2 Query Management Facility to distribute to field locations for the monitoring of their progress in regards to budgeted dollars used in monthly guarantees, overtime, special assignments, training classes, etc.

My personality is strong. I feel I make a difference at CNOC. I am able to make decisions while at the same time openly listen to new ideas and suggestions. I am a quick-learner, organized, consistent and fair and self-motivated Manager. One of my goals is to always remain a step ahead of the processes and to continue to be proactive. I have implemented several incentives for my group to come to work. The mark off percentage in my department is 1.5%. I do believe that communication is the key to success.

We use the LMS computer system in our department. I work with the testing group in Washington daily for system enhancements and changes to better our efficiency and production. My computer qualifications, verbal and written communication skills and attendance records are all excellent. My evaluations have all been above average.

Feel free to contact any past or present staff members as a reference to my character and performance.

NATIONAL RAILROAD PASSENGER CORPORATION

30th Street Station, Philadelphia, PA 19104

February 25, 2004



MS ALVIA L LACY
1306 JERVIS SQUARE
BELCAMP MD   21017

RE: Your application for the Dir position
    Vacancy No. 50124988

Dear Ms Lacy:

Thank you for submitting your application for the position of
Dir.

Another candidate, whose background and experience more closely
meet the needs of the department, has been selected.

We appreciate your interest in furthering your career with
Amtrak and encourage you to apply for future vacancies.

Sincerely,

Patricia Kerins

Patricia M. Kerins
Human Resources Department

# Job Opportunity Application

**For use by Current Amtrak Employees Only**
Applicants possessing the best combination of current skills and past job performance will be invited to interview for available positions. Only candidates with at least one year in their current position will be considered for other positions.

Received by Human Resources
RECEIVED
Amtrak
JAN 2 6 2004

Title of Position Desired: Director Crew Mgnt - Services
Posting Notice Number: 50124988
Location: Wilmington, DE

Please complete all information and submit this form to arrive at your nearest Human Resources Office on or before the posting's expiration date. This form does not allow you to spell check your data. For extensive text, you may want to compose your text in another document and cut and paste it into this form. Attach additional sheets if not enough room is provided for your data.

## PERSONAL INFORMATION

| | |
|---|---|
| Name: **ALVIA L. LACY** | Social Sec. No.: 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 |
| Street Address: **1306 JERVIS SQ,** | Home Tel. No.: 410-272-4819 |
| | Work Tel. No.: 302 834-2769 |
| City: **BELCAMP**   State: **MD**   Zip:**21017** | Assigned Work Hours: 6-2 |
| Work Location: **BEAR, DE** | Assigned Work Days: **MON-FRI** |

## EDUCATION

| Level | Did You Graduate? | Dates From/To | Degree/Major | School Name | Location/City/State |
|---|---|---|---|---|---|
| High School | ☒ Yes  ☐ No | From : 9/3/70  To: 6/7/74 | HIGH SCHOOL DIP. | ABERDEEN SR. HIGH | ABERDEEN, MD 21001 |
| College | ☒ Yes  ☐ No | From : 6/ /83  To: 12/ /86 | BS BUSINESS ADMINISTRATION | UNIVERSITY OF MARYLAND | COLLEGE PARK, MD |
| Graduate School | ☐ Yes  ☐ No | From : / /  To: / / | | | |
| Vocational School | ☒ Yes  ☐ No | From : 1/ /76  To: 8/ /76 | | AIRCO TEC INST. | BALTIMORE, MD |
| Other | ☐ Yes  ☐ No | From : / /  To: / / | | | |

## PRESENT JOB STATUS

| | | |
|---|---|---|
| Present Job Title: **CARREPAIR-PERSON** | Band/Zone **BEAR, DE** | Last Performance Rating: N/A   Date of Last Rating: / / |
| Supervisor's Name: **MR J. WALTERS** | Supervisor's Title: **MANAGER** | |

May a Human Resources Department representative contact your supervisor regarding your interest in this position?
☐ Yes ☒ No    Supervisor's Telephone No.:

## HUMAN RESOURCES USE ONLY – DO NOT ENTER DATA IN THIS SECTION

| Entered | | Forwarded | |
|---|---|---|---|
| Date: | By: JHB | Date: 1/21/04 |
| By: | To: Philadelphia | |

Note: It is the policy of the National Railroad Passenger Corporation to offer all employment opportunities without regard to race, color, religion, gender, age, national origin, disability, or veteran status.

NRPC 1764 (10/01) MSWord Template

90621056



**AMTRAK EMPLOYMENT HISTORY (List Current Position First)**

| Dates From/To | Position Title | Supervisor and Department | Major Duties |
|---|---|---|---|
| From: 8/ /83  To: 1/ /88 | TRACK -PERSON | TRACK | MAINTAIN AND REPAI R TRACK LOCATIONS WITHIN THE NEC. |
| From: 1/ /88  To: / /. | CARREPAIR-PERSON | MECHANICAL | REPAIR, AND MAINTAIN AMF I & II, IN ADDITION TO AIR BRAKE DUTIES. |
| From: / /  To: / / | | | |
| From: / /  To: / / | | | |

**OTHER EMPLOYMENT HISTORY**

| Dates From/To | Position Title | Company | Major Duties |
|---|---|---|---|
| From: 7/ /97  To: / /99 | CSR | MCC | COMPLETE DUTIES IN SALES, BANK DEPOSITS, CLOSINGS, AND TRANSACTIONS, AS RELATED TO CENTER. |
| From: / /  To: / / | | | |
| From: / /  To: / / | | | |

**RELATIVES AT AMTRAK**

Do you or your spouse have any relatives currently employed at Amtrak? ☐ Yes ☒ No
If yes, you must complete the following information about these relatives.

| Name | Relationship | Position/Department | Location |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |

**APPLICANT'S QUALIFICATIONS** This form does not allow you to spell check your data. For extensive text, you may want to compose your text in another document and cut and paste it into this form. The field below will expand to allow 5,500 characters. Attach additional sheets if necessary.

Please explain how you fulfill the posted skills and experience requirements for this position.
I FULFILL THE POSTED SKILLS AND EXPERIENCE REQUIRED FOR THIS POSITION, BASED ON MY BACHELORS DEGREE IN BUSINESS ADMINISTRATION, AND MY EXPERIENCE, AND TECHNICIAL BACKGROUND IN THE FIELD OF MECHANICAL OPERATIONS, MAINTENANCE PROCEDURES, FRA, AND SAFETY REGULATUION.

**SIGNATURE**

**PLEASE READ THIS CAREFULLY**

I certify that all information on this Job Opportunity Application is true. I understand and agree that if employed in a nonagreement position my employment and compensation can be terminated with or without cause, and/or without notice, at any time, at the option of either the company or myself. I have voluntarily submitted this form and consent to its processing according to Human Resources Department procedures. I further understand that it may be used to update permanent employee information in the Human Resources Information System.

_Alvia R. Lacy_          A433          1/1/03

05/11/00    09:47   ☎               MILES STOCKBRIDG              @002
'05/11/00   09:34   MML&R → 410 385 3700

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALVIA L. LACY                    :    CIVIL ACTION

                                 :         FILED  MAY - 8 2000

          v.                     :

NATIONAL RAILROAD PASSENGER CORP: NO. 99-3529

### O R D E R

AND NOW, this 8th day of May, 2000, upon consideration of defendant's supplemental Motion to Dismiss (Doc. #5) filed after entry of an intervening consent decree and in the absence of any response by plaintiff thereto, as such motion is unopposed, see L. R. Civ. P. 7.1(c), and as it is uncontested that plaintiff is a member of the class certified in McLaurin v. National R.R. Passenger Corp., Civ. No. 98-2019 (D.D.C.) in which a consent decree was entered expressly precluding, in Sections III.A.17 and III.F, further pursuit of the type of claims asserted by plaintiff herein; as is it uncontested that plaintiff did not opt out of that class action and indeed is presently seeking relief, including appointment to the very foreman training position at issue in this case, pursuant to the terms of the McLaurin decree; as the Court in McLaurin found that the class members were adequately and fairly represented during the course of the negotiations which were conducted "in good faith at arms length by competent and experienced counsel for the Parties and with the assistance of a skilled mediator"; and, as plaintiff

                                        ENTERED

                                        MAY - 9 2000

                                    CLERK OF COURT

A434

05/11/00    09:34    MTM&R → 410 305 3700    MILES STOCKBRIDG    003

is bound by the terms of the McLaurin decree, see Grimes v. Vitalink Communications Co., 17 F.3d 1553, 1558 (3d Cir.), cert. denied, 513 U.S. 986 (1994) ("all ordinary class members are bound by the deal struck by their named representatives in the event the court determines that they were adequately and fairly represented during the course of the negotiations"). IT IS HEREBY ORDERED that said Motion is GRANTED and the above action is DISMISSED.

BY THE COURT:

JAY C. WALDMAN, J.

2

# SPRENGER & LANG

A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW

WRITER'S ADDRESS:

1614 TWENTIETH STREET, N.W.
WASHINGTON, D.C. 20009-1001
(202) 265-8010
FAX (202) 332-6652

**MICHAEL D. LIEDER**
WASHINGTON, DC OFFICE
E-Mail: mlieder@sprengerlang.com
Website: www.Sprengerlang.com

325 RIDGEWOOD AVENUE
MINNEAPOLIS, MINNESOTA 55403
(612) 871-8910
FAX (612) 871-9270

April 26, 2004

Ms. Alvia L. Lacy
1306 Jervis Square
Beicamp, MD 21017

RE:    *McLaurin et al. v. National Railroad Passenger Corp.*

Dear Ms. Lacy:

At your request, I am writing this letter to memorialize the telephone conversation that we had last week. So that everyone will be fully informed, I also am copying Warren Kaplan and Mara Thompson on the letter.

As I informed you, the period covered by the *McLaurin* Consent Decree expired December 31, 2003. We have no more authority to seek job relief. The process for distributing money from the Amtrak Management Settlement Fund is concluded. I regret that we were not able to provide you with any relief during the period of the Decree, but we lack the authority to do so now.

Although I discussed the situation with you last week, I would like to explain more fully the facts, as I understand them.

The class in *McLaurin* consisted of African-American management employees and African Americans who were denied promotion or hiring into management ranks. For persons such as yourself who were employed in unionized positions, the class claims covered your denied or deterred attempts to gain promotion to a management position, but not claims of discriminatory denial of pay, promotions or hostile environment within your bargaining unit job.

The Court granted final approval to the Consent Decree on October 25, 1999. The Consent Decree established two types of relief for class members: monetary and job relief. Subsequently, the Court approved a claims distribution formula under which points were awarded for several different types of claims based on a variety of factors. One of the types of claims for which points were awarded was for discriminatory denials of promotion to management ranks. The formula also provided that anyone who elected to seek job relief would

Ms. Alvia Lacy
April 27, 2004
Page 2 of 4

receive no points for the type of claim for which job relief was sought and a 25% reduction in all other points awarded under the claim form.

You submitted a claim form for a monetary award. Based on the information on your form and any other information available to us, you were awarded the maximum number of points for a denial of promotion to management claim, 300 points. Because you were never a management employee, you did not receive any points for pay discrimination or hostile environment claims. You also submitted a job relief form.

Originally, about 70 persons submitted both monetary and job relief forms. Maia Caplan, an experienced attorney who had worked on the case for a year at the time of the final approval of the settlement, was responsible for communicating with each of the persons seeking job relief to inform them of the financial implications under the approved claims distribution formula. When she explained the financial implications of seeking job relief in addition to monetary relief, all but four persons decided not to seek job relief. You were one of the four.

I did not participate in any of the conversations between Ms. Caplan and claimants, but I did talk with her from time to time about what to say to claimants. Based on those conversations and the facts that she helped to devise the proposed distribution formula and drafted the legal papers explaining the proposed formula to the judge, I am confident that Ms. Caplan knew that the formula provided that anyone who selected job relief would lose all points associated with the claim for which job relief was sought and 25% of other points.

You had several conversations with Ms. Caplan about whether to select job relief. On December 10, 1999, she wrote to you confirming that you had withdrawn your job relief election form. Five days later, she wrote confirming that you had reconsidered your decision to withdraw your job relief election and decided that you would pursue job relief "as we have discussed in our telephone conferences."

Apparently confusion arose at some time during the conversations between Ms. Caplan and you. You have told Mr. Kaplan and me that you came away from the conversations with Ms. Caplan with the understanding that you would lose 50%, or 150, of your points. I have no reason to doubt the accuracy of your memory on this point. That belief, however, is at odds with the formula.

Shortly after December 15, 1999, we proposed a list of awards from the settlement fund to the Court. Your name was not on the list, because you had elected to proceed with job relief. That eliminated all the points associated with your claim for discriminatory denial of promotion to a management position, and you had no other claims covered by the *McLaurin* action.

The Court approved the list as we submitted it. We notified all persons on the approved list of their awards, and distributed their awards to them after they submitted releases as required under the Consent Decree. You, obviously, never received a notice because you were not on the list approved by the Court.

**A437**

Ms. Alvia Lacy
April 27, 2004
Page 3 of 4

      Ms. Caplan left Sprenger & Lang on June 30, 2000. Before she left, she had discussed job relief several times with you and contacted Amtrak's lawyers on your behalf. For a brief period after Ms. Caplan's departure I worked on your file, and then in September 2000 transferred it to Mara Thompson. Mara Thompson has developed an expertise within our firm at administration and monitoring work under consent decrees, including efforts to obtain job relief for class members. Our records show that Ms. Caplan, Ms. Thompson, our legal assistant Deborah Toms, and I all had conversations with you about job relief during 2000 and 2001. Ms. Caplan, Ms. Thompson and I all had conversations and/or exchange of correspondence with Amtrak lawyers Kathy Ford and William Herrmann about job relief for you.

      Our efforts were, obviously, unsuccessful. After several unfruitful conversations with Amtrak's lawyers, Ms. Thompson (at Amtrak's suggestion) suggested that you identify for us only a few positions at a time in which you were interested, so that both sides could focus our negotiations in an attempt to find a management position for you. When you did so, Amtrak complained to us that you were identifying positions for which either you did not meet the minimum qualifications or for which, even if you did meet the minimum qualifications, there were other candidates with far superior qualifications. In essence, you were not applying for beginning management positions. Amtrak was unwilling to hire you for an intermediate management position when it had candidates for the same positions with similar educational background and greater management experience. Ms. Thompson's notes indicate that she communicated Amtrak's position to you.

      You informed me during our telephone conversation last week that you were not interested in lower level management positions if they paid less than you were making in the unionized position. That makes good economic sense from your point of view. However, the positions that you identified gave us little bargaining leverage with Amtrak. The other three candidates for job relief identified positions for which they had qualifications roughly comparable to those of other applicants. We were able to secure job relief for each of them. To the best of my knowledge, each of them was happy with the job relief process.

      Sometime in spring 2001, you may have become frustrated. Our records reflect that you stopped sending lists of jobs in which you were interested to Ms. Thompson or Ms. Toms. Without your identification of jobs in which you were interested, Ms. Thompson had no basis for negotiating with Amtrak's lawyers. The job relief process ground to a halt. Even if it had continued, however, I doubt that we would have been able to find a job for you as long as you were willing to consider only management positions that paid as much or more than you were making in your bargaining unit position.

      You also informed me last week that you are going to seek a lawyer to represent you in your ongoing claims of discrimination with Amtrak. Although the statute of limitations may prevent you from pursuing claims arising from all the incidents of discrimination that you have suffered at Amtrak, the settlement of the *McLaurin* suit does not bar any claims that you may have of a hostile working environment in your current job or of any pay or promotion claims in

**A438**

Ms. Alvia Lacy
April 27, 2004
Page 4 of 4

your bargaining unit position. The *McLaurin* settlement also does not bar any claims arising out of discrimination in your efforts to seek a management position after 1999.

It is important to understand what the suit may bar because, based on the papers that you sent to Mr. Kaplan, shortly after entry of the Consent Decree Amtrak obtained the dismissal of a lawsuit that you filed arising out of your efforts to obtain a foreman position based supposedly on the effects of the *McLaurin* settlement. That was improper. The claims in the *McLaurin* case did not encompass any claims that you may have arising from Amtrak's refusal to award you foreman positions, since foreman positions are bargaining unit jobs.

You should talk with Mr. Kaplan about your intentions. Any claims that you may have arising out of the hostile working environment in Bear and concerning the denial of promotions may be encompassed within the scope of a class action lawsuit that Mr. Kaplan and others are handling called *Campbell v. National Railroad Passenger Corp.*

I wish you well in your efforts to obtain justice from Amtrak, and am sorry that our lawsuit did not work out better for you.

Sincerely,

Michael D. Lieder

Cc:    Warren Kaplan, Esq.
       Mara Thompson, Esq.

58753

**A439**

POSITIONS I HAVE APPLIED FOR WITH AMTRAK, IN THE PAST
YEAR.  (10/03 - 10/04)

| 11/03 | AMTRAK-PENN PHIL INVENTORY SVC. | #50172566 |
| 11/03 | AMTRAK-PENN-PHIL INVENTORY SVC. | #50172570 |
| 11/03 | AMTRAK-PENN-PHIL CONTRACTING AGT. | #50172580 |
| 11/03 | AMTRAK-PENN-PHIL SR. CONTRACTING AGT. | #50172572 |
| 11/03 | AMTRAK-PENN-PHIL SR. CONTRACTING M/W | #50172576 |
| 11/03 | AMTRAK-PENN-PHIL  REG. FLEET OFFICER | #50172496 |
| 11/03 | AMTRAK-PENN-PHIL  MANAGER AUTO | #50172497 |
| 11/03 | AMTRAK-DEL-BEAR REG. FLEET | #50153439 |
| 11/03 | AMTRAK-WAS-SR PRIN CONTRACT E/C | #50167654 |
| 11/03 | AMTRAK-DEL-WILM OFFICER TRANSPORTATION | #50173640 |
| 1/04 | AMTRAK-WILM- CREW MGMT. | #50124988 |
| 1/04 | AMTRAK-WASH-SUPERVISOR HSR. | #50175062 |
| 2/04 | AMTRAK-DEL-WILM- CREW MGMT. | #50171836 |
| 3/04 | AMTRAK-PENN-PHIL INVENTORY SVCS | #50172570 |
| 3/04 | AMTRAK-DEL-_SR MGR MATERIAL | #50175903 |
| 3/04 | AMTRAK-PENN- PROJECT ENG. | #50156915 |
| 3/04 | AMTRAK-WASH-HUMAN RES OFFICER | #50121016 |
| 3/04 | AMTRAK-WASH- GOVT. AF/SPEC. | #5007109 |
| 3/04 | AMTRAK-MD-BALT. ASST. ENG. TRACK | #50146685 |
| 7/04 | AMTRAK-WASH- MANAGER E/D | #50180873 |
| 6/04 | AMTRAK-WASH- OPERATION SUPER. | #50130938 |
| 9/04 | AMTRAK-WASH- MANAGER C/B | #50125481 |
| 9/04 | AMTRAK-WASH- OPERATION SUPER. | #50157903 |
| 9/04 | AMTRAK-PENN-PHIL- DOCUMENT CONTROL | #50182531 |
| 9/04 | AMTRAK-PENN-PHIL- ENG ROAD MAINT. | #50146328 |
| 9/04 | AMTRAK-PENN-PHIL FIELD ENV. SPEC. | #50146672 |
| 12/03 | AMTRAK-WASH-QUALITY ASSURANCE INS. | #50166678 |
| 10/04 | AMTRAK-PENN-PHIL ADMIN SUPPORT SEP. | #50183697 |
| 10/04 | AMTRAK-DEL-WILM- OPER PRACTES | #50183713 |
| 10/04 | AMTRAK-WASH- ADMIN INVENTORY H/S | #50183771 |

**4.    Allegation:**    I have been falsely issued letters of discipline regarding my attendance.

**Response:**    Complainant has one counseling letter (not a letter of discipline) in her file between March 2003 and March 2004 and that letter is dated March 21, 2003.  During the relevant time period a number of Caucasians were also given counseling letters for attendance.  *See exhibit #3* As is plainly illustrated by exhibit number 3 no one is immune from absenteeism counseling letter.  Race and sex do not play a part.  For example, Exhibit number 3 lists all Caucasians who received a counseling letter, dispelling the allegation of race discrimination.  Exhibit number 3 also consists of men and women, which dispels the allegation of discrimination because of her sex.  (There are other minorities who have had counseling letters; exhibit number 3 is to show that other ethic groups also receive counseling letters)

**COMPLAINANT RESPONSE:**    When I first registered my complaint in reference to the falsely issued letters of discipline regarding my attendance, I never ever said the issue was of race or sex.  This is another incident where Amtrak has twisted the truth.  My complaint from the beginning has been "Selected Employees" are allowed exception of punching in their time card.  Therefore, those employees will never receive any letters of discipline, because they are not required to punch in.  In addition, I have stated according to policy any employee who is a hourly wage employee, should be punching in, and this is not the case at the Bear, DE  facility. Allowing an employee the opportunity to be excluded is unfair, and fraudulent.

I request the EEOC, review the time cards of employees at the Bear, DE facility during the time period of 2003, - 2004. In addition, I have included one of the many letters from my union  Vice President J. B. Carlton, in reference to unwarranted letters.  See exhibit # 4

For the record, any letters of counseling, and letters of discipline, serve as negative reviews when they are in an employees file.

A441

Name: __ALVIA LYNN LACY_____    Date: __10/20/04_____

# HARASSMENT (SEXUAL, RACIAL, ETC.) QUESTIONNAIRE

Provide specific examples of all alleged verbal and or physical harassment. Be as exact as you can be in describing each act of harassment (e.g., the exact words that were said and/or the exact nature of any physical harassment). If more space is needed for any response, please use additional pages.

1.    For each act of alleged harassment, indicate the following:

   a)    Detailed description of the harassment, including dates:

The following incidents have occurred to me in the past year.

I was issued a letter in reference to my attendance, I stated on one letter I had a Doctor's note, and the date should be an excused absents. I was told there was no excused absents to be issued. I asked the supervisor how can this be when there is a list of timekeeping codes, for such occurrences. I have been issued  3  letters in the past year with the same status, each time I challenge the letters, nothing changes.  My main concern is when Human Resources inquires in reference to my work record this incorrect information will be issued. (Cont. on page 5 # 3)

   b)    Name and title of person(s) doing the harassment and the working relationship of each person to you (e.g., immediate supervisor, co-worker):

Supervisors at the Bear, DE facility.

Review enclosed information.

9:02                                    A442

## HARASSMENT QUESTIONNAIRE (p. 2)

2.  If you were subjected to unwanted harassment, was your employment status in any way threatened if you did not go along with the harassment? For example, did the harasser tell you that you would be discharged, would receive a lower evaluation, would not receive a pay raise or promotion? If your answer is yes, provide specifics about what was told to you.

On one occasion I requested Mr. Gill to assign a pipe-fitter to

work with me. I waited one hour, and no one was assigned. I

approached MR. Gill a second time, asking has he assigned

someone. ? His reply was "shit what you want me to do

your job, and you go home?" He then added I should have you

fired. This took place in July 2004.

3.  Did you inform the person doing the harassment that you objected to what was said or being done? If yes, what did you say? What was the response, if any?

On countless occasions I have objected to what was said or

being done, and the response is always the same, "if you dont

like it quit."

4.  Does the employer have a (sexual) harassment policy that you are aware of? Is there a provision for reporting sexual or other harassment? If so, did you use that procedure? If you have a copy of this policy please attach it to this document.

Yes The company has a policy. however I do not know what or

how it is stated.

## HARASSMENT QUESTIONNAIRE (p. 3)

5.   Did you report the harassment to any employer official or representative? (X)yes ( )no
     If yes, indicate the following:

   a)   Name of person _Mr. Walters,   and Mr. McDowell   and on_
        _occasions Mr. Gill, and My Union Rep. Mr. Carlton._

   b)   Job title _Mr. Walters, and Mr. McDowell are managers_
        _in addition Mr. Gill is a manager._

   c)   Which act or acts of harassment did you report?

        _The incidents of the note left on my work station, a_

        _and the note left on my locker. I also reported the_

        _incident of the co-worker telling me to F.O.A.D,._

        _(Review listed information)_

   d)   When did you report this harassment?

        _The harassment was reported when it occurred._

   e)   Did you report this harassment orally or in writing?

        _In each case  it was reported orally, and on one_

        _incident I called to report my concerns.  (Review listed_

        _information._

   f)   If in writing, do you have a copy of the complaint? If so, please attach.

        _N/A_

   g)   What happened as a result of your complaint?  If you received a written
        response, please attach a copy.

        _Review submitted information_

## HARASSMENT QUESTIONNAIRE (p. 4)

6.    Other than as described in #4 above, did you tell any co-workers about any act or acts of harassment? If yes, provide the following information:

    a)    Name/address/phone number of co-worker(s).

        LaDoris Wiggs  (302) 425-4457

    b)    Indicate which act or acts of harassment you mentioned and the date you mentioned the acts.

        LaDoris Wiggs knows aboutn  all the acts of harassment.

    c)    When did you tell the person or persons?

        I would not say anything for fear of retaliation,

        from the person, as you know there was an employee

        in the Willmington facility who went on a shooting

        spree, a few years ago.

7.    To the best of your knowledge, have any other current or former employees been subjected to similar harassment? If yes, provide the following for each such employee, adding extra pages if needed?

    a)    Name    N/A

    b)    Job title

    c)    Address/phone number

## HARASSMENT QUESTIONNAIRE (p. 5)

d)    Description of harassment received

Review listed information.

_____

_____

_____

_____

_____

_____

e)    Name and job title of each person doing the harassment

Review Information

_____

_____

_____

_____

f)    Approximate date(s) of harassment

On going and current

_____

g)    How are you aware that this other harassment occurred?

The only way is when you are questioned, or if you

are there when it takes place.

_____

_____

_____

## HARASSMENT QUESTIONNAIRE (p. 6)

7. If you were not directly harassed but were affected by the offensive conduct of a harasser toward another person, provide the name, postion or other identification of the person harassed and the harasser.

Review submitted information

_____

_____

_____

_____

8.    Were there any other witnesses to harassment? If so, provide the name and job title of each such witness, along with his/her telephone number and address if you know them, and indicate which incident(s) the individual witnessed.

Review submitted information

_____

_____

_____

_____

_____

_____

_____

I declare under penalty of perjury that I have read the above statements and that they are true and correct.

                                          10/20/04
_____        _____
**Signature**                    **Date**

9/02                            **A447**

ALVIA LACY

## HARASSMENT AND  HOSTILE WORK ENVIRONMENT

I will start by listing incidents and occurrences which have taken place at the Bear, DE facility.  The second section will contain incidents and occurrences that took place within the past year.  I am trying my best to convey the **biatent** atmosphere of harassment and hostile work environment  I have been exposed to for the past 16 years.

1) Foreman screamed at me and stated he could have me fired, this was in 1989.  The foreman Mr. Carlton latter resigned from the position of foreman, and told me he was instructed by the management staff to harass me and overload my work duties.

2)  A manager completed the employee evaluation form, which was full of false statements, and remained in my file for a undetermined time. I did interview for this position prior to the evaluation being sent to Bear, DE.  The inter-viewer stated I was the most qualified applicant and the selection for the position would be me.  He went on to state, once he received the evaluation form I would hear from him. time passed I heard nothing.  When I called his office he stated  Because of the evaluation sheet I was not selected. I latter requested to review my employee file.  Upon reviewing my file I was shocked, the evaluation was full of false statements. The forms were not signed and to this date I still don't know who completed the forms.  One statement in the evaluation addressed my attendance record, listed were the dates  and time period when I had injured my back. ( The evaluation form is enclosed)

ALVIA  LACY

Time passed, and talk was going around the shop of a visit
from Mr. Tom Downs CEO of Amtrak.  I decided to present a
letter to him addressing some of my concerns.  (The letter is
enclosed for review) The day of his visit I gave the letter to
Mr. Downs for his review.  I latter received a **reply** ... to **my**
letter from Mr. Warington, I tried on several occasions to
reach Mr. McGowan, and Ms. Davidson and I was never successful.
(The letter is enclosed)  A few weeks latter Mr. Nesci,
requested me at the main office.  When I arrived He requested
I sit down and review my employee record.  I began to
review my file, and I noticed the papers were all typed and
very neat, in addition the employee evaluation form was not
in the file.  Mr. Nesci asked me "where is the form you
refered to" ?  I stated  "it is not in this file."  He then
said What did it look like, and what did it say ?" It was
clear the form had been removed,  Mr. Nesci did not know
my union representative Mr. Minista made a copy of the form
when I reviewed my file the first time.

3)  While working under the supervision of Mr. Sheridan, He
stated the management staff advised him to harass me, and
overload my work assignments.  (the letter from Mr. Sheridan
is enclosed)

4) Manager Mr. Miller and John Moore were inside a car at
the Bear, DE facility.  Employee Bill Benson, heard the
statement " we have got to get these niggers to do so work".

Mr. Miller did not know Mr. benson who is Black was listing to the statement.  A few days latter Mr. Benson came to me, and told me what occurred, and asked what he should do ?  I I said report the incident. Mr. Benson reported the incident and I was questioned during the investigation.  No one was found quility  and as matter of fact both Mr. Miller and Mr. Moore were promoted.

5)  One morning while moving cars in the shop.  I went inside the car to clear the car for movement.  While on the car a co-worker began telling me about a set of bad wheels on a car on 28 track.  While talking to him Bill Benson who is white, came to the car and screamed "get off your fat ass right now and get down here".  I was upset, and told him once I completed the moves for the day I was going to report him.  I did report the incident to my union rep, and Mr. Nesci.  Nothing happened, not even an appology.

6)  While working on the upgrade cars Foreman Pat Gallo who is white came on the car and shouted at me"hurry up and get this shit done on this car".

7)  While assigned to the wreck line I was harassed on a daily basis, I was forced to attend welding classes, while white co-workers were allowed to skip the class, I was told I had to attend.

8)  All my co-workers know I have a Bachelor of Science

A450

3

ALVIA LACY

Degree in Business, and I am often teased about not

being promoted.  One afternoon a cartoon was taped to my

locker.  (The cartoon is enclosed for review)

9)  One afternoon while lining up to punch-out at the time

clock.  My co-worker Ms. LaDoris (who is black) walked up

and stood in front of me in line.  A co-worker Mr. Zigcraft

who is white stated "where I come from we          niggers

for stuff like that".  Everyone was shocked.  The incident

was reported.

10)  While training in the foreman program, I was harassed o

by Mr. John Moore, on a regular basis.  He stated I had to

arrive at my work location 20 minutes early. This was not

required by the other foreman.

11) A few years ago a co-worker Conie  McDowell complained

about employees leaving the job early.  a few days latter

she found her lunch-box, full of human waste.  The

company did nothing about the incident.

12) My co-worker Ladoris had a incident where the foreman

Mr. Washburn called her  a "Jackass". LaDoris also had a

co-worker call her a "bitch".  The incident was reported.

13)  One day while working on 29 track, Pam Dye and

I were talking.  We were standing outside the car. Someone

banged on the window, inside the car when we turned to look

a co-worker had pulled his pants down and pressed his

behind against the window.  The employee has since been

promoted.

4

ALVIA LYNN LACY

I have listed only a few incidents which have occurred at
the Bear, DE facility.  In each case one fact remains true
no one was held accountable for their inapproate actions.

I will now list a few incidents which have occurred to me
in the past year

1)  While on 24 track, a co-worker Mr. F. Koppel    became,
angry of an employee who gave me a item from his
refrigerator.  I offered to pay for the item, and gave a
dollar bill to Mr. Koppel, he took  the dollar and set it
on fire.  Stating  " heres how I feel about your dollar
Alvia".  A few minutes latter he screamed to me " Alvia
do you know what F.O.A.D. means?" I said no.  He screamed to
me it "stands for Fuck Off And Die."  He then walked away.
I was scared to death. I went to Mr. Joe Walters and told
him about the incident.  My union representative was also
present and witnessed the incident, and Mike Farmer also
witnessed the incident.  To this date I try to avoid this
employee.  (the employee is a white male)

2)  A co-worker told Mr. Gill He couldn't work with me,
and I was a problem for him.  The co-worker is white.

3)    cont. from number 1. section a). I expressed to Mr.
Gill the policy was not being inforced fairly, based on the fact
some    hourly employees are not required to punch in and
others must.  I told him I was going to report the policy

5
A452

ALVIA LACY

to the employee relations department.  After I made several

telephone calls I reached Ms. Everson Intake Coordinator,

with Amtrak.  I explained the situation to her.  She asked

if the police was being forced on race,sex, ect. ? (See

enclosed letter) I told her I didn't think so.  She went on

to ask me to name some employees who were not clocking in.

I stated Mike Skinner, and Carrie Bradford.  I informed her

they were white males, and union members.  She stated her

department could not address the issue unless it was

discrimination towards the protected race.  I then requested

her to just forward me a letter stating I contacted her

office and she could not address my concerns,  a few days latter

I received the letter from her. The following week I went

to lunch break, when I returned the rat note was on my work

station.  I reported the incident to both Mr. McDowell and

Mr. Joe Walters.  In addition, I was told by a co-worker

that employees in the main were angry about being required

to punch in their timecards.  (the rat note is enclosed for review.)

# WARNING
## There is a fat letter writing RAT watching you, punch your time card



A454

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Drill      v.      Bethlehem-Center      School
Dist.W.D.Pa.,2006.Only the Westlaw citation is
currently available.
   United States District Court,W.D. Pennsylvania.
   Karen DRILL, Joseph X. Matesich, Plaintiffs,
                            v.
BETHLEHEM-CENTER SCHOOL DISTRICT, a
   political subdivision of the Commonwealth of
Pennsylvania; Herman B. Jackson, individually and
    as Superintendent of Schools, Bethlehem-Center
         School District, Defendants.
            **Civil Action No. 03-692.**

                  April 28, 2006.

Louis C. Long, Pietragallo, Bosick & Gordon, LLC,
Witold J. Walczak, ACLF of PA, Pittsburgh, PA,
for Plaintiffs.
Anthony G. Sanchez, Todd P. Prugar, Andrews &
Price, Pittsburgh, PA, for Defendants.

                  *OPINION*
HAY, Magistrate Judge.
*1 Presently before this Court for disposition is a
motion for summary judgment brought by
defendants Bethlehem-Center School District ("
Bethlehem") and Herman B. Jackson ("Jackson"),
Bethlehem's Superintendent.[FN1]

> FN1. In accordance with the provisions of
> 28 U.S.C. § 636(c) and Federal Rule of
> Civil Procedure 73, the parties consented
> to have a United States magistrate judge
> conduct all proceedings in this case,
> including the entry of a final judgment.
> Doc. no. 12.

Plaintiffs, Karen Drill ("Drill"), a member of
Bethlehem's Board of Directors, and Joseph X.
Matesich ("Matesich"), a former employee at

Bethlehem, commenced this action under 42 U.S.C.
§ 1983 alleging that defendants had instituted a "
chain of command" policy ("the Policy") pursuant
to which staff members are forbidden to have direct
communication with members of Bethlehem's
Board of Directors (the "Board") without first
seeking approval from Jackson. Plaintiffs
complained that the Policy restricts communication
on matters of public concern between school
employees and elected board members thereby
violating their right to free speech. As well,
Matesich alleged that he was given a five day
suspension without pay, demoted from the
Automated Systems Coordinator to an Automated
Systems Technician and ultimately fired in
retaliation for violating the Policy.

The record demonstrates that Matesich was hired by
Bethlehem as its Automated Systems Coordinator in
October of 2000 after several other candidates had
been offered but rejected the position.[FN2] Jackson
was subsequently hired as Bethlehem's
Superintendent after a five to four vote by the
Board.[FN3] Jackson testified that certain members
of the Board, including Drill and Danny Symcheck (
"Symcheck"), made him feel unwelcome and would
monitor his activities.[FN4]

> FN2. Defendant's Appendix ("Def.App."
> )(Matesich's Depo.), pp. 2, 3, 4.

> FN3. Def.App. (Jackson Depo.), pp. 31, 36.

> FN4. Def.App. (Jackson Depo.), pp.
> 32-34. 2

In July of 2001, a seminar was given by the
Department of Education for school district
superintendents at which Jackson received a laptop
computer.[FN5] Jackson testified that he believed the
computer was given to him personally and, because
he already had two laptops at home, decided to sell
the one he received at the conference.[FN6] It

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.a         ...=atp&prid=A005580000000...   12/4/2006

Slip Copy                                                                                              Page 2

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
(Cite as: Slip Copy)

appears that in December of 2001, Bethlehem's security officer, Tex Calhoun ("Calhoun"), was in the office of Joseph Nepa ("Nepa"), Bethlehem's business manager and Matesich's supervisor, when Jackson came in and asked if anyone knew of anyone who may be interested in purchasing a laptop computer.[FN7] Calhoun indicated that he was interested and subsequently purchased the computer from Jackson for $1100.00.[FN8]

      FN5. Def.App. (Jackson Depo.), pp. 42-43.

      FN6. Def.App. (Jackson Depo.), pp. 46-48.

      FN7. Def.App. (Jackson Depo.), p. 47; Plaintiff's Appendix ("Pl.App.") (Calhoun Depo.), pp. 25-26.

      FN8. Def.App. (Jackson Depo.), pp. 46-47; Pl.App. (Calhoun Depo.), pp. 27, 30-31.

At some point surrounding the transaction, Jackson, having apparently forgotten his password, was having difficulty getting into the computer and called Matesich to his office to set the computer up so that Calhoun could access it.[FN9] Having thereby learned of the proposed sale and believing that the laptop at issue was the property of the school district, Matesich commenced an investigation including contacting the "Intermediate Unit," the Department of Education and Dell Corporation.[FN10] Matesich learned that the laptops were purchased with grant money for use by the school districts, that they were the property of the school district and that the serial number on the computer Jackson sold to Calhoun matched the number on the laptop Jackson received at the seminar.[FN11]

      FN9. Def.App. (Jackson Depo.), pp. 43-44; Pl.App. (Calhoun Depo.), pp. 28-30.

      FN10. Def.App. (Matesich Depo.), pp. 7-9; Def.App. (E-mail from Department of Education to Matesich), p. 97; Pl.App. (Calhoun Depo.), p. 31.

      FN11. Def.App. (Matesich Depo.), pp. 7-9; Def.App. (E-mail from Department of Education to Matesich), p. 97.

*2 It appears undisputed that Matesich never approached Jackson or anyone else in the administration about his concerns over the sale, stating that he wanted to get all the information first, but did tell Drill and Symcheck, two Board members who were opposed to Jackson.[FN12] Matesich also approached Nepa and suggested that Bethlehem should have a policy regarding equipment that was acquired at seminars.[FN13] When asked by Nepa whether his suggested policy concerned Jackson's laptop, Matesich stated that he "avoided the issue." [FN14] It nevertheless appears that rumors began circulating that Jackson had stolen the computer and sold it. Consequently, according to Jackson, despite having been told by Bethlehem's solicitor, Dennis Makel ("Makel"), that there was nothing wrong with his having sold the computer since it was given to him, Jackson returned the money to Calhoun and retrieved the computer.[FN15] It also appears that Jackson spoke to Matesich about the rumors at which time, according to Jackson, Matesich "blew him off." [FN16] Matesich, on the other hand, testified that Jackson badgered him with questions and berated him about his attitude and not being a team player. Matesich also testified that he nevertheless began questioning Jackson about whether he had a laptop that belonged to the district and whether he had been to a seminar where he received a Dell laptop, at which time Jackson told him it was none of his business and, when Matesich began to ask yet another question, began shouting that he was the superintendent and told Matesich he was going to sue him.[FN17]

      FN12. Def.App. (Matesich Depo.), pp. 9-17. See Defendants' Concise Statement of Material Facts, ¶ 16; Plaintiffs' Response to Defendants' Concise Statement of Material facts, ¶ 16. See also W.D. Pa. L.R. 56.1E.

      FN13. Def.App. (Matesich Depo.), pp. 10-11.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 3

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

FN14. *Id.* at p. 11.

FN15. Def.App. (Jackson Depo.), pp. 53-56, 59-60, 68.

FN16. Def.App. (Jackson Depo.), p. 52, 55, 58.

FN17. Pl.App. (Matesich Sworn Statement), pp. 6-9; Pl.App. (Matesich Depo.), pp. 18-19.

Further, it appears that, at Makel's suggestion, Jackson wrote a letter to Matesich asking him to respond to certain questions concerning the rumors that had been spreading and the proposed policy he suggested to Nepa.[FN18] According to Jackson, Matesich did not provide an appropriate reply.[FN19]

FN18. Def.App. (Jackson Depo.), pp. 52, 53, 55-56, 60; Def.App. (January 3, 2002 Letter), p. 98; Pl.App. (Matesich Sworn Statement), p. 7.

FN19. Def.App. (Jackson Depo.), p. 60.

It also appears undisputed that after learning from Matesich that Jackson had sold the computer, Drill contacted the Ethics Commission which, in turn, interviewed Matesich during the course of its investigation.[FN20] The Ethics Commission issued its adjudication on April 18, 2003, concluding that Jackson had committed an unintentional violation of the Ethics Act and noting that Jackson agreed to pay a $500 fine to settle the matter.[FN21]

FN20. Def.App. (Matesich Depo.), p. 18.

FN21. Def.App. (Adjudication of State Ethics Commission), pp. 101-112; Pl.App. (same), pp. 36-47.

Sometime in early 2003, prior to the Ethic's Commission's adjudication, discussions took place regarding the need to upgrade and/or develop Bethlehem's technology program which appears to have been beyond Matesich's knowledge or capabilities.[FN22] Jackson testified that he had consequently recommended to the Board that Richard DeMarco ("DeMarco"), a friend of Nepas's who had experience in the field, be given the job and that DeMarco was, in fact, hired as a consultant.[FN23] DeMarco subsequently developed a plan, one which Matesich concedes he did not agree with, which he presented to the Board and technology committee on March 19, 2003.[FN24] While DeMarco was presenting his proposal, a representative of Star Tech Company, DeMarco's competitor, appeared to offer a counter proposal having been told by Matesich that it was okay to do so.[FN25] Matesich had apparently invited the Star Tech representative to attend the meeting without authorization or knowledge by either Jackson or Nepa which was in direct contravention to a directive issued to Matesich on numerous occasions that he was to provide him and Nepa with any information before it was brought to the Board's attention.[FN26] Matesich testified that he believed it was an open meeting for quotes and that if DeMarco was giving a quote he could have another quote there too.[FN27] Matesich also testified, however, that he had already given Nepa quotes from Star Tech and another company named Computer Centerline, and that Nepa had rejected them as being too high.[FN28] It was also Matesich's testimony that usually his role was just to get the proposals and give them to Nepa to use.[FN29]

FN22. Def.App. (Jackson Depo.), p. 75. *See* Defendants' Concise Statement of Material Facts, ¶ 34; Plaintiffs' Response to Defendants' Concise Statement of Material Facts, ¶ 34.

FN23. Def.App. (Jackson Depo.), p. 75.

FN24. *Id.* at p. 76; Def.App. (Matesich Depo.), pp. 20-21. *See* Defendants' Concise Statement of Material Facts, ¶ 35; Plaintiffs' Response to Defendants' Concise Statement of Material Facts, ¶ 35.

FN25. Def.App. (Jackson Depo.), p. 76; Def.App. (Matesich Depo.), p. 23.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A457**

Slip Copy                                                    Page 4

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

FN26. Def.App. (Jackson Depo.), pp. 76-77. *See* Defendants' Concise Statement of Material Facts, ¶ 36; Plaintiffs' Response to Defendants' Concise Statement of Material Facts, ¶ 36.

FN27. Def.App. (Matesich's Depo.), pp. 24-25.

FN28. *Id.* at pp. 21-25. *See* Defendants' Concise Statement of Material Facts, ¶ 38; Plaintiffs' Response to Defendants' Concise Statement of Material Facts, ¶ 38.

FN29. *Id.* at p. 24.

*3 Nevertheless, as a result of the incident, Jackson issued a letter to Matesich on March 20, 2003, advising him that he had recommended to the Board that, effective March 21, 2003, Matesich be suspended for five days without pay, be transferred to another position and be placed on six months probation. [FN30] In another letter dated March 25, 2003, Jackson informed Matesich that the Board had voted the previous day to transfer him to the position of Technology Technician at the same rate of compensation and to place him on six months probation.[FN31]

FN30. Def.App. (March 20, 2003 Letter), p. 99; Pl.App. (Matesich Depo.), p. 21.

FN31. Def.App. (March 25, 2003 Letter), p. 100; Pl.App. (Matesich Depo.), pp. 21-22.

Plaintiffs filed a complaint commencing this lawsuit on May 15, 2003, wherein they brought claims against both defendants for violating their civil rights under the First and Fourteenth Amendments to the United States Constitution (Count I); for violating Matesich's civil rights by demoting him and by denying him a job performance evaluation and bonus (Count II); for violating Matesich's right to due process under the Fifth and Fourteenth Amendments by subjecting him to an adverse job action without notice or an opportunity to be heard (Count III); and for violating Matesich's civil rights

under the First, Fifth and Fourteenth Amendments by retaliating against him when he attempted to keep the line of communication with board members open (Count IV). Matesich also brought state law claims for breach of contract against Bethlehem (Count V); negligent and intentional infliction of emotional distress against both defendants (Count VI); and a claim for punitive damages against Jackson (Count VII).

Defendants thereafter filed a motion to dismiss pursuant to which this Court dismissed all of plaintiffs' claims except those brought at Count IV, to the extent Matesich alleged that he was retaliated against in violation of his First and Fourteenth Amendment rights, and Matesich's claim for punitive damages against Jackson brought at Count VII.[FN32]

FN32. *See* Docket Nos. 13, 14.

In the interim, in October of 2003, it appears that Jackson began experiencing some problems with his desktop computer and Matesich was contacted to fix them. [FN33] Matesich apparently last worked on the computer on October 23rd and, according to Jackson, when he returned to his office afterward all of the information he had stored on the computer and his palm pilot, including dates he had entered on his calendar, had been wiped out. Jackson testified that when he asked Matesich why the information had been removed and not restored, Matesich explained that when Microsoft 2000 Pro is reinstalled it destroys all of the existing data on the computer. When pressed as to why he had not saved or stored the information somewhere else if he knew it would be destroyed, Matesich sated, " You tell me what I was supposed to do." [FN34]

FN33. Def.App. (Matesich Depo.), p. 26; Def.App. (Jackson Depo.), p. 78.

FN34. Def.App. (Jackson Depo.), pp. 79-81.

Matesich, on the other hand, testified that Jackson's programs were still on his computer but, rather than

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

showing up on his desktop as a shortcut icon as they had been before, it was necessary to hit the start icon to pull up the menu of available programs which Jackson apparently did not know how to do. Matesich also testified that he didn't realize this was the nature of the problem at the time but yet told Jackson that the programs were still there. When asked whether he showed Jackson how to get them back he responded that, "He didn't ask me to," " Like he had been using his computer for three years, at least," and "I'm to the point that I'm so far advanced that I don't think of those little things anymore." [FN35] Later, however, Matesich testified that a special program was needed to restore everything.[FN36]

    FN35. Def.App. (Matesich Depo.), pp. 26-28.

    FN36. Pl.App. (Matesich Depo.), p. 23.

*4 As a result, Jackson wrote a memorandum to the Board dated October 31, 2003, in which he relayed the incident and indicated that 2 1/2 years of files were no longer retrievable from his computer. He also indicated that he asked Matesich in the presence of Board President Denise Duvall whether he knew that all of the data would be destroyed when he reinstalled Microsoft 2000 Pro and did it anyway, to which Matesich responded, "Yes, what else was I supposed to do?" [FN37] Jackson also recommended that Matesich be terminated which the Board voted to do on December 16, 2003.[FN38]

    FN37. Def.App. (October 31, 2003 Memo), p. 113.

    FN38. *Id.* at p. 114.

Thereafter Matesich filed a request for unemployment benefits which Bethlehem challenged on the basis that he had engaged in willful misconduct. A hearing was held before an unemployment compensation referee on March 22, 2004, following which the referee found that Matesich had admitted that he knew the files would be lost and reinstalled the program anyway, that he

was uncooperative in restoring the files and did not do so or offer to do so at any time prior to his termination even though he had the requested files in his possession and was capable of restoring them to Jackson's computer. The referee also found that Matesich had secured and removed a copy of the files from the premises and retained them after he was terminated and concluded that Matesich had engaged in willful misconduct and was ineligible for unemployment benefits. [FN39] Matesich appealed the referee's determination to the Unemployment Compensation Review Board which affirmed the decision.[FN40] No further appeals were taken.

    FN39. *Id.* at pp. 115-116.

    FN40. Def.App. (Board of Review Decision), p. 118.

Matesich, however, sought and was granted leave to file an amended complaint in this case so as to add claims arising out of the termination of his employment.[FN41] An amended complaint was filed on May 5, 2004, wherein plaintiffs reasserted their First Amendment claim brought at Count I of the original complaint (Count I), brought a claim alleging that Matesich's termination violated the Pennsylvania Whistleblower Law ("PWL"), 43 P.S. § 1421, et seq. (Count II); reasserted Matesich's retaliation claim brought under the First and Fourteenth Amendments (Count III); claimed that Matesich's termination violates the Pennsylvania Public Official and Employee Ethics Act ("Ethics Act"), 65 Pa.C.S.A. §§ 1101, et seq. (Count IV); asserted a new retaliation claim under the First Amendment based on Matesich's termination (Count V); and again requested punitive damages from Jackson (Count VI).

    FN41. *See* Docket Nos. 17, 20.

Defendants subsequently filed a second motion to dismiss in which they sought to have Counts I and IV of the amended complaint dismissed arguing that Count I was merely a reiteration of Count I brought in the original complaint which had been dismissed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                      Page 6

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

by the Court and that there was no private right of action under the Ethics Act. The Court granted defendants' motion leaving only Matesich's claims brought under the PWL and his claims for retaliation.

Defendants have now filed a motion for summary judgment arguing that there is insufficient evidence of record to sustain Matesich's remaining claims and that they are entitled to judgment as a matter of law.

**\*5** Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). Thus, it must be determined " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990), *cert. denied,* 501 U.S. 1218 (1991), quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251-52.

Defendants initially contend that the evidence of record is insufficient to permit Matesich to succeed on his claim brought pursuant to the PWL at Count

II of the amended complaint.

It appears undisputed that under the PWL:

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 P.S. § 1423(a).[FN42] Thus, to succeed on a claim under the PWL, an employee must demonstrate that, prior to being discharged, he or she made a good faith report of waste or wrongdoing to his or her employer or an appropriate authority and was discharged in reprisal for making the report. *Lutz v. Springettsbury Township,* 667 A.2d 251, 253 (Pa.Commw.Ct.1995). A "good faith report" is one "which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." 43 P.S. § 1422. As well, the PWL defines an " appropriate authority" as either a federal, state or local government body, or an agent thereof, having jurisdiction over, *inter alia,* professional conduct, ethics or waste. *Id.* An "employer" is defined as a person supervising one or more employee including the employee in question or an agent of a public body. *Id.*

> FN42. Although Matesich also recites the language of 43 P.S. § 1423(b), which prohibits retaliation against an employee who is requested by an appropriate authority to participate in an investigation, subsection (b) does not apply here. Not only has Matesich failed to present any argument in this regard but he has only alleged a violation of subsection (a) in the amended complaint. *See* Amended Complaint, ¶¶ 49, 50 (Docket No. 23).

**\*6** Defendants argue that Matesich did not make a good faith report as the evidence demonstrates that he never made a report to his employer, the Ethics Commission or any other appropriate authority and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                            Page 7

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

that to the extent his informing Drill and Symcheck of his suspicions is considered a "report" it was not made in good faith. As well, defendants argue that the evidence of record does not support a finding that Matesich was terminated in reprisal for making reports to Drill and Symcheck as almost two years had passed in the interim.

Matesich has not specifically addressed either of defendants' arguments in this regard but merely states, without any discussion of the evidence, that he has raised genuine issues of material fact regarding good faith reports of waste and, citing to a number of cases where summary judgment was denied on claims brought under the PWL, but without discussion of the facts or issues presented in those cases, simply concludes that summary judgment is inappropriate here. We disagree.

First, it appears undisputed that Matesich did not report an ethics violation, or any other violation, to the Ethics Commission. Rather, it was Matesich's testimony that he had never heard of an ethics violation at the time, that it was Drill who contacted the Ethics Commission and that it was the Ethics Commission that, in turn, contacted him.[FN43]

FN43. Def.App. (Matesich Depo.), p. 18.

Further, the evidence demonstrates that the only people that Matesich did report his suspicions that Jackson had sold a laptop belonging to the school district to was Drill, Symcheck and Tex Calhoun, none of whom appear to be Matesich's employer or an appropriate authority.[FN44] Indeed, it appears that Calhoun is the school's security officer and is neither Matesich's supervisor nor an agent of the school district. Similarly, Drill and Symcheck are merely individual members of the Board and, as such, are unable to act alone for the Board or Bethlehem thereby precluding a finding that they are "agents" of either entity. *See Bangor Area Education Association v. Angle,* 720 A.2d 198, 201 (Pa.Commw.Ct.1998), *affirmed,* 561 Pa. 305, 750 A.2d 282 (1999)(per curiam)("The [Public School] Code confers no authority upon *individual* school board members to act unilaterally under the guise of carrying out the responsibility of the board as a

*whole.* The law is clear that actions of by a school board are taken by collective authority.")(emphasis in original). *See also* Black's Law Dictionary 63 (6th ed. 1990)(Defining "agent" as "a person authorized by another to act for or in place of him.... ") Thus, Matesich did not report his concerns to either his employer or an appropriate authority as required under the statute.

FN44. Although Matesich has stated that he also informed his supervisor, Nepa, about Jackson's sale of the computer, the record reflects only that he mentioned to Nepa that Bethlehem should have a policy concerning equipment acquired at seminars using a printer as an example. Def.App. (Matesich Depo.), p. 10. Further, when Nepa asked him whether this was about the laptop, Matesich testified that he "avoided the issue," stating that he wanted to get all the information first. *Id.* at 11. Thus, the record does not support Matesich's contention that he reported Jackson's sale of the computer to his supervisor.

Nor has Matesich pointed to any evidence of record from which a jury could conclude that he was terminated as a result of his having reported his suspicions about Jackson to Drill and Symcheck.

Under Pennsylvania law,
An employee who has been terminated based on a filed report and wants to base his or her complaint on their employer's violation under the Whistleblower Law must specify how their employer is guilty of waste and/or wrongdoing. They must also show by concrete facts or surrounding circumstances that the report led to their dismissal, such as that there was specific direction or information they received not to file the report or there would be adverse consequences because the report was filed.

*7 *Gray v. Hafer,* 168 Pa. Commw. 613, 620, 651 A.2d 221, 225 (1994), *affirmed,* 642 Pa. 607, 669 A.2d 335 (1995)(per curiam).

Here, Matesich has not only failed to point to any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A461**

Slip Copy                                                                                          Page 8

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

such concrete facts but, as previously mentioned, has failed to address the issue at all. The mere fact that he made a report and was subsequently terminated, however, is not sufficient. *Id. See Lutz v. Springettsbury Township,* 667 A.2d at 253. Moreover, the record demonstrates that Matesich divulged his suspicions to Drill and Symcheck at the latest in January of 2002, but was not terminated until December of 2003, almost two years later. Absent any facts showing that the two events were related, the lapse of two years is simply too attenuated to create an issue of material fact. *See Golaschevsky v. Pennsylvania Department of Environmental Resources,* 683 A.2d 1299, 1304 (Pa.Commw.Ct.1996), *affirmed,* 554 Pa. 157, 720 A.2d 757 (1998)(Declining to find a causal connection even though only four months had passed between the report and the plaintiff's termination). As such, defendants are entitled to summary judgment on Matesich's claims brought under the PWL.[FN45]

> FN45. Having found that Matesich is unable to succeed on his claim brought under the PWL because there is no evidence of record from which a fact finder could conclude that Matesich made a report to his employer or an appropriate authority or that there is a causal connection between his report to Drill and Symcheck and his termination, we need not, and have not, addressed whether the report was made in good faith or whether the wrongdoing reported is encompassed by the PWL.

Defendants also contend that Matesich's retaliation claim brought at Count III of the amended complaint is subject to summary judgment as Matesich is unable to point to evidence that his purported violation of the Policy or his interview with the Ethics Commission was a substantial or motivating factor in the Board's decision to suspend and transfer him in March of 2003.[FN46]

> FN46. As previously discussed, the retaliation claim brought at Count III of the

amended complaint is a reiteration of the retaliation claim brought by Matesich in the original complaint filed on May 15, 2003. Because the original complaint was filed prior to his termination, this claim necessarily pertains to his suspension and transfer in March of 2003. In contrast, Matesich has alleged in the retaliation claim brought at Count V of the amended complaint that he was terminated in December of 2003 in retaliation for his having filed this law suit.

A public employee's claim of retaliation for engaging in protected activity is properly assessed under a three-prong analysis. *Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.), *cert. denied,* 522 U.S. 816 (1997). The first two prongs are satisfied where the plaintiff can demonstrate that the activity in question is protected and that the protected activity was a substantial reason for the retaliatory action. If, however, the defendants are able to establish that they would have taken the same action even if the protected activity had not taken place then the third step of the analysis has been satisfied and plaintiff's claims must fail. *Id.*

Instantly, defendants argue that the second prong cannot be met in this case and that the evidence of record nevertheless establishes that Matesich would have been suspended even if he had not engaged in the protected activity. Defendants specifically argue that Matesich's reports to Drill and Symcheck regarding Jackson's sale of the computer and the concomitant Ethics Commission investigation were not a motivating factor in the decision to suspend and transfer him as evidenced by, amongst other things, the fact that Matesich contacted Drill and Symcheck in January and was interviewed by the Ethics Commission in March of 2002, yet Matesich was not suspended and transferred until March of 2003, a year later.

The Court of Appeals for the Third Circuit has held that "the mere fact that an adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A462**

Slip Copy                                                    Page 9

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

*Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir.1997). Moreover, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997), quoting *Robinson,* 120 F.3d at 1302. *E.g., Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023 (1990) (Finding that causal connection was established were only two days elapsed between the protected activity and plaintiff's discharge.)

**\*8** Here, it is undisputed that Matesich reported that Jackson had sold a computer belonging to the school district to Drill and Symcheck in January of 2002 and that he was subsequently interviewed by the Ethics Commission in March of 2002. It is also undisputed that Matesich was not suspended and transferred until March of 2003. Thus, one year passed between the protected activity and the adverse employment action at issue, which, in this Court's view, is not unusually suggestive of a retaliatory motive and precludes a finding that a causal connection between the two events may be inferred. *See Weston v. Pennsylvania,* 251 F.3d 420, 431-32 (3d Cir.2001) (Finding that causation could not be inferred where the suspensions which the plaintiff received "were more than a year distant from his protected activities.")

Further, while the Court is cognizant of the fact that "[w]hen temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus," *Krouse v. American Sterilizer Co.,* 126 F.3d at 503-04, Matesich does not provide the necessary link. Indeed, other than to reiterate the elements of a retaliation claim and repeat his allegations that he was suspended and transferred because he engaged in protected activity, he does little to counter defendants' argument that there is no evidence to establish a causal connection between the two events.[FN47] The only evidence to which Matesich points is a series of meetings he had with Jackson on January 2nd, January 3rd, January 4th, and January 16th, 2002, at which the sale of the laptop was discussed and Jackson, according to Matesich,

was confrontational and threatening. The difficulty with Matesich's evidence, however, is that the last of these conversations occurred in January of 2002, which was still over a year before he was suspended and transferred and, thus, does not fill the gap or provide evidence of retaliatory animus during the intervening period.

> FN47. Moreover, although Matesich has cited several cases-mostly unpublished-in which claims for retaliation were at issue, he has failed to discuss how they are otherwise relevant to the instant dispute or why summary judgment should be denied here simply because it was denied in those cases. Indeed, the first two cases have been cited for propositions that are not even at issue here, *i.e.,* what constitutes an adverse employment action and whether the speech at issue involves a matter of public concern. *See Miles v. City of Philadelphia,* 2001 U.S. Dist. LEXIS 4736 \*18-21 (E.D.Pa.2001); *VanTassel v. Brooks,* 355 F.Supp.2d 788, 798 (W.D.Pa.2005). *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, pp. 28-30.

Moreover, Matesich has failed to address at all defendants' argument that the adverse actions would have been taken even if his violation of the Policy and report to the Ethics Commission had not occurred. Defendants have argued, and Matesich does not dispute, that he did not favor hiring DeMarco or agree with his proposal and that, after DeMarco had been hired by the Board to upgrade Bethlehem's computer system and was presenting his proposal at a meeting, a representative from a competitor appeared to present a counter proposal having been told by Matesich, without anyone's authorization and in an effort to disrupt the meeting, that it was okay to do so.[FN48] Although Matesich testified that he thought he should be able to have another company present a quote at the meeting, he also testified that it was his role merely to get the proposals and give them to Nepa and concedes that Nepa had already rejected Star Tech's proposal as being too high.[FN49]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 10

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

FN48. Def.App. (Jackson Depo.), pp. 75-76; Def.App. (Matesich Depo .), pp. 23-25. *See* Defendants' Concise Statement of Material Facts, ¶¶ 35, 36, 39; Plaintiffs' Response to Defendants' Concise Statement of Material Facts, ¶¶ 35, 36, 39.

FN49. Def.App. (Matesich Depo.), pp. 21-25. *See* Defendants' Concise Statement of Material Facts, ¶ 38; Plaintiffs' Response to Defendants' Concise Statement of Material Facts, ¶ 38.

\*9 Moreover, defendants have stated in their Concise Statement of Material Facts that it was because of this incident that Jackson recommended that Matesich be transferred and placed on probation which the Board voted to do. [FN50] Rather than dispute defendants' assertion or point to evidence that would create an issue of fact, Matesich merely states that "[a]fter reasonable investigation, plaintiffs are without information sufficient to form a belief as to the truth of the allegations...." [FN51] Under these circumstances, it appears that Matesich is without sufficient evidence to create an issue of fact for trial and defendants are therefore entitled to summary judgment on Matesich's retaliation claim brought at Count III of the amended complaint.

FN50. Defendants' Concise Statement of Material Facts, ¶¶ 40, 41.

FN51. Plaintiffs' Response to Defendants' Concise Statement of Material Facts, ¶¶ 40, 41.

Defendants have lastly argued that they are entitled to summary judgment on Matesich's retaliation claim brought at Count V of the amended complaint in which Matesich claims he was terminated in December of 2003 in retaliation for filing the instant suit. Specifically, defendants contend that summary judgment is warranted because over six months passed between the protected activity and the adverse employment activity, thereby precluding the inference of a retaliatory motive, and

that Matesich has failed to adduce evidence of a retaliatory animus in the intervening months. Defendants also argue that the evidence of record shows that Matesich would have been terminated even if he hadn't filed the instant lawsuit and that Matesich is nevertheless estopped from challenging his termination as the issue was already fairly litigated at the unemployment compensation hearing initiated by Matesich.

Matesich, much as before, has seemingly conceded that summary judgment is appropriate as, other than the collateral estoppel issue, he has failed to address any of the arguments raised by defendants in their brief. Instead, Matesich merely summarizes the basis of his complaint, *i.e.,* that the "chain of command" policy restricted communication on matters of public concern which violated his First and Fourteenth Amendment rights and that he was improperly disciplined and terminated and then concludes that the "school district's interest in penalizing plaintiff Matesich for commencing his civil rights action constituted a major motivating factor and played a prominent role in its decision to terminate his employment." [FN52] Matesich then states that defendants' termination of his employment "gives rise to an independent, retaliation based cause of action under Section 1983 and the First Amendment...." [FN53]

FN52. Plaintiff's Response to Defendants' Motion for Summary Judgement, pp. 33-34.

FN53. *Id.* at p. 34.

Matesich's response not only ignores defendants' motion but appears, as before, to misperceive the import of summary judgment. It is not sufficient at this stage of the proceedings that the facts as alleged in the complaint "give rise" to a cause of action. Rather, it is incumbent upon plaintiff at the summary judgment stage to point to *evidence* of record that, if presented to and found credible by a jury, would permit a verdict in his favor. This Matesich has failed to do.

\*10 It nevertheless appears undisputed that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 11

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

initial complaint in this matter was filed on May 15, 2003, and that Matesich was suspended in November and ultimately terminated on December 16, 2003, seven months later. The passage of even six months, however, is insufficient standing alone to establish a causal connection between the protected activity and the alleged retaliation. *See Williams v. Philadelphia Housing Authority Police Department,* 380 F.3d 751, 760 (3d Cir.2004), *cert. denied,* 544 U.S. 961 (2005)(Finding that the just over two months between the protected activity and plaintiff's termination was not so close as to be unduly suggestive of retaliation.); *Thomas v. Town of Hammonton,* 351 F.3d 108, 114 (3d Cir.2003) (Finding that the three weeks between the date of plaintiff's complaint and the termination letter was not so close as to be unduly suggestive.)

While, as previously discussed, courts may look to other evidence of a retaliatory animus during the intervening period when temporal proximity between the protected activity and the alleged retaliatory action is lacking, Matesich has not pointed to any such evidence nor is the Court able to cull any from the record.[FN54] *See Krouse v. American Sterilizer Co.,* 126 F.3d at 503-04. As such, the record does not support a finding that retaliation was a substantial or motivating factor in Bethlehem's decision to terminate Matesich's employment.

> FN54. Although Matesich has referenced in paragraph 113 of his Concise Statement of Material Facts that he furnished information to the Pennsylvania State Auditor General's Office in October of 2003 regarding Jackson's alleged abuse of sick leave, he has failed to provide any evidentiary support from which a fact finder could conclude that Matesich, in fact, furnished the information or that Jackson, or anyone else from Bethlehem was aware of it. The fact that Matesich has alleged that he furnished such information in his complaints, which is the only " support" he cites, is, at this juncture, wholly insufficient.

Moreover, defendants have argued that Matesich was terminated because of the loss of information and other problems arising after he attempted to fix Jackson's computer in October of 2003 and, thus, would have been terminated regardless of whether he filed the instant suit.[FN55] Matesich has not only failed to address defendants' argument in this regard but has again seemingly conceded that there is no evidence of record to counter defendants' assertions or create a genuine issue of fact. Indeed, defendants stated in their Concise Statement of Material Facts that Jackson recommended and the Board voted to terminate Matesich as a result of the computer repair incident. [FN56] Matesich's has again responded stating only that "[a]fter reasonable investigation, plaintiffs are without information sufficient to form a belief as to the truth of the allegations...." [FN57] If, at this juncture, plaintiffs are without sufficient information to refute defendants' assertions in this regard, it follows that they do not have sufficient information to present to a jury. Defendants are therefore entitled to summary judgment. [FN58]

> FN55. *See* Def.App. (Jackson's Depo.), pp. 78-81.

> FN56. Defendants' Concise Statement of Material Facts, ¶¶ 49-51. 28

> FN57. Plaintiffs' Response to Defendants Concise Statement of Material Facts, ¶¶ 49-51.

> FN58. Having already found that Matesich is unable to succeed on his retaliation claim brought at Count V of the amended complaint we need not address whether or not he is estopped from challenging his termination because the issue was decided unfavorably to him at the unemployment compensation proceedings.

Finally, we note that in his response to defendants' motion for summary judgment Matesich has curiously addressed a wrongful termination claim that was not only not the subject of defendants' motion but was never alleged by plaintiffs in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 12

Slip Copy, 2006 WL 1159457 (W.D.Pa.)
**(Cite as: Slip Copy)**

first instance. Equally baffling, in response to defendants' reply, in which defendants point out that a wrongful discharge claim has never been alleged and is not before the Court, Matesich, rather than point to the amended complaint where one might expect to find what causes of action have been alleged, argues that plaintiffs fully briefed the wrongful discharge claim in their brief in opposition to defendants' motion to dismiss the amended complaint.[FN59] Notwithstanding that a complaint may not be amended by a brief filed in opposition to an motion to dismiss, *Pennsylvania v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir.1988), the portion of the brief to which Matesich cites discusses his claim brought under the Ethics Act which defendants had argued should be dismissed because no private right of action exists under that statute.[FN60] While Matesich did indeed cite to cases in his responsive brief where claims for wrongful discharge had been brought, the Court noted then and reiterates now that, "Plaintiff, however, has not brought a wrongful discharge claim nor has he asserted in the amended complaint that his termination violated a public policy." [FN61] Thus, the Court need not address Matesich's argument that his claim for wrongful discharge survives summary judgment.

> FN59. Plaintiffs' Sur-Reply to Defendants' Motion for Summary Judgment, pp. 1-2.

> FN60. *See* Plaintiffs' Brief in Opposition to Motion to Dismiss Amended Complaint, pp. 4-5 (Docket No. 34).

> FN61. Opinion, Hay, M.J., p. 10 (Docket No. 36). 30

**\*11** For these reasons, defendants' motion for summary judgment (Docket No. 52) is GRANTED.

W.D.Pa.,2006.
Drill v. Bethlehem-Center School Dist.
Slip Copy, 2006 WL 1159457 (W.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 505589 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Defendants' Motion for Summary Judgment (Jan. 27, 2006) Original Image of this Document (PDF)
• 2005 WL 4693969 (Trial Motion, Memorandum and Affidavit) Response to Plaintiffs' Motion to Compel Discovery Defendants, by and through their attorneys, Anthony G. Sanchez, Esquire, Todd P. Prugar, Esquire, and the law firm of Andrews & Price, file the following Response to Plaintiffs' Motion to Compel Disc overy. (Sep. 2, 2005)
• 2005 WL 4693968 (Trial Motion, Memorandum and Affidavit) Discovery Dispute Certificate (Aug. 31, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.



57 FEP Cases 1685

Page 1

1990 WL 484147 (E.D.N.C.), 57 Fair Empl.Prac.Cas. (BNA) 1685

**(Publication page references are not available for this document.)**

H

E.D.N.C., 1990.
EDWARDS
v.
JOE CULLIPHER CHRYSLER-PLYMOUTH,
INC., et al.,
**No. 89-86-CIV-4-H**

U.S. District Court, Eastern District of North
Carolina, New Bern Division

September 28, 1990

BNA Labor Relations Reporter Headnote - FEP
Cases
CIVIL RIGHTS ACT OF 1964
1.Race -- Promotion
C108.3045 C108.3178
E.D.N.C., 1990.
Automobile dealer lawfully refused to promote
black technician to service manager on ground that
he had no material and supervisory experience,
despite his assertion that he gained managerial
experience during his six years in U.S. Army, where
he did not list this experience on his employment
application, dealer had no knowledge of it, and
persons who were promoted had substantial
managerial experience.
EDWARDS v. JOE CULLIPHER CHRYSLER
57 FEP Cases 1685

BNA Labor Relations Reporter Headnote - FEP
Cases
CIVIL RIGHTS ACT OF 1964
2.Race -- Discharge
C108.30253 C108.73349
E.D.N.C., 1990.
Black employee who was discharged for refusing,
in presence of customer, to do work assigned to him
has not made out prima facie case, where he has not

identified any white employees who received lesser
sanctions for similar conduct, employer's general
manager stated in affidavit that he was first
employee who had refused to do work in presence
of customer, and after he was discharged, employer
offered his position to two black persons.
EDWARDS v. JOE CULLIPHER CHRYSLER
57 FEP Cases 1685

Leo R. Edwards, Greenville, N.C., plaintiff pro se.

Laura B. Russell, Raleigh, N.C., for defendants.

Full Text of Opinion

MALCOLM J. HOWARD, District Judge

This matter is before the court on the defendants'
motion for summary judgment pursuant to Fed. R.
Civ. P. 56. The plaintiff, a black male, alleges that
the defendants failed to promote him, wrongfully
terminated him, and failed to rehire him because of
his race in violation of Title VII of the Civil Rights
Act of 1964, 42 U.S.C. Sections 2000e--2000e-17.
For the reasons discussed below, the court grants
the defendants' motion.

FACTS

The plaintiff began working for Joe Cullipher
Subaru as an automotive technician in May of 1984.
The plaintiff alleges that in 1986 he told Curtis
James Gordon, the general manager of Joe
Cullipher Subaru, of his desire to be service
manager. That position became open in January of
1987, and the defendants hired a white male. The
position also became open in October of 1987, and
the defendants again hired a white male.

The plaintiff was fired in February of 1988,
allegedly for insubordination and refusing to do
work assigned to him in the presence of a customer.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 FEP Cases 1685                                                                                  Page 2

1990 WL 484147 (E.D.N.C.), 57 Fair Empl.Prac.Cas. (BNA) 1685

(Publication page references are not available for this document.)

Subsequently, the plaintiff submitted an application for service manager, and again the defendants hired a white male. The plaintiff then filed a charge with the Equal Employment Opportunity Commission, which determined that no violation of Title VII occurred. The plaintiff then commenced this action.

## DECISION

### A. Failure to Promote

This is an individual disparate treatment case. The plaintiff is attempting to establish his case through direct, indirect, and circumstantial evidence. See Holmes v. Bevilacqua, 794 F.2d 142, 146 [41 FEP Cases 43] (4th Cir. 1986). The direct and indirect evidence of race discrimination is an affidavit from Jasper T. Nichols, who worked for the defendants as a service dispatcher and parts manager. Mr. Nichols states that during an all-white management meeting, company officials said they would not consider a black for the position of service manager. Nichols Aff. Para.8. The plaintiff also proffers his own testimony and the affidavits of other black employees alleging a pattern of derogatory racial comments directed at blacks by the defendants and a pattern of discriminatory hiring practices.

The court assumes that the plaintiff has presented sufficient direct and indirect evidence of intentional discrimination to establish a prima facie case of failure to promote. [FN1] The burden shifts, therefore, to the defendants to show that no genuine issue of material fact exists as to whether they would have reached the same decisions absent the unlawful motive. Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 [49 FEP Cases 954] (1989); Smallwood v. United Air Lines, Inc., 728 F.2d 614, 620 [34 FEP Cases 217] (4th Cir.), cert. denied, 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 [35 FEP Cases 1608] (1984).

The defendants assert that they did not promote the plaintiff because he had no managerial and supervisory experience. The defendants consistently informed the plaintiff that prior managerial experience was a requirement for the position.

Edwards Dep., p. 60. The plaintiff states that he gained managerial experience during his six years in the United States Army. The plaintiff states that during this period he was responsible for the supervision of 15-20 men and that at times he was supervising 300-400 men. Edwards Aff. Para.2.

The defendants, however, had no knowledge of the plaintiff's alleged military management experience. The resume he provided to the defendants indicated that in the Army he was a clerk and a forklift operator. When asked in his 1984 application about his prior experience, the plaintiff checked boxes marked mechanic, mechanic helper, lubrication man, and parts clerk. He did not check the boxes marked service manager, shop foreman, or parts manager. The plaintiff's 1988 application is substantially similar. No managerial experience is listed in either of the applications on file with the defendants. Assuming the plaintiff's characterization of his military experience is correct, it is irrelevant because he did not provide this information to the defendants when the hiring decisions were made.

The plaintiff alleges in response to the summary judgment motion that as an automotive technician at Joe Cullipher Subaru he supervised "many of the operations of both the service and parts departments." Plaintiff's Memorandum, p.2. The plaintiff also submits the affidavit of a fellow employee who states that the plaintiff "served as manager" and "assisted the service manager." Jones Affidavit, Para.4. These contentions, however, directly contradict the plaintiff's deposition testimony:

Q. . . . What were your duties and responsibilities as a mechanic at Joe Cullipher Subaru? A. My responsibilities were to, ah, repair, ah, vehicles, ah, Subaru vehicles. Ah, to state inspect. Ah, that's, ah, basically we wrote warranty tickets. Ah, dealt with customers, Ah . . . Q. . . . [A]re you finished? A. Yes. I am finished.

Edwards Dep. pp. 40-41.

The plaintiff may not create issues of fact through affidavits that contradict his prior deposition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 FEP Cases 1685                                                                                                    Page 3

1990 WL 484147 (E.D.N.C.), 57 Fair Empl.Prac.Cas. (BNA) 1685

**(Publication page references are not available for this document.)**

testimony. Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1363-66 (8th Cir. 1983); Radobenko v. Automated Equipment Corp., 520 F.2d 540 (9th Cir. 1975); Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of Summary Judgment as a procedure for screening out sham issues of fact." Camfield Tires, 719 F.2d at 1365. The plaintiff is attempting to create a question of fact with affidavits that contradict both his deposition testimony and the information he provided to the defendants at the time the hiring and promotion decisions were made.

No genuine issue of fact exists, therefore, as to whether the persons hired by the defendants had substantially more experience than the plaintiff. The defendants hired Mr. Bob Hale to fill the January 1987 opening. Mr. Hale had over thirteen years of managerial and supervisory experience. Gordon Aff. Para.3. [FN2] The December 1987 vacancy was filled by Mr. Bobby Leneave, who had two years of managerial experience as the body shop manager for Joe Cullipher Chrysler-Plymouth. Gordon Aff. Para.4. The defendants hired Mr. Jeff Culver to fill the February 1988 vacancy. Mr. Culver had been parts and service manager of another dealership for two years. Gordon Aff. Para.5. In contrast, the plaintiff had no managerial experience (or at least failed to inform the defendants that he had such experience). Accordingly, the court finds that there is no genuine issue as to whether the defendants would have promoted the plaintiff absent the alleged discriminatory motive.

The plaintiff relies also on circumstantial evidence to support his claim. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 [5 FEP Cases 965] (1973). To create a prima facie case under McDonnell Douglas, the plaintiff must show that: (1) he belongs to a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected; and (4) the position was filled by a white

person. Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 910 n. 1 [50 FEP Cases 1066] (4th Cir. 1989). For the reasons stated above, the court finds that the plaintiff has failed to create an issue of fact as to whether he was qualified for the position of service manager, and he has thus failed to make out a prima facie case under McDonnell Douglas.

Furthermore, if the plaintiff could make out a prima facie case, the defendants have articulated a legitimate, non-discriminatory motive for not promoting the plaintiff (the greater qualifications of the other applicants), and the plaintiff has failed to create a genuine issue as to whether this articulated reason is a pretext. McDonnell Douglas, 411 U.S. at 804. [FN3] Accordingly, the defendants are entitled to summary judgment on the plaintiff's claims that they failed to promote him in violation of Title VII.

B. Wrongful Discharge

The plaintiff has presented no direct or indirect evidence of race discrimination with regards to his termination. The only evidence of race discrimination concerned the defendants' alleged refusal to hire blacks to fill management positions. The plaintiff has put forth no evidence that the defendants did not want blacks as automotive technicians or that race played any role in his discharge.

To establish a prima facie case through circumstantial evidence the plaintiff must show that: (1) the plaintiff did not engage in prohibited conduct or perform his job poorly or, if he did, that such conduct or performance was similar to that of a white person; (2) the plaintiff's discharge was a more severe punishment than that given to the white person; and (3) the plaintiff was replaced by a non-minority worker with comparable or lesser qualifications. Troublefield v. Lehman, No. 86-3829 (4th Cir. October 26, 1987) (un-published).

The plaintiff was fired for refusing to do work assigned to him in the presence of a customer. The plaintiff does not deny refusing to perform the work, but states that pursuant to an unwritten company policy the job should have been assigned

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 FEP Cases 1685

Page 4

1990 WL 484147 (E.D.N.C.), 57 Fair Empl.Prac.Cas. (BNA) 1685

**(Publication page references are not available for this document.)**

to another technician. Edwards Dep., p. 93. The plaintiff also contends that he was not aware that a customer was present.

Viewing the facts in the light most favorable to the plaintiff, the court cannot say that such a termination violates any interest protected by Title VII. Moreover, the plaintiff has failed to identify any white employees who received lesser sanctions for similar conduct, and Mr. Gordon has filed an affidavit stating that the plaintiff was the first employee at Joe Cullipher Subaru who in the presence of a customer refused to do work. Gordon Aff. Para.9. Furthermore, it is undisputed that the plaintiff cannot satisfy the third prong of this test. After the plaintiff was fired, the defendants offered his position to two black persons. Gordon Aff. Para.10. Therefore, the plaintiff has failed to make out a prima facie case of race discrimination.

Accordingly, it is hereby ORDERED that the defendants' motion for summary judgment is GRANTED, and this action is DISMISSED.

> FN1 The court views the evidence in the light most favorable to the plaintiff. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). It is not clear that the affidavits submitted by the plaintiffs are sufficient to create a question of fact. They do not indicate which persons made the discriminatory statements or the dates on which they were made. Nevertheless, the court assumes for purposes of this order that the plaintiff has established a prima facie case based on direct and indirect evidence.

> FN2 The plaintiff may not recover for the January 1987 failure to promote because he did not file his EEOC charge within 180 days of the incident. 42 U.S.C. Section 2000e-5(e). Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 [24 FEP Cases 827] (1980).

> FN3 Another reason articulated by the

defendants for not hiring the plaintiff to fill the third opening is his termination for insubordination. The plaintiff has failed to create a genuine issue of fact as to whether this reason is a pretext.

110

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                 Page 1

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350
(Cite as: Not Reported in F.Supp.)

**c**
Hoff v. County of Erie
    United States District Court; W.D. New York.
        **Lee Ann Hoff, Plaintiff**
                    **v.**
        **County of Erie et al., Defendants.**
        **Civil Action No. CIV-76-477E**
CIV-76-477E
                June 18, 1981

ELFIN, D.J.
**\*1** This is an action charging discrimination on account of sex and retaliation for filing a charge of discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*FN1 This court has jurisdiction over this suit and all parties thereto. 42 U.S.C. § 2000e-5(f); this case was tried by me, sitting without a jury, on various dates in September 1980. At the close of plaintiff's case, defendants moved to dismiss under Fed.R.Civ.P. rule 41 (b); decision on such motion was deferred until after presentation of defendants' case. The following constitute my findings of fact and conclusions of law as required by Fed.R.Civ.P. rule 52(a).

> FN1 This action was, as its caption indicates, initially pleaded as a class action; plaintiff timely moved for such certification. However, while such motion was under advisement, plaintiff requested leave to withdraw such motion, and, there being no opposition, I granted plaintiff leave to file an amended complaint deleting such class action allegations. Such was timely done; this suit therefore, never became a class action.

### Parties and Background

Hoff is a female resident of Boston, Massachusetts, where she is now completing the requirements for a

Ph.D. Degree at Boston University. From April 1974 until August 1976 Hoff was employed as the Direct Services Manager of defendant South East Corporation V ("SEC V").FN2

> FN2 SEC V's proper name, by which it seems never to have been referred, is *Mental Health Services-Erie County South East Corporation V.*

SEC V is a not-for-profit New York corporation whose principal purpose is to enter into contracts with Erie County, N.Y. to provide certain outpatient mental health services to residents of a geographical portion of Erie County, referred to as Catchment Area V or Area V.FN3 Erie County ("the County") is a county of the State of New York; the County and SEC V were at all relevant times connected by a contract. This contract provides generally for payment by the County of all but a small fraction of SEC V's operating expenses and close budgetary supervision and control by the County. Of great importance to the case at bar, section 2.2 of this contract provides for the position of Executive Director of SEC V, and requires prior approval of the Erie County Department of Mental Health ("the Department") of any person appointed by SEC V to fill a vacancy in the Executive Director's position; section 2.3 requires approval by the County of all job descriptions and a review by the County of the credentials and starting salary of all members of the professional staff before reimbursement may be had for the salary (or related expenses) for the relevant employee. Section 2.2 would appear, on its face, to give the Department an absolute veto power over SEC V's appointment of an Executive Director; however, this provision was seemingly interpreted by the Department to permit only the same review of qualifications required for all professional staff members.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 2

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P
32,350
**(Cite as: Not Reported in F.Supp.)**

FN3 Such Catchment Area consists of the Towns of West Seneca, Orchard Park, Boston, Concord, Elma, Aurora, Colden, Marilla, Wales, Holland, and Sardinia and a portion of the City of Buffalo.

*2 The job description for the Executive Director position required, *inter alia,* that he or she have served for five years in a "senior administrative capacity in a mental health (or similar) facility, institute, or agency." The job description for Direct Services Manager required, *inter alia,* "five years full-time paid experience in a senior capacity in the delivery of client services in a mental health facility, institute, or agency." The Department Director of Manpower Training and Development, one Carolyn Daughtry, who had assisted in the preparation of these job descriptions, stated that:
senior administrative capacity means that the person must have had responsibility for actually directing and managing a program, planning, staffing, organizing, directing, hiring, firing and the rest. It does not include supervision at a middle management level to establish that. It means at the lead point of responsibility, the final responsibility for either a manager segment of a program or in the top management capacity of an agency or facility.

This description was not seriously challenged.

### Hoff's Qualifications

Hoff testified at length as to her professional qualifications; this testimony was not significantly impeached and I found such generally to be highly credible. She had obtained a Diploma in Nursing in 1954 from St. Alexius Hospital School of Nursing, Bismarck, N.D., whereat she was Valedictorian of her class; a Bachelor of Science degree in Nursing *magna cum laude* in 1958 from St. Louis University; a Master of Science degree in Nursing in 1963 from the Catholic University of America; she also has taken numerous special courses and workshops, including a one-year fellowship in Suicidology at Johns Hopkins University School of Medicine in 1969. She is a member of numerous professional organizations,

including *Sigma Theta Tau,* the national scholastic honor society for nursing, has written extensively, and is an editor of a professional journal.

Her professional experience may be described as follows: from 1954-1956 she was an Instructor in Medical-Surgical Nursing at St. Alexius Hospital School of Nursing. From 1962 until 1967, she held the position of "Supervisor and Nurse Clinician" at St. Alexius Hospital. During the time she held this position, she began and developed an in-patient and out-patient psychiatric and mental health service at St. Alexius Hospital, including one of the first specifically-designed suicide prevention services in the United States. Her duties included the establishment of professional qualifications and guidelines for professional staff; recruitment and training of such professional staff, establishment of administrative and clinical procedures for the psychiatric portion of the hospital; budgeting and resource allocation; coordinating medical, nursing, and support staff to optimize professional care, as well as some private counselling of hospital inpatients. The administrative portion of her work predominated over that devoted to direct patient care or the immediate supervision of direct patient care. Especially as the work involved the establishment of a new and unique department, I find that the period of 1962-67 does represent five years of senior administrative experience as defined by the County. From 1967-69 she served full-time as "Psychiatric Nurse Consultant" at the Memorial Mental Health and Retardation Center, also in Bismarck, N.D., which work continued on a diminished basis while she pursued her fellowship at Johns Hopkins in 1969-70. She served under an Executive Director and planned and coordinated programs for the Center; however, I am not persuaded that her role there involved sufficient personal responsibility to qualify as a "senior administrative" position; it seems to be adequately described by the term "consultant." After her course of study in 1970 at Johns Hopkins, Hoff came to Erie County. Her first position was with the Suicide Prevention and Crisis Center ("the SPCC ") in Buffalo, N.Y. where her title was that of Clinical Director. The SPCC had a small professional staff but more than one hundred

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 3

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350
**(Cite as: Not Reported in F.Supp.)**

volunteers who manned telephones. She developed a procedural manual, helped systematize staffing and attention to patients, prepared record keeping and forms for the use of the volunteer staff and means of requiring their use, and coordinated an " out-reach service" with local police agencies and selected a staff for such service. According to Hoff, this work constituted a senior administrative position. In contrast, defendants offered Daughtry's deposition testimony.[FN4] According to Daughtry, the Executive Director of the SPCC was responsible for clinical standards and for development of guidelines. Hoff's position was described as senior level clinical, by reference to the organization chart for the SPCC; that Hoff was described as a Director Daughtry described of little importance, due to somewhat careless use of that term in such agencies at that time. I find Hoff's first-hand description of her organizational, planning, and staffing responsibilities to be of greater probative weight than Daughtry's testimony, which was based less on personal knowledge than on an organizational chart not in evidence,[FN5] and accordingly I find that Hoff's service at the SPCC constituted, during the developmental stage of the agency, senior level administrative experience.[FN6]

FN4 Her deposition and that of James Warde, M.D., the Commissioner of the Erie County Department of Mental Health, were admitted into evidence by stipulation of the parties. There was a suggestion that Daughtry no longer is within the subpoena power of this Court; it is clear that Warde could have been subpoenaed, as he is still engaged in his capacity as Commissioner.

FN5 Daughtry's testimony therefore consists in part of hearsay; Hoff did not object and has not done so, thereby waiving any objection.

FN6 *Compare* Daughtry's testimony that because the Buffalo General Hospital Community Mental Health Center was in the course of development during Hoff's tenure, Hoff's position there then qualified

as senior administrative while it would not do so at a later time.

*3 The parties agree that Hoff's positions with the Buffalo General Hospital Community Mental Health Center and with SEC V together constituted three years of senior administrative experience prior to October 1975.

### The Claim Herein

As noted above, Hoff began serving as Direct Services Manager of SEC V in April 1974; at that time the Executive Director of SEC V was one Martin Livenstein. Hoff, as Direct Services Manager, and Eugene Kieffer, the Comptroller of SEC V and an accountant, both reported directly to Livenstein, and they and Livenstein constituted the management team of SEC V. Hoff and Kieffer were prepared to and did each temporarily assume certain of Livenstein's duties when Livenstein was away on business or on vacation; Livenstein customarily issued a memorandum giving each certain areas of responsibility.

Plaintiff had assisted, with Livenstein, Daughtry and others, in the preparation of the job descriptions for both Executive Director and Direct Services Manager, and was familiar with the prerequisites for these positions. She also knew that the County would reject any candidate having insufficient qualifications.

Approximately June 15, 1975, Livenstein informed the Board of Directors of SEC V that he was resigning his position effective July 31, 1975 to take a position as Mental Health Commissioner in Sullivan County, N.Y. Immediately thereafter, the Board of Directors ("the Board") formed an *ad hoc* Search Committee to find a new Executive Director; the Chairman of the Search Committee was to be John Cooney, a West Seneca, N.Y. pharmacist who had been on the Board since SEC V's incorporation and who regularly had headed the Board's Personnel Committee.

Cooney was familiar with Hoff and was impressed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 4

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350
**(Cite as: Not Reported in F.Supp.)**

with her and her work. In late June 1975, he requested that she apply for the Executive Director position, saying that he believed her to be qualified. Hoff testified at trial that she believed he had offered her the position; I do not doubt the sincerity of her belief, but I am persuaded that he only invited her to apply for the post. He had no authorization to make the offer, and was concurrently engaged in commencing a search for applicants. Hoff later submitted her resume to Cooney.

Shortly after Hoff spoke with Cooney, she called Commissioner Warde, announced that she had been offered the position by Cooney, and requested a conference to discuss certain facets of what would be their working relationship. She also stated, "of course, there's no question but that I am over-qualified for the position." Warde responded that he didn't know whether she was qualified or not, further declined to meet with her on grounds that holding such a meeting before formal selection of a candidate by the Board of Directors would tend to undercut the autonomy of the Board, and generally refused to be drawn into the subject at all.

In or about July 1975, Cooney requested the assistance of the Department in recruiting candidates. The Search Committee met on or about July 21, 1975 with Daughtry, a meeting at which Warde was present for a short time. Daughtry suggested placing newspaper advertisements, which thereafter was done; it was also noted that the Department received unsolicited resumes in the ordinary course of its business and that resumes of qualified candidates were forwarded to the Search Committee.[FN7]

> FN7 Daughtry testified that she did not learn about Livenstein's resignation until after he had left. Such testimony is inconsistent, although not seriously so, with her attendance at this meeting, which shortly preceded Livenstein's departure.

*4 The Search Committee also requested, probably at this meeting but possibly later, that the County

review informally the qualifications of a group of selected candidates before final selection, so that the Selection Committee, which considered itself inexpert in personnel matters, would not go to the time, trouble and expense of interviewing candidates that the County would not have approved after a final selection. Such a service was routinely provided upon request by the County to the six contracting mental health corporations although by late 1975 it was a service not frequently requested; Daughtry believed that generally the Boards of Directors of the contracting corporations felt able to do the preliminary screening themselves.

The Search Committee continued to meet after the Department people left the July 21, 1975 meeting; it decided to appoint an acting Executive Director and it further decided that Hoff should not be the acting Executive Director, inasmuch as she was a declared candidate for the Executive Director position and would gain what was felt to be an unfair advantage from any incumbency. SEC V had never faced a comparable situation before; there was no provision of its personnel manual nor any other established policy to apply. The Search Committee accordingly decided to appoint Comptroller Kieffer to the interim post. Both he and Hoff were in a "direct line" of succession to the Executive Director's position; the (permanent) Executive Director's position required qualifications not required of either subordinate. It had been customary for Hoff and Kieffer effectively to share direction in the Executive Director's absence; it appears that when Livenstein planned to be away, he would delegate particular areas of responsibility to Hoff and/or to Kieffer. Kieffer, although not a mental-health professional, was qualified to direct the affairs of SEC V on an interim basis, with the normal assistance of the Direct Services Manager. County approval was sought and obtained in August 1975. There was no job description for acting Executive Director.

The Search Committee received thirty-six resumes from applicants. Of these only two were from females; Hoff's and that of one Nancy J. Pickup, of Leesburg, Florida. These resumes were screened by members of the Search Committee in early

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A474

Not Reported in F.Supp.                                                    Page 5

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350
**(Cite as: Not Reported in F.Supp.)**

September 1975; nine, including Hoff's were found potentially to meet the County's requirements for the position. Eight of these resumes were sent to Daughtry under a cover letter dated September 5, 1975; two more, one of which was actually a duplicate of one included with the first letter, were forwarded under cover of a letter dated September 9, 1975.[FN8]

> FN8 The resumes forwarded September 5, 1975 were those of Shaughnessy, Cammarata, Karst, Hoff, Taylor, Pelinski, Lovelace, and Lerner. The resumes forwarded September 9 were a duplicate of the of Shaughnessy and that of Hartl.

Daughtry reviewed these resumes, and, in a telephone conversation and then in a meeting with Cooney, advised him that three of the resumes submitted-those of Shaughnessy, Taylor, and Pelinski-met the County's requirements. She also passed along two resumes which had been sent directly to the County: those of Bussell and Comini. It is not clear whether she specifically advised Cooney that her review of the candidates' qualifications was based solely on the resumes; however, I find that Cooney at least knew that the review conducted was informal and in less detail than would precede confirmation of an actual appointment.

#### [Review of Resumes]

**\*5** Daughtry's testimony does not show that her review of the resumes for minimum qualifications was a rational process. During her testimony, she was shown the resumes of Lerner and Karst, which were not approved by her in 1975. During her testimony, she stated that these resumes had been approved and went into considerable detail about how their administrative experience satisfied the criteria. This remarkable, and unexplained, confusion wholly discredits her testimony in showing the reasonableness of the review process. However, I still credit her testimony that, during her review of the two batches of resumes received from

Cooney, she extended a similar degree of scrutiny to each and did not in any case go beyond the face of the resume plus information about Erie County facilities already known to her.

This, however, was not the only contact that the Department's personnel had had with the application process herein. Commissioner Warde had been telephoned by a personal friend, one "Bud" Royer, who was the director of a mental health facility in Pittsburgh, Pennsylvania, and who informed Warde that there had been a change of administration in Pennsylvania and that a number of "good people" would be looking for jobs. Royer mentioned Comini and Pelinski; Warde invited them to submit *curricula vitae*. Pelinski applied directly to Cooney; Comini, however, sent his resume in care of Warde, by a letter dated September 17, 1975. The cover letter refers to Warde's conversation with Royer and states that Comini and Warde had discussed his application, presumably over the telephone, the previous day.

Warde had also discussed Hoff's credentials with Daughtry before her resume was forwarded September 5th. Hoff had described herself as "over-qualified" for the position; Warde testified that he was generally familiar with Hoff's work since her arrival in Erie County, but that he was under the impression that her work was clinical rather than administrative, so, as a routine matter, he went to Daughtry's office and requested that she review Hoff's file relating to her administrative experience. After looking at Hoff's file, which included her previous resume submitted at the time she applied for the Direct Services Manager's position,[FN9] it was Daughtry's judgment and Warde's concurrence that Hoff was "light" on senior administrative experience. Ward and Daughtry both testified that they did not remember the date of this discussion or whether it preceded or followed either the meeting with the SEC V Search Committee or Warde's discussion with Royer; no other evidence of its timing was produced. However, Warde's testimony suggests that his inquiry was triggered by Hoff's description of herself as "over-qualified;" and, inasmuch as such an inquiry would be not unexpected under these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A475**