Not Reported in F.Supp.                                                                 Page 6

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350
(Cite as: Not Reported in F.Supp.)

circumstances, I am persuaded that Warde's conversation with Daughtry occurred on or about June 1975, not later. There is no evidence that Warde and Daughtry discussed Hoff's credentials (or anything else, for that matter) at the time he passed Comini's resume to her for review, or at any time proximate to his conversation with Royer. There is no direct evidence, and I decline to infer, that Warde interceded in the process to "put his thumb on the scale," in favor of either candidate mentioned by Royer, or that for any similar reason he attempted to derail Hoff's candidacy.

FN9 Such file was not introduced in evidence.

*6 The resume submitted by Hoff consists of eleven sheets of paper, generally single-spaced. It is composed of a one-page Biographical Sketch, and a ten-page *vita*. It describes in detail her education, publications and accomplishments. However, especially in comparison with the three resumes approved by Daughtry, it is generally deficient in that it does not show what she did during her tenure in her various jobs, nor does it show what period of time was involved in any of the numerous listed professional accomplishments. The closest the submitted document ever comes to doing this is the conclusory statements in the Biographical Sketch that Hoff "pioneered in the 1960's in the national development of community mental health centers and specialized crisis service," and that she has " over twelve years experience" doing a variety of things, including direct service. Witnesses at trial shown the resume stated that without further inquiry it could not be determined whether Hoff possessed the requisite five years senior administrative experience, an opinion with which I concur. The resume does not unambiguously show the requisite five years experience in a senior administrative capacity. Additionally, although I have determined that plaintiff's position with the SPCC was in a senior administrative capacity, such determination is seemingly contrary to that which could be determined simply from an inspection of the organization chart of that agency, on which Daughtry testified that she based her determination.

By contrast, the five resumes returned or forwarded as approved by Daughtry specify in far greater detail the duties performed by the applicants in each of their various professional positions.

The SEC V Search Committee was advised of Daughtry's decision relating to the applicants in October 1975. Cooney did not attempt to challenge the Department's decision because he felt that Daughtry had the relevant experience and he considered the Department's decision final. He promptly moved to schedule interviews with the five approved candidates: Shaughnessy, Comini, Pelinski, Bussell and Taylor. Interviews with the first three were scheduled for and held October 21 and 28, 1975; the latter two declined interviews.

*[Claimant's Rejection]*

Hoff, meanwhile, had been informed October 14, 1975 by SEC V Board Chairman Peter Crotty that her application had been rejected by the County due to lack of administrative experience. Hoff made no inquiry as to precisely why her application had been rejected, and she did not supply a new resume or any additional information promptly or at any time prior to January 12, 1976; the information she supplied on the latter date consisted of *the same resume* plus a number of letters of recommendation, all of which appear to relate to her work with SEC V or the Buffalo General Hospital Community Mental Health Center, the time in which positions had already been credited as time in a senior administrative capacity, and are therefore of relevance to the alleged deficiency in her credentials.

*7 After interviewing Shaughnessy, Comini and Pelinski, the Search Committee had by early November decided to hire Comini. In its meeting held November 20, 1975, the Board of Directors of SEC V authorized Cooney to inform the Department that Comini was its unanimous choice for the Executive Director. He was not formally hired until after the Board of Directors meeting April 15, 1976; however, he remained the Board's first choice from November 1975 until that time.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A476

Not Reported in F.Supp.                                              Page 7

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350
**(Cite as: Not Reported in F.Supp.)**

He was not engaged beginning in January 1976 solely because of budget cutbacks that would otherwise have forced the cancellation of all salary increases, which, in the acting Executive Director's opinion, would have caused the loss of several key staff persons. It was the Board's intention not to begin the application process again unless Comini withdrew his application. Comini first met the full Board December 22, 1975; at about this time Crotty told Hoff that Comini had met or would meet the full Board.

As noted above, Hoff submitted a renewed application January 12th, and another February 10, 1976. These applications were not considered, as the Board had already determined that it would hire Comini as Executive Director when funds became available, subject only to his continued interest. The Board's decision, as described in the minutes of its meetings, reflects a full consideration of the various unpalatable alternatives caused by the budget cutbacks.

Hoff filed a charge of discrimination on account of sex with the Equal Employment Opportunity Commission ("the EEOC") March 17, 1976. She testified that she had later resigned due to " pressures and tensions" caused by her filing the charge of discrimination with the EEOC. However, Hoff was unable to point to any definite acts of pressure or harassment, and her testimony on this issue was notably vague, evasive, and undetailed in remarkable contrast to her generally forthright and highly credible testimony; I find her testimony that there was pressure put on her to resign unworthy of belief. I find that she left her position voluntarily in August 1976 to pursue graduate studies at the London School of Economics, for which she had applied in December 1975. Since her resignation in August 1976, plaintiff has been primarily a full-time student and has had only relatively small amounts of income from temporary positions and from book royalties.

Hoff introduced no evidence that either the overall application process or the submission of resumes to the County for preinterview screening had any disparate impact on females within the relevant

labor market. Nor did she introduce evidence that females were statistically underrepresented on defendants' work forces or portions thereof. She did introduce some evidence that certain other females did not receive positions for which they had applied. I find this evidence too limited, sketchy, and speculative to be of significant probative weight.

### Conclusions of Law

Plaintiff introduced no evidence that the application process or any portion thereof had a disproportionate impact on females in the relevant labor market. She has therefore wholly failed to establish a *prima facie* case of disparate impact. *See, e.g., Dothard v. Rawlinson,* [14 EPD P 7632] 433 U.S. 321, 329 (1977).

**\*8** Whether plaintiff has established a *prima facie* case of disparate treatment presents a much more difficult question. The general formula for establishing a *prima facie* case as stated by the United States Supreme Court may be "regendered" as follows:
(i) that she belongs to a protected group; (ii) that she applied for and was qualified for a job for which the employer was seeking applicants; (iii) that despite her qualification, she was rejected, and (iv) that, after her rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications.

*See, e.g., Texas Dept. of Community Affairs v. Burdine,* [25 EPD P 31,544] 10 S.Ct. 1089, 1094 n.6 (1981) (quoting from *McDonnell Douglas Corp. v. Green,* [5 EPD P 8607] 411 U.S. 792, 802 (1973)). However, it has been stressed that the precise components of a *prima facie* case may not be applied mechanically but must be modified as necessary to encompass differing factual issues. *See, e.g., Furnco Construction Corp. v. Waters,* [17 EPD P 8401] 438 U.S. 567, 575-76 (1978); *Teamsters v. United States,* [14 EPD P 7579] 431 U.S. 324, 358 (1977). The purpose of the requirements for the *prima facie* case is to rule out most legitimate reasons for failure to hire the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 8

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350
**(Cite as: Not Reported in F.Supp.)**

plaintiff, so that it becomes "more likely than not" that the employer has acted for impermissible reasons. *See Texas Dept. of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1094. Herein, I have determined that plaintiff *at trial* showed that she was qualified for the position, but that she did not show to the employer at the time she applied that she was qualified and that, moreover, she failed to amend or supplement her application after being apprised of and supplied with reasons for its rejection. Absent proof that her application unambiguously demonstrated her qualifications, I do not believe that plaintiff has ruled out most of the possible legitimate reasons for her rejection and thereby created a *prima facie* case of intentional sex discrimination. I find that plaintiff has failed to prove a *prima facie* case appropriate to the facts at bar. I do, however, find that she applied (albeit defectively), that she was in fact qualified, that she was rejected, and that the position remained open at least through November 21, 1975.

Plaintiff has failed to show that SEC V was still seeking applicants for the position at the time of her January 12th and February 10, 1976 applications; she has therefore failed to establish a *prima facie* case with respect to these applications.

Assuming *arguendo* that plaintiff has established a *prima facie* case with regard to her initial application forwarded to the Department in September 1975, the burden then shifts to the employer to articulate some "legitimate, nondiscriminatory reason for the employee's rejection." All the employer need do is "raise a genuine issue of fact as to whether it discriminated against the plaintiff." *See, Texas Dept. of Community Affairs v. Burdine, supra,* 101 S.Ct. at 1094. Daughtry's, Warde's and Cooney's testimony is far more than sufficient to raise the necessary issue of fact: they testified that plaintiff was rejected because she was not qualified and because her application, together with the other information immediately available to the County, did not affirmatively show her to be qualified.

**\*9** This, under the rule of *McDonnell Douglas Corp. v. Green, supra,* (as restated this term in

*Texas Dept. of Community Affairs v. Burdine, supra* ) requires the employee to show that the articulated reasons were pretextual, a showing that merges with her ultimate and continuing burden of showing intentional discrimination on account of sex. I find that plaintiff has failed to do so. It was clearly reasonable for SEC V and the County to employ a system to screen the applicants prior to conducting full interviews, and also clearly reasonable to place the burden on the interested applicant to demonstrate his or her credentials. That the process as applied by Daughtry was substantially arbitrary and arguably unfair does not make such process merely a pretext for sex discrimination, especially inasmuch as the five Daughtry-approved resumes did not suffer from the deficiencies of plaintiff's. In the absence of a showing of a desparate [sic] impact on women generally, Title VII does not require that the employer structure his employment decisions to maximize the opportunities for minorities and females (*Furnco Construction Corp. v. Waters, supra,* 438 U.S. at 577-78) or even that such decisions be soundly based, provided that the basis for them is honestly relied on. *See, e.g., Lieberman v. Gant,* [23 EPD P 31,164] 630 F.2d 60, 65 (2nd Cir. 1980). Although Daughtry's testimony suggests that the screening process was in fact not sound, I am wholly unpersuaded that it "was so ridden with error that defendant could not honestly have relied upon it." *Lieberman v. Gant, supra,* at 65. To the contrary, I am persuaded that the defendants could and did so rely on it. In conclusion, plaintiff has failed to prove by a fair preponderance of the evidence that the failure to promote her to the position of Executive Director of SEC V constituted intentional discrimination by reason of sex.

Plaintiff has established a *prima facie* case of discrimination against SEC V by reason of its failure to promote her to the position of acting Executive Director. The County, however, had no role in this decision. The burden then shifts to SEC V to articulate some legitimate non-discriminatory reason for the failure to promote her to the interim post. The testimony of Cooney that this was done so as not to give her an unfair advantage over other declared candidates is clearly an articulation of such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A478

Not Reported in F.Supp.                                          Page 9

Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350
**(Cite as: Not Reported in F.Supp.)**

a legitimate reason and, in fact, demonstrates a commendable desire to be fair. Plaintiff offered no substantial evidence that would show that this was a mere pretext for discrimination. Kieffer was qualified for the interim appointment; there is no other evidence that the purported decision was wholly unreasonable, no evidence that it violated any policies or regular procedures of the organization (there being none to apply) and no direct evidence of intentional sex bias. Plaintiff has not shown that the decision by SEC V not to promote her to the acting Executive Director's position constituted discrimination by reason of sex.

*10 Plaintiff has not shown that her resignation from SEC V was other than voluntary or was connected to any acts of apparent retaliation by defendants. She has not established a claim of retaliatory constructive termination.

Although plaintiff has failed to establish any of her claims, I find that the instant action was brought in good faith.

For these reasons, it is hereby ORDERED that the complaint herein is dismissed.

Hoff v. County of Erie
Not Reported in F.Supp., 1981 WL 308 (W.D.N.Y.), 26 Fair Empl.Prac.Cas. (BNA) 290, 27 Empl. Prac. Dec. P 32,350

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A479

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1534746 (D.Del.), 94 Fair Empl.Prac.Cas. (BNA) 114, 15 A.D. Cases 1490, 28 NDLR P 207
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
Persinger v. Delmar School Dist.D.Del.,2004.
United States District Court,D. Delaware.
Kathleen M. PERSINGER, Plaintiff,
v.
DELMAR SCHOOL DISTRICT, Defendant.
**No. Civ.A. 02-1447-JJF.**

July 8, 2004.

John M. Stull, of John M. Stull, Wilmington, Delaware, for Plaintiff.
Marc S. Casarino, of White & Williams, LLP, Wilmington, Delaware, for Defendant.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Presently before the Court is Defendant's Renewed Motion For Summary Judgment. (D.I.48.) For the reasons set forth below, the Court will grant the Motion.

## BACKGROUND

On June 27, 2001, the Plaintiff, Kathleen M. Persinger, filed a charge with the Delaware Department of Labor and the Equal Employment Opportunity Commission ("EEOC") alleging that Delmar School District (the "School District") discriminated against her on the basis of race, gender, religion, and disability. Plaintiff subsequently filed suit in this Court alleging that her supervisor at the School District, Dr. Harry Hoffer ( "Dr.Hoffer"), subjected her to a continuing campaign of discrimination and harassment which she contends caused her to become mentally and emotionally incapable of performing her job as a special education teacher, thus forcing her to obtain disability pension benefits and resign from her position.

Not surprisingly, the School District presents a different rendition of the events surrounding Plaintiff's resignation. On March 15, 2003, Plaintiff was proctoring a standardized state test at the School District. During this examination, the School District asserts that Plaintiff was observed by two of her fellow teachers modifying a student's answer and providing unauthorized written aids to students. The School District contends that this conduct is proscribed by state regulations and exposed it to sanctions by the state. The School District asserts that it was this conduct that led to a final confrontation with Plaintiff, at which point Plaintiff had a panic attack and was taken to the hospital. The School District states that it subsequently advised Plaintiff that she would be terminated for her transgressions, but postponed terminating her so that Plaintiff could complete an application for disability benefits. Plaintiff subsequently received a disability pension which mooted any termination intentions of the School District.

On November 20, 2003, the Court granted Plaintiff an extension of time to respond to the School District's discovery requests and set a deadline for the completion of discovery. (D.I.40.) Based on this extension, the Court permitted the parties to supplement their case dispositive motions. *Id.* By its supplemented Motion, the School District moves the Court to grant it summary judgment on all of Plaintiff's claims.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A480**

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2004 WL 1534746 (D.Del.), 94 Fair Empl.Prac.Cas. (BNA) 114, 15 A.D. Cases 1490, 28 NDLR P 207
(Cite as: Not Reported in F.Supp.2d)

Fed.R.Civ.P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). Thus, to properly consider all of the evidence without making credibility determinations or weighing the evidence the "court should give credence to the evidence favoring the [non-movant] as well as that ' evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." ' *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254 (1986)).

*2 To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:
do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U .S. 574, 586-87 (1986)(quoting Fed.R.Civ.P. 56). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Liberty Lobby, Inc.,* 477 U.S. at 252 (1986).

DISCUSSION

I. Whether Summary Judgment Is Appropriate On Plaintiff's Hostile Work Environment Claim [FN1]

FN1. It is not clear from the Complaint or Plaintiff's Opposition Brief what Plaintiff advances as her theories for recovery.

However, based on a reading of the papers, the Court construes Plaintiff's Complaint to contend discrimination based on: 1) hostile work environment; 2) violation of the Americans With Disabilities Act (the " ADA"); and 3) constructive discharge.

A. *Contentions*

The School District contends that it should be granted summary judgment on Plaintiff's hostile work environment claim because Plaintiff has failed to establish a prima facie case of discrimination. The School District maintains that Plaintiff has pointed to no evidence demonstrating that she was discriminated against on the basis of religion, race, or gender. The School District also contends that, even if Plaintiff were able to demonstrate that Dr. Hoffer discriminated against her on the basis of religion, race, or gender, she could not establish respondeat superior liability for the School District because she has provided no evidence that high-level officials at the School District were aware of this alleged discrimination.

Plaintiff did not submit an opposition brief to the School District's supplemented Motion, and therefore, the Court concludes that Plaintiff intends to rely upon her prior submission in opposition to the School District's initial summary judgment motion. (D.I.51.) In her papers, Plaintiff contends that she was terminated from employment at the School District due to continued harassment and pressure by Dr. Hoffer. Plaintiff asserts that the uncontested facts and documents establish the discriminatory and harassing actions of Dr. Hoffer.

B. *Decision*

As discussed above, the Court construes the Complaint to allege that the School District subjected Plaintiff to a hostile work environment based on her gender, religion, and race in violation of Title VII of the Civil Rights Act of 1964. (D.I. 37 at A2.) When evaluating Title VII claims, courts utilize the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A481**

Not Reported in F.Supp.2d                                                                Page 3

Not Reported in F.Supp.2d, 2004 WL 1534746 (D.Del.), 94 Fair Empl.Prac.Cas. (BNA) 114, 15 A.D. Cases 1490, 28 NDLR P 207
**(Cite as: Not Reported in F.Supp.2d)**

*Green,* 411 U.S. 792 (1973). This burden shifting involves three steps: 1) the plaintiff has the initial burden of establishing a prima facie case of discrimination; 2) if the plaintiff meets his or her burden, the burden shifts to the defendant to articulate some legitimate non-discriminatory rationale for his or her action; and 3) if a defendant proffers a non-discriminatory reason, the burden shifts again to the plaintiff to prove by a preponderance of the evidence that the reasons proffered by the defendant are merely a pretext for illegal discrimination. *See McDonnell Douglas,* 411 U.S. at 801-05; *Chandler v. City of Newark,* 2001 WL 902209 at *2 (D.Del. July 31, 2001)(quoting *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1973)). The School District maintains that Plaintiff cannot establish a prima facie case of discrimination in violation of Title VII.

*3 In order to state a prima facie hostile work environment Title VII claim, Plaintiff must demonstrate that: 1) she suffered intentional discrimination because of her membership in a protected class; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected her; 4) such discrimination would have affected a reasonable person of the same protected class in that position; and 5) the existence of respondeat superior liability. *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir.1995); *Hall v. Bell Atlantic Corp.,* 152 F.Supp.2d 543, 550 (D.Del.2001). The School District contends that Plaintiff has failed to adduce evidence sufficient to establish elements one and five of a prima facie case.

The Court agrees with the School District that Plaintiff has failed to provide evidence sufficient to establish the first element of her Title VII hostile work environment claim. As an initial matter, the Court notes that Plaintiff has pointed to no specific facts in her Opposition Brief supporting her claim of discrimination and, that on this ground alone, summary judgment in favor of the School District is appropriate. *See Matsushita,* 475 U.S. at 586-87 (noting that a party opposing a motion for summary judgment "must come forward with 'specific facts showing that there is a genuine issue for trial." ')

(quoting Fed.R.Civ.P. 56).[FN2] Moreover, the Court is persuaded that the allegations of discrimination against the School District consist entirely of unsupported, vague, and conclusory allegations of discriminatory attitudes held by Dr. Hoffer that are not evidence of intentional discrimination.

> FN2. Instead of identifying particular passages of the Appendix accompanying her motion for summary judgment (D.I.51), Plaintiff states that "[b]ased on the provable, admitted and established facts and relevant documents which authenticity is uncontested, as compiled in the attached Appendix material ... [Plaintiff] has shown ... no other result that the continual and effective harassment of her on the job has resulted in her loss of job ...." (D.I. 39 at 9.) Such generalized references to an appendix of compiled materials one hundred and sixty two pages in length do not qualify, in the language of the rule, as "set[ting] forth specific facts showing that there is a genuine issue for trial," and thus cannot preclude the entry of summary judgment. Fed.R.Civ.P. 56(e). The Court should not be required, although it has attempted to do so here, to "develop [a party's] argument or defense [or] augment a nonmovant's position[.]" James Wm. Moore et al., 11 *Moore's Federal Practice* § 56.13[3] (3d ed. rev.2003).

For example, Plaintiff relies on the deposition testimony of Pamela K. Grosz in support of her allegation that Dr. Hoffer intentionally discriminated against Plaintiff because of her gender. In her deposition, Ms. Grosz was asked, " Are you aware of any ... instances where Dr. Hoffer exhibited negative, I'll call it, attitude toward women employees of Delmar High School other than yourself?" Ms. Grosz responded, "I can't remember specific ones, but, I mean, there were times that he raised his voice at some other women. I should say specifically [Plaintiff]." (D.I. 51 at 145-46.) Upon further questioning about the specifics of Dr. Hoffer's hostility toward Plaintiff,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A482**

Not Reported in F.Supp.2d                                              Page 4

Not Reported in F.Supp.2d, 2004 WL 1534746 (D.Del.), 94 Fair Empl.Prac.Cas. (BNA) 114, 15 A.D. Cases 1490, 28 NDLR P 207
**(Cite as: Not Reported in F.Supp.2d)**

Ms. Grosz replied:
A: [Dr. Hoffer] got upset about something that we said.
Q: What was said?
A: Something regarding-I don't really know.... I can't remember what people say. I'm sorry.

*Id.* at 146. Even when viewed in the light most favorable to Plaintiff, the fact that Dr. Hoffer was upset about something Ms. Grosz and Plaintiff said does not provide probative evidence of intentional discrimination.[FN3]

> FN3. Plaintiff's responses to questions in her deposition regarding evidence of gender discrimination were similarly non-specific. *Id.* at 61-62.

Plaintiff's responses to questions about religious discrimination during her deposition also fail to establish discrimination by the School District. The following testimony is illustrative:
*4 Q: Can you tell me any specific instances while you were employed at [the School District] that Dr. Hoffer discriminated against you because of your religion?
A: Yes, I can.
Q: Please explain.
A: There were other people in the school that prayed with [Dr. Hoffer].
...
Q: So you attribute the fact that Dr. Hoffer did not want to pray with you or have you pray for him to be discrimination against you because of your religion.
A: Yup.

(D.I. 48 at A58-59.) Further, when questioned if she remembered any specific incidents where Dr. Hoffer discriminated against her because of race, Plaintiff responded, "Nope. That's pushed far back. I'm sure it will come back to me in dreams, don't worry." *Id.* at A60. The Court concludes that these unsubstantiated, generalized, and conclusory assertions are insufficient to establish intentional discrimination by Dr. Hoffer.[FN4] Thus, because Plaintiff cannot establish the initial showing of

illegal discrimination by Dr. Hoffer, the Court will grant the School District summary judgment on Plaintiff's hostile work environment claim based on race, gender, and religion. [FN5]

> FN4. The Court also observes that the deposition testimony of one of the witnesses Plaintiff relies on in support of her hostile work environment claim actually supports the School District's assertion that there is no evidence of discrimination in violation of Title VII in this case. In her deposition, Ilah Preston testified that Dr. Hoffer only cared if subordinates felt he had power over them. " He didn't care if you were [sic] man, woman, black, white, Indian. He didn't care about any of that." (D.I. 51 at 156.)

> FN5. Even if the Court were to find that Plaintiff established a prima facie case of discrimination, the Court would grant the School District summary judgment because Plaintiff has failed to identify evidence sufficient to overcome the legitimate non-discriminatory reason offered by the School District for its decision to terminate Plaintiff (which was never carried out because of Plaintiff's receipt of disability). The School District asserts that while Plaintiff was proctoring a state test, she impermissibly modified a student's answer and provided unauthorized aids in the testing room. (D.I. 52 at 5.) The School District contends that these actions were prohibited by state guidelines and exposed it to sanctions by the state. The record evidence demonstrates that the School District advised Plaintiff that she would be terminated based on these actions, at which time Plaintiff chose to seek a disability pension. (D.I. 37 at A44, A46, A47.)
> Once the School District has identified a legitimate non-discriminatory reason for its employment action, for Plaintiff to survive summary judgment, she must point to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A483**

Not Reported in F.Supp.2d                                                                                     Page 5

Not Reported in F.Supp.2d, 2004 WL 1534746 (D.Del.), 94 Fair Empl.Prac.Cas. (BNA) 114, 15 A.D. Cases 1490,
28 NDLR P 207
**(Cite as: Not Reported in F.Supp.2d)**

some evidence that would allow a reasonable factfinder to infer that the School District's non-discriminatory reasons were "either ... post hoc fabrication[s] or otherwise did not actually motivate the employment action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted). Plaintiff must do more than demonstrate that the employer's promotion decision was "wrong or mistaken," *id.* at 765, but offer evidence sufficient to persuade reasonable minds that her evidence of pretext is more credible than the School District's justifications. *See Iadimarco v. Runyon,* 190 F.3d 151, 166 (3d Cir.1999) (citing *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 62 (3d Cir.1989), *abrogated on other grounds, Hazen Paper Co. v. Biggins,* 507 U.S. 604 (1993)).

The Court concludes that the evidence produced by Plaintiff consists of only generalized and unsupported allegations of discrimination. Neither Plaintiff nor her supporting witnesses could identify any specific acts by Dr. Hoffer that indicate Plaintiff was discriminated against based on race, religion, or gender. Accordingly, although Plaintiff may be able to demonstrate at trial that she had a strained relationship with her supervisor, Dr. Hoffer, the Court concludes that Plaintiff would be incapable of persuading reasonable jurors that the School District's proffered justifications for deciding to terminate her were pretextual. *Sheridan v. E.I. DuPont de Nemours & Company,* 100 F.3d 1061, 1067 (3d Cir.1996).

**II. Whether Summary Judgment Is Appropriate On Plaintiff's ADA Claim**

*A. Contentions*

The School District contends that it is entitled to summary judgment on Plaintiff's ADA claim because, even if it concedes that Plaintiff has a mental illness that qualifies as a disability under the ADA, Plaintiff has provided no evidence that the School District was aware of such disability. Thus, the School District contends that it was impossible for it to discriminate against Plaintiff because of her disability. Further, the School District maintains that Plaintiff cannot establish that she was qualified for the position she held because in her claim for a disability pension Plaintiff asserted that she was unable to perform any of the duties required of a special education teacher. Plaintiff did not respond to the School District's arguments.

*B. Decision*

The *McDonnell Douglas* burden shifting framework described above also applies to claims of discrimination in violation of the ADA. *Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir.2000) (citations omitted). In order to establish a prima facie case of discrimination in violation of the ADA, a plaintiff must show that he or she: 1) is a disabled person within the meaning of the ADA; 2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and 3) has suffered an adverse employment decision as a result of discrimination. *Id.* (citing *Gaul v. Lucent Techs., Inc.,* 134 F.3d 576, 580 (3d Cir.1998); *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 142 (3d Cir.1998) (en banc)).

The Court concludes that the School District is entitled to summary judgment on Plaintiff's ADA discrimination claim for failure to establish a prima facie case of discrimination. First, Plaintiff provided no response to the School District's assertion that its employees were unaware of Plaintiff's disability. Certainly, if no official at the School District was aware of Plaintiff's disability, there can be no discrimination on the basis of such disability. Further, based on the absence of any response by Plaintiff to the School District's contention that Plaintiff's application for disability benefits contradicts her present claim that she is otherwise qualified to perform the essential functions of a special education teacher, the Court concludes that Plaintiff has failed to satisfy the second element of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A484**

Not Reported in F.Supp.2d                                                            Page 6

Not Reported in F.Supp.2d, 2004 WL 1534746 (D.Del.), 94 Fair Empl.Prac.Cas. (BNA) 114, 15 A.D. Cases 1490,
28 NDLR P 207
**(Cite as: Not Reported in F.Supp.2d)**

her prima facie case of discrimination in violation of the ADA.

*5 As the Third Circuit discussed in *Motley v. New Jersey State Police,* 196 F.3d 160 (3d Cir.1999), there is an inconsistency between a plaintiff's claim that he or she is qualified for a position, but denied that position due to a disability, and a prior application for disability by the same plaintiff where the plaintiff represented that he or she qualified for disability benefits due to a "total disability." *Id.* at 164-66. In such cases, the Third Circuit has held that a plaintiff " 'must proffer a sufficient explanation' to resolve the contradiction." *Id.* at 165 (quoting *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 1603 (1999)).

In the instant case, Plaintiff's application for disability benefits to the Delaware State Board of Pension Trustees represented that she "is unable to perform all educationally related responsibilities.... At the present time, no duty is possible. A risk is posed that threatens the well-being of children." (D.I. 51 at A52.) Plaintiff's representation that she is wholly unable to perform her teaching duties because of a danger posed to children, in the Court's view, contradicts any claim that she is otherwise qualified, with or without reasonable accommodations, to perform the essential duties of her job as a special education teacher. And, as Plaintiff has made no attempt to explain her " apparent about-face concerning the extent of her injuries [,]" *Motley,* 196 F.3d at 165, the Court concludes that Plaintiff has not established the second element of a prima facie case of discrimination in violation of the ADA.[FN6]

FN6. Because the Court has concluded that Plaintiff's discrimination claims cannot be maintained, the Court will also grant the School District summary judgment on Plaintiff's constructive discharge claim based on these same events. *See Phillips v. DaimlerChrysler Corp.,* C.A. No. 01-247 JJF, 2003 WL 22939481 (D.Del. March 27, 2003) (citing *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 581 (3d

Cir.1998) (holding that because a disability discrimination claim failed, the constructive discharge claim based on the same events necessarily fails)).

CONCLUSION

For the reasons discussed, the Court will grant the School District's Motion for Summary Judgment.

An appropriate Order will be entered.

*ORDER*

At Wilmington, this 8th day of July, 2004, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendant Delmar School District's Renewed Motion For Summary Judgment (D.I.48) is *GRANTED.*

*JUDGMENT IN A CIVIL CASE*

For the reasons stated in the Court's Memorandum Opinion and Order issued on July 8, 2004;

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendant Delmar School District (D.I.48.)

D.Del.,2004.
Persinger v. Delmar School Dist.
Not Reported in F.Supp.2d, 2004 WL 1534746 (D.Del.), 94 Fair Empl.Prac.Cas. (BNA) 114, 15 A.D. Cases 1490, 28 NDLR P 207

Briefs and Other Related Documents (Back to top)

• 1:02CV01447 (Docket) (Aug. 28, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A485**

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**c**
Seldomridge v. Uni-Marts, Inc.D.Del.,2001.Only
the Westlaw citation is currently available.
United States District Court, D. Delaware.
Shirley SELDOMRIDGE, Plaintiff,
v.
UNI-MARTS, INC., Defendant.
**No. CIV A 99-469 GMS.**

July 10, 2001.

MEMORANDUM AND ORDER
SLEET, District J.

I. INTRODUCTION

*1 On August 3, 1999, Shirley Seldomridge ("
Seldomridge") filed this employment discrimination
lawsuit against her former employer, Uni-Marts,
Inc. ("Uni-Marts"), under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (199
4), and the Civil Rights Act of 1991. 42 U.S.C. §
1981(a) (1994). In her complaint, Seldomridge
alleges that she was sexually harassed when her
supervisor stood naked before her as she was
working one afternoon. As a result, Seldomridge
claims that she experienced a hostile working
environment and was subsequently constructively
discharged from her position at Uni-Marts.
Presently before the court is Uni-Marts' motion for
summary judgment. After reviewing the record in
the light most favorable to Seldomridge, the court
concludes that she cannot establish her claims as a
matter of law, and will therefore, grant Uni-Mart's
motion for summary judgment.

The following sections explain the reasons for the
court's decision more thoroughly.

II. FACTS

Shirley Seldomridge is a married woman who once

worked at a Uni-Marts convenience store in
Delaware. Seldomridge had been employed at
Uni-Marts from December 5, 1997 until on or about
February 11, 1998. On Friday, January 16, 1998,
Seldomridge was working at the store with her
supervisor, Robert A. Walsh ("Walsh"). At some
time between 1 and 2 p.m. that day, Walsh told
Seldomridge that he was going to go to the
bathroom, but when he came out, he would be
wearing "nothing but a cigarette." At first,
Seldomridge thought her manager was joking, and
thus, she paid his comment no mind. However, a
few minutes later, she looked up and saw Walsh
standing in the doorway to the storage area
completely naked and "posing" approximately 36
steps away from where she was standing. According
to Seldomridge, she glanced at Walsh for less than a
second, promptly looked away, and stated, "Oh, my
God." Walsh then ran into the bathroom of the
workplace and stayed there for as long as
Seldomridge remained in the store.

About ten to fifteen minutes after the incident,
Seldomridge called her husband to come and pick
her up from the store. Within five minutes, he
arrived and took her home. She yelled to Walsh that
she was leaving and that she would not be back.
Later that afternoon at around three o'clock,
Seldomridge says that Walsh called her at home,
but she would not talk to him.

On the day of the incident, Seldomridge referred to
her employee handbook and telephoned a toll-free
number at the Uni-Marts headquarters to complain
about the incident. She spoke to someone, described
what had happened to her, and was told she would
be contacted. She also called this number after
Walsh called her at home. There is evidence in the
record that Seldomridge received a call from
Uni-Marts offices at 4:25 that afternoon.

Seldomridge also approached a New Castle County
Police Officer and advised him that Walsh had "
exposed his genitals" to her. As a **result**, Walsh was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

charged with Indecent Exposure in The Second Degree in violation of Section 764(a) of Title 11 of the Delaware Code. Walsh pled guilty to the charge in March of 1998. Seldomridge further **alleges** that she was so upset by the **incident** that she consulted with a psychiatrist on the very next business day. Seldomridge states that she consulted the psychiatrist about the **incident** one time. The record indicates that Seldomridge had been consulting this psychiatrist since 1995 or 1996.

### A. Uni-Marts' Conduct After **Incident** and Sexual Harassment Policy

**\*2** As a **result** of Seldomridge's call to the toll-free number, a Uni-Marts attorney and a Uni-Marts regional manager contacted John C. Minchak (" Minchak"), a group supervisor at Uni-Marts responsible for monitoring the day-to-day operations of a group of Uni-Marts' stores. Minchak was advised to give Seldomridge time off with pay, and told to suspend Walsh until Uni-Marts completed its investigation.

Minchak attempted to contact Walsh on the evening of the incident, but did not have a chance to speak to him until some time between six and seven the next morning. At this time, Walsh admitted his actions. As a result, Minchak immediately terminated Walsh's employment with Uni-Marts.

Uni-Marts contacted Seldomridge to inform her that Walsh had been fired and that she could take time off with pay. Although it is not clear from the record, it appears that Seldomridge returned to work approximately one to two weeks after the incident. In her deposition, Seldomridge acknowledged that Uni-Marts acted appropriately in terminating Walsh. There is no evidence in the record that Walsh contacted her after his termination.

It is undisputed that Uni-Marts had a sexual harassment and discrimination policy that was communicated to Seldomridge when she began her employment. This policy was communicated to employees through the employee handbook and a policy and procedures letter provided to each employee when hired. Seldomridge acknowledges that she received, read, and understood the company's policies by signing the acknowledgment page of the employee handbook and signing and initialing the company's policy and procedures letter. Seldomridge also acknowledges that she " called the sexual harassment number in that handbook." Thus, it is not disputed that she used the sexual harassment policy when she called the Grievance Committee to report Walsh's conduct on January 16, 1998.

The policy in effect during Seldomridge's employment was originally drafted in May of 1987. It was amended in October of 1991. The policy seeks to prevent sexual harassment and discrimination in the workplace. It clearly states that sexual harassment or discrimination will not be tolerated by Uni-Marts. The policy also sets forth a process for employees to complain and seek redress from the company in the event that an employee believes he or she is the victim of sexual harassment or is having any type of difficulty in the workplace. Specifically, the policy provides for a Grievance Committee to investigate and remedy any workplace problems.

### B. Alleged Hostile Work Environment and Constructive Discharge

Before the incident, Seldomridge stated that Walsh made her uncomfortable at work by saying that he thought she was pretty, he would like to "rock her world," and by making other "stupid, off-the wall comments." The record indicates that Seldomridge never filed a grievance against Walsh for making any of these comments prior to the incident. As Seldomridge's supervisor, Walsh had the power to: set her work schedule, fire her, recommend an increase or decrease in her wages, undertake or recommend tangible employment decisions affecting her, and direct her daily activities. There is no evidence in the record that Walsh made any negative employment decisions against Seldomridge.

**\*3** After the incident, Seldomridge continued to work for Uni-Marts for approximately one month

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A487**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

after Walsh's termination. During this time period, she alleges that she was subjected to comments by customers and a co-worker named Teddy [FN1] about the incident with Walsh. She stated that some customers would come into the store and make " really stupid comments." According to Seldomridge, Teddy would agree with customers by saying he did not believe that Walsh would do " anything like that." Besides Teddy, Seldomridge stated that other Uni-Marts' employees believed her. Seldomridge also stated that a customer who was friendly with Walsh did not believe her and that this customer did not want Seldomridge to wait on her. According to Seldomridge, this customer also made "smart comments behind her back." She also stated that one customer joked that he would take his clothes off, too. Seldomridge characterized the conduct by Teddy and certain customers as an " every day thing."

> FN1. Although Seldomridge states that Teddy was "hostile" to her and would not speak to her, she does not provide any specific examples.

Seldomridge admits that she never used the phone number in the handbook to notify the Grievance Committee of the problems she was having in the store. She also admits that she never notified anyone in management at Uni-Marts about any problems in the store after the incident with Walsh. However, Seldomridge claims that the acting store manager at this time knew how she was being treated. There is no other evidence in the record supporting this claim. Within a month after returning to work, Walsh left her employment at Uni-Marts for another job at a place called the Eating Post.

C. Walsh's Employment At Uni-Marts

Walsh was hired by Uni-Marts on August 28, 1993. On his employment application, Walsh stated that the reason he left his prior position was "violation of co[mpany] policy." Four months after being hired by Uni-marts, Walsh was promoted to store manager. On June 2, 1995, Walsh was promoted to

supervisor. In connection with that promotion, Uni-Marts conducted a search of Walsh's driving record. The record showed a number of traffic violations. As a result, a Uni-Marts manager wrote a memo remarking that "His overall [sic] seems to indicate a disregard for rules and regulations." On March 22, 1996, Walsh was demoted from Supervisor to Store Manager.

Prior to exposing himself to Seldomridge, Walsh received a score of 188 out of a possible 200. This placed him in the top category of excellent, on a Management Personnel Performance Evaluation. The worksheet contains no evaluation criteria based on anti-discrimination or harassment prevention.

Prior to his employment with Uni-Marts, Walsh had a prior criminal history. [FN2] In 1995, an Information was filed by the Delaware Attorney General's Office charging Walsh with three counts of indecent exposure to girls under 16 years of age. The disposition of these charges is unavailable. In 1992, Walsh was charged with Felony Unlawful Sexual Contact Second Degree and Misdemeanor Indecent Exposure First Degree (indecent exposure to a girl under 16 years of age). He pled guilty to the misdemeanor charge and the Unlawful Sexual Contact charge was dismissed. In 1985, Walsh was charged with extortion. The disposition of this charge is unavailable.[FN3]

> FN2. This information was retrieved through a criminal records check done at Seldomridge's request by Robert Shannon, a licensed private investigator.

> FN3. A pre-trial services report made in the 1992 case, also indicates that 1) Walsh received six months of unsupervised probation for two counts of Lewdness in 1991, 2) Walsh pled guilty and was fined for six counts of Indecent Exposure in 1990, and 3) Walsh was arrested in 1986 for Indecent Exposure (disposition unavailable). Outside of the report, there is no other evidence documenting these charges. Thus, it is not clear where, or even if, these **incidents** occurred.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

### D. Prior Sexual *Harassment* Claims Against Walsh

**\*4** After the **incident**, Seldomridge learned of a prior sexual **harassment allegation** against Walsh from Tina Eastlake and her husband. On or about February 3, 1997, Tina Eastlake filed a complaint with the Delaware Department of Labor ("DDOL") **alleging** that Walsh sexually **harassed** her. Eastlake was a Uni-Marts employee who worked under Walsh. According to Eastlake the **alleged harassment** occurred on January 30, 1997. In her complaint, Eastlake stated that she and Walsh had enjoyed a casual dating relationship that ended in November of 1996. At that time, Eastlake informed Walsh that she did not wish to see him anymore. As a result of the relationship ending, Eastlake alleged that Walsh then subjected her to unfavorable treatment. In her complaint, Eastlake stated that she had advised Uni-Marts corporate officers of Walsh's conduct, however, she was not satisfied with their attempts to resolve the matter.

In response to Eastlake's allegations, Uni-Marts conducted its own investigation of her complaints. In a letter confirming a conversation with Eastlake on January 31, 1997, Amy Hunter ("Hunter"), Associate General Counsel for Uni-Marts, informed Eastlake that the grievance committee had met on several occasions regarding her grievance against Walsh. Hunter that stated that, "[o]ur final recommendation, after a thorough investigation is as follows. We would like to offer you a transfer to the Cecilton Store as an assistant manager. We understand that this will mean a longer commute for you. Therefore, we will also offer a fifty cent per hour wage increase to cover transportation costs."

In a letter from Hunter to Eastlake dated February 10, 1997, Hunter stated "We have tried for several weeks to address your concerns and come to some type of resolution." Hunter again offered Eastlake a transfer to the Cecilton store. She also offered Eastlake a full-time position in the same store, at the same pay rate, for the 11 p.m. to 7 a.m. shift. Hunter then stated that if Eastlake did not respond by February 14, 1997, the company would assume that she had resigned. In a position statement to the DDOL, Uni-Marts claimed that Walsh "felt there were some problems with Tina's job performance.

Specifically, certain tasks were being left undone and paperwork was left uncompleted." The Grievance committee felt that a change in managers would not be an acceptable solution because this would have called for others to be transferred as well.

The DDOL found "no reasonable cause to believe that Uni-Marts discriminated against Eastlake with respect to her sex and that reasonable cause does not exist to believe that Uni-Marts engaged in unlawful employment practices."

### III. SUMMARY JUDGMENT STANDARD

The court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Life Save Co.,* 206 F.3d 271, 278 (3d Cir.2000); *Knabe v. Bourty Corp.,* 114 F.3d 407, 409 n. 4 (3d Cir.1997) (both citing Fed.R.Civ.P. 56(c)). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, *see Charlton v. Paramus Board of Educ.,* 25 F.3d 194, 197 (3d Cir.1997), and a fact is material if it could affect the outcome of the suit under governing law. *Id.* (citations omitted). For the non-moving party to prevail on a motion for summary judgment, the party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Knabe v. Bourty,* 114 F.3d at 409 n. 4; *Newsome v. Administrative Office of the Courts of the State of New Jersey,* 103 F.Supp.2d 807, 815 (D.N.J.2000) (stating that a failure to prove an essential element of the nonmoving party's case necessarily renders all other facts immaterial).

**\*5** In deciding a motion for summary judgment, "a court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor." *Knabe v. Bourty,* 114 F.3d at 409 n. 4 (citing *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994)). Moreover, it is not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A489

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the province of the court to weigh the evidence and to decide the case on its merits; rather, the court shall simply determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.

With these standards in mind, the court will turn to the substance of Uni-Marts' motion for summary judgment.

### IV. DISCUSSION

In its briefing on the motion, Uni-Marts argues that it is entitled to summary judgment because Seldomridge cannot establish her claims for hostile work environment harassment or constructive discharge. In addition, Uni-Marts argues that Seldomridge cannot show that she is entitled to punitive damages.[FN4] In contrast, Seldomridge alleges that there are sufficient facts in the record from which a reasonable jury could rule in her favor on all of these issues. The court will address these issues in turn.

FN4. Uni-Marts also argues that, even assuming that a hostile work environment existed, it still has an affirmative defense to liability. However, because the court concludes that Seldomridge's hostile work environment claims fail as a matter of law, it need not address Uni-Marts' affirmative defense.

### A. Hostile Work Environment

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).[FN5] Although the statute mentions specific employment decisions with immediate consequences, it covers more than "terms" and "conditions" in the narrow contractual sense. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 786 (1998). Thus, sexual harassment that is so "severe or pervasive" as to " 'alter the conditions of [the

victim's] employment and create an abusive working condition violates Title VII. *Id.* (quoting *Meritor Sav. Bank FSB v. Vinson,* 477 U.S. 57, 67 (1986)); *Kunin v. Sears Roebuck and Co.,* 175 F.3d 289, 293 (3d Cir.1999) (stating that it is well established that a plaintiff can prove a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment).

FN5. According to her complaint, Seldomridge filed a charge of discrimination with the DDOL on April 16, 1998 and May 8, 1998. She received a "right to sue" letter from the Equal Employment Opportunity Commission on May 6, 1999, and subsequently filed her complaint eighty-nine days later on August 3, 1999. Thus, Seldomridge has established that she complied with all of Title VII's pre-filing requirements in a timely manner. *See* 42 U.S.C. § 2000e-5(e)(1) (affording a plaintiff 180 day to file a charge of discrimination with either the appropriate state or federal agency and 90 days to file suit after receiving a right to sue letter).

Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment. *Meritor Savs. Bank FSB v. Vinson,* 477 U.S. 57, 65 (1986). In order to fall within the purview of Title VII, the conduct in question must be severe or pervasive enough to create both an " objectively hostile or abusive work environment-an environment that a reasonable person would find hostile," and an environment the victim-employee subjectively perceives as abusive or hostile. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22, (1993).[FN6]

FN6. The Supreme Court reaffirmed *Harris* ' "severe and pervasive" test in *Faragher v. City of Boca Raton,* 524 U.S. 775, 783 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 724, 732, (1998).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A490**

Not Reported in F.Supp.2d                                                                 Page 6

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

In this case, Seldomridge argues that she was subjected to a hostile work environment when Walsh exposed himself to her on January 16, 1998. In addition, Seldomridge also argues that she was subjected to a hostile work environment when she returned to work after the incident. The court will address these arguments in turn.

### 1. Claim Based on the January 16, 1998 Incident

*6 In deciding a hostile work environment claim, the court must examine the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23. In order to establish a hostile work environment claim, a plaintiff must show that:
(1) the plaintiff suffered intentional discrimination because of their sex,
(2) the discrimination was pervasive or regular,[FN7]

>    FN7. Although the *Andrews* test states that the conduct must be "severe and pervasive," the Supreme Court's decisions in *Faragher* and *Ellerth* emphasize that actionable conduct can also be severe or pervasive. *See, e.g., Pittman v. Continental Airlines, Inc.,* 35 F.Supp.2d 434, 441 (E.D.Pa.1999) (explaining same).

(3) the discrimination detrimentally affected the plaintiff,
(4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and
(5) the existence of respondeat superior liability.

*See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482-83 (3d Cir.1990). *See also Weston v. Pennsylvania,* No. 99-1608, 2001 WL 539470, at *3-4 (3d Cir. May 22, 2001); *Kunin v. Sears Roebuck & Co.,* 175 F.3d 289, 293 (3d Cir.1999).

In this case, there is no dispute as to the first, third, and fifth factors of the *Andrews* test. As to the first prong, Walsh's conduct was motivated by Seldomridge's sex or gender.[FN8] As to the third prong, there is evidence in the record to support Seldomridge's claim that, from a subjective viewpoint, she was detrimentally affected. Specifically, Seldomridge claims that she sought the counsel of her therapist about the incident, and that she was troubled enough to immediately report the incident to the police. Finally, as to the fifth prong, because Walsh was Seldomridge's immediate supervisor, Uni-Marts would be vicariously liable for his conduct.[FN9] *See Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998); *Faragher v. City of Boca Raton,* 524 U.S. at 777-78 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."). Therefore, the court will focus its inquiry on whether Walsh's conduct was sufficiently severe or pervasive and whether it would objectively detrimentally affect a reasonable person in Seldomridge's position.

>    FN8. For the purposes of Title VII, "sex" and "gender" are not considered to be distinct concepts. *See Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 148 (3d Cir.1999).

>    FN9. As the court has stated, it is clear that under the Supreme Court's decisions in *Ellerth* and *Faragher,* Uni-Marts would be vicariously liable for Walsh's conduct. However, Seldomridge also suggests that Uni-Marts is directly liable under Title VII because of its own negligence in hiring and retaining Walsh.

In *Burlington Industries, Inc. v. Ellerth,*524 U.S. 742, the Supreme Court explained that an employer may be liable for a supervisor's harassing conduct either directly or indirectly. *See id.* at 758-760. An employer will be directly liable for a supervisor's harassment when the employer either intended, or negligently permitted,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A491

Not Reported in F.Supp.2d

Page 7

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the tortious conduct to occur. *Id.* at 759. (" Thus, although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment."); *Dees v. Johnson Controls World Services, Inc,.* 168 F.3d 417, 421 (11th Cir.1999) (explaining same). *See also Anderson v. Deluxe Homes of PA, Inc.,* 131 F.Supp.2d 637, 647 n. 10 (M.D.Pa.2001) (explaining that respondeat superior liability could depend "on whose behavior is at issue, that of the supervisor or the employer itself").

The court need not address this issue, however, because it finds that Walsh's hostile work environment claim fails because the conduct was not severe enough to be actionable under Title VII. In addition, the court need not decide whether Uni-Marts was negligent in hiring Walsh because Seldomridge has failed to allege any state law claims for negligent hiring or retention. *See e.g., A.R. Anthony & Sons v. All-State Investigation Sec. Agency, Inc.,* Civ. A. No. 82C-AP-18, 1983 Del.Super. LEXIS 647, at *5 (Del.Super.Ct. Sept. 27, 1983) (explaining that an employer is liable for negligent hiring when it has " reason to know or in the exercise of reasonable care should have known that an employee has an undue tendency to cause harm"). However, the court does note that Seldomridge has not cited to one case which interprets Title VII as mandating that an employer conduct a criminal background investigation into every employee. *But see e.g., Bryant v. Better Business Bureau of Greater Maryland,* 923 F.Supp. 720, 752 (D.Md.1996) (explaining that "[E]ven where the employer knows of a criminal record and still hires the employee, this does not automatically make out a prima facie case of negligent hiring. Instead, it depends upon the nature of the criminal record and the surrounding circumstances.") (citations omitted). Thus, although there is evidence

that Walsh had a criminal record, Seldomridge has failed to adduce any evidence which would demonstrate that Uni-Marts should have known about Walsh's background. *See id.* (granting summary judgment to defendants where a plaintiff failed to demonstrate with sufficient specificity that the defendants should have known about another employee's criminal background).

Uni-Marts maintains that because Walsh's exposure to Seldomridge was a single, isolated incident, she cannot establish a hostile work environment as a matter of law. In general, an isolated incident of sexual misconduct is not actionable under Title VII. *Clark Cty. School District v. Breeden,* 121 S.Ct. 1508, 1510 (2001) (citing *Faragher,* 524 U.S. at 788); *Rush v. Scott Specialty Gases, Inc .,* 113 F.3d 476, 482 (3d Cir.1997). In exceptional cases, however, an isolated incident may be actionable under Title VII if it is extremely serious such that it alters the terms and conditions of employment to create a hostile or abusive work environment. *See Meritor,* 477 U.S. at 67. In other words, a single incident may support a claim for hostile work environment sexual harassment if the incident is "of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work ...." *LaRose v. Philadelphia Newspapers, Inc.,* 21 F.Supp.2d 492, (E.D.Pa.1998). For example, a single incident of physical assault or offensive touching has been held to be sufficiently severe to support a hostile work environment claim. *See e.g., Grozdanich v. Leisure Hills Health Center, Inc.,* 25 F.Supp.2d 953, 969-70 (D.Minn.1998) (holding that a reasonable jury could find that an isolated incident of sexual assault created a hostile work environment).[FN10] *See also Jones v. United States Gypsum,* No. C99-3047-MWB, 2001 WL 196616, at *4 (N.D.Iowa Jan. 21, 2000) (holding that single incident of offensive touching may be severe enough to support a hostile work environment claim).

FN10. Citing *Todd v. Ortho Biotech, Inc.,* 138 F.3d 733,736 (8th Cir.1998) (single

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

attempted rape at national sales meeting held sufficiently severe misconduct to be actionable); *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 464 (7th Cir.1990) (single incident where supervisor picked up plaintiff and forced her face against his crotch impliedly considered to create hostile environment); *Fall v. Indiana University Bd. of Trustees*, 12 F.Supp.2d 870, 879 (N.D.Ind.1998) (single assault, involving a groping of intimate areas, may create hostile environment).

*7 Furthermore, in determining whether a plaintiff-employee has been subjected to a hostile work environment, the court not only looks to the regularity or severity of allegedly harassing conduct, but also must look to the fourth factor of the *Andrews* test, and determine whether the conduct would detrimentally affect a reasonable person. *See Anderson v. Deluxe Homes of Pa, Inc.*, 131 F.Supp.2d 637, 646 (E.D.Pa.2001).[FN11] After all, "not all workplace conduct that may be described as harassment affects a " 'term, condition or privilege of employment." ' *Kantar v. Baldwin Cooke Co.*, No. 93 C 6239, 1995 U.S. Dist. LEXIS 17330, at *10 (N.D.Ill. Nov. 13, 1995) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) ). The purpose of including the objective standard is to "protect[ ] the employer from the hypersensitive employee [while] still serv[ing] the goal of equal opportunity by removing the walls of discrimination that deprive women of self-respecting employment." *Andrews*, 895 F.2d at 1483; *see also Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir.2000) ("But a plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee, and the standard would not have an objective component.").

FN11. Evidence that others were harassed may serve to bolster the objective reasonableness of a plaintiff's claims. *Anderson*, 131 F.Supp.2d at 646 (citing *West v. Philadelphia Electric Co.*, 45 F.3d

744, 757 (1995). Although there is evidence in the record concerning another complaint about Walsh, the court will not consider Tina Eastlake's **allegations** of **harassment** because Seldomridge has stated that she did not learn of Eastlake's complaints until well after the **incident**. *See, e.g., Hirase-Doi v. U.S. West Comms., Inc.*, 61 F.3d 777, 782 (10th Cir.1995) (explaining that a plaintiff may rely only on evidence relating to **harassment** of which she was aware during her employment). In addition, considering that Eastlake's **alleged** *quid pro quo* **harassment** claim arose within the context of an affair she had with Walsh and did not involve the type of conduct at issue with Seldomridge (i.e.exposure), the court will not consider the Eastlake complaint in determining whether Seldomridge's claims are objectively reasonable.

Even construing the evidence in the record in Seldomridge's favor, the court concludes that Walsh's brief exposure to Seldomridge was not so severe that it altered the terms and conditions of her employment.[FN12] In determining whether Walsh's conduct was so severe that it changed the conditions of Seldomridge's employment, the court is mindful that it must look to the totality of the circumstances. Under the totality of the circumstances of this case, the court concludes that Seldomridge's claim must fail as a matter of law. In particular, the court notes that Seldomridge thought Walsh was joking when he said he would be coming out of the bathroom wearing "nothing but a cigarette." Although Seldomridge characterizes this conduct as offensive and inappropriate, she does not suggest that she felt threatened by Walsh's conduct leading up to the exposure. *See Slaughter v. Waubonsee Comm. Coll.*, No. 94 C 2525, 1995 U.S. Dist. LEXIS 14236, at *12 (N.D.Ill. Sept. 29, 1995). Also, Seldomridge stated that she only saw Walsh naked for a few seconds from about 30 feet away and Walsh immediately retreated to the store room area. Seldomridge does not allege that Walsh tried to keep her from leaving the store, or even that he tried to approach her. In addition, it is undisputed that Uni-Marts immediately and effectively dealt with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 9

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Walsh's conduct. Thus, this brief incident, which Seldomridge concedes was quickly and effectively resolved, cannot be said to have unreasonably interfered with her work performance. *See Mathers v. Sherwin-Williams Co.,* Civ. A. NO. 97-5138, 2000 U.S. Dist. LEXIS 3716, at *28 (E.D.Pa. Mar. 27, 2000) (affirming an arbitrator's conclusion that the plaintiff failed to meet the objective prong of the *Andrews* test because a "reasonable person would [not] have found this one-time comment, in the context in which it occurred and as it was subsequently addressed by [the defendant], to be severe and pervasive enough to have resulted in a hostile or abusive work environment.").

> FN12. Seldomridge also stated that before the incident Walsh made her uncomfortable at work by saying that he thought she was pretty, he would like to " rock her world" and by making other " stupid, off-the wall comments." Interestingly, Seldomridge does not argue that these comments contributed to her hostile work environment claim. However, even if Seldomridge did argue that Walsh's comments and the one-time incident created a hostile work environment, the court concludes that under the totality of the circumstances, Seldomridge still cannot establish an actionable claim under Title VII. It is well established that "simple teasing, offhand comments, and isolated incidents will not amount to discriminatory changes in the 'terms and conditions of employment." ' *Faragher,* 524 U.S. at 788 (citations omitted). *See e.g., Bishop v. National Railroad Passenger Corp.,* 66 F.Supp.2d 650, 663 (E.D.Pa.1999) (holding that staring, leering and suggestive comments were neither severe nor pervasive, nor sufficiently detrimental to create a hostile work environment); *Pittman v. Continental Airlines, Inc.,* 35 F.Supp.2d 434, 442 (E.D.Pa.1999) (holding that occasional encounters with graphic sexual conversation and personal questions failed to create an atmosphere that would have an "objectively

detrimental effect on a reasonable person in her position").

**\*8** In light of the evidence in the record, the court concludes that no reasonable fact finder could return a verdict for Seldomridge on her hostile work environment claim. Although Walsh's brief one-time exposure may have been offensive and inappropriate, it was not so severe or extremely serious, under the totality of the circumstances, that it altered the conditions of Seldomridge's employment. *See e.g., Bauder v. Wackenhut Corp.,* Civ. A. 99-1232, 2000 WL 340191, at *4 (E.D.Pa. Mar. 23, 2000) (holding that a one time incident where supervisor grabbed plaintiff employee's behind did not sufficiently support a hostile work environment claim); *DeCesare v. National Passenger Railroad Corp.,* No. CNA 98-3851, 1999 WL 330258, at *3 (E.D.Pa. May 24, 1999); *Pittman,* 35 F.Supp.2d at 442; *Bishop,* 66 F.Supp.2d at 664; *Porta v. Dukes,* No. Civ. A 98-2721, 1998 WL 470146, at *2 (E.D.Pa. Aug. 11, 1998).[FN13] *See also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998) [FN14] (affirming grant of summary judgment to defendant where plaintiff's hostile work environment claim was based upon a single incident of breast touching and one lewd comment).

> FN13. Both *DeCesare* and *Porta* cite to several other cases where a single incident was found to be insufficient to support a hostile work environment claim. These cases include: *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 708 (7th Cir.1995) (finding no hostile environment existed where the company president rubbed the plaintiff's leg, grabbed her buttocks, and asked her for dates); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534-35 (7th Cir.1993) (finding that there was no hostile environment where the plaintiff's supervisor put his hand on the plaintiff's leg and kissed her until she pushed him away, and on another occasion the supervisor lurched at the plaintiff and tried to grab her); *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

337 (7th Cir.1993) (holding that there was no hostile work environment where supervisor asked the plaintiff for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her); *Cooper-Nicholas v. City of Chester*, No. 95-6493, 1997 WL 799443 (E.D.Pa.Dec.30, 1997) (supervisor's sexual comments over nineteen months were not frequent or sufficiently severe to create a hostile work environment).

FN14. In particular, the court in *Quinn* noted that: "Though the two incidents in question-[supervisor's] comment, apparently regarding [plaintiff's] posterior, and his use of papers held in his hand to touch her breasts-are obviously offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [plaintiff's] work environment. Nor are these incidents, together or separately, of sufficient severity to alter the conditions of [plaintiff's] employment without regard to frequency or regularity." *Id.* at 768

2. Claim Based on Conduct of Co-Workers and Customers After Seldomridge Returned to Work

Seldomridge also argues that the actions of a co-worker, Teddy, and certain customers after her return to work constituted actionable sexual harassment. Again, the court looks to the factors established by the Third Circuit to determine whether Seldomridge can establish a hostile work environment claim. In particular, the court must look to see if: (1) the plaintiff suffered intentional discrimination because of their sex, (2) the discrimination was pervasive or regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990).

The parties dispute whether Seldomridge can establish the first prong of the test. In particular, Uni-Marts argues that, even accepting all facts in the record as true, Seldomridge cannot establish that the conduct of Teddy and the customers was motivated by Seldomridge's sex or gender. The court agrees. While sexual overtones are not necessary to show discrimination because of the plaintiff's sex, the offending conduct must nonetheless be motivated by a plaintiff's sex or gender. *See Durham Life Ins. Co. v. Evans*, 166 F.3d at 148 (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir.1996)). After all, Title VII is not a "general civility code." *Faragher*, 524 U.S. at 788. "[O]rdinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not actionable. *See Id.* Moreover, "Title VII is not a shield against harsh treatment in the workplace; it protects only in instances of harshness disparately distributed." *Swingle v. Henderson*, No. 99-1826(DRD), 2001 WL 483317, at *12 (D.N.J. May 8, 2001) (quoting *Jackson v. City of Killeen*, 64 F.2d 1181, 1186 (5th Cir.1981)). In particular, allegedly harassing conduct that is motivated by a bad working relationship, by a belief that the plaintiff has in some way acted improperly, or even by personal animosity is not actionable under Title VII. *See Koschoff v. Henderson*, 109 F.Supp.2d 332, 345-46 (E.D.Pa.2000). Based on the record before it, the court concludes that a reasonable jury could not find that the teasing Seldomridge suffered was motivated by her gender.[FN15]

FN15. Although the court will not address the second, third, and fourth factors articulated in *Andrews*, it notes that the conduct of Teddy and certain customers simply does not rise to the level of severity or pervasiveness that is required by Title VII. "A recurring point in these opinions is that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted). Moreover, Title VII is not "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

designed to protect the overly sensitive plaintiff." *See Bishop,* 66 F.Supp.2d at 664 (citing *Harley v. McCoach,* 928 F.Supp. 533, 539 (E.D.Pa.1996)).

**\*9** In addition, Seldomridge's hostile work environment claim fails because she cannot establish respondeat superior liability. Although the Supreme Court has not address hostile work environment claims arising from the actions of a co-worker, the Third Circuit's decision in *Kunin v. Sears Roebuck and Co.,* 175 F.3d 289 (3d Cir.1999) , is controlling on this issue. *Kunin* examined the scope of respondeat superior liability for hostile work environment claims based on the actions of a co-worker. *Id.* at 290. Under *Kunin,* employer " liability exists where the defendant [employer] knew or should have known of the harassment and failed to take prompt remedial action." 175 F.3d at 293-94. In this case, Seldomridge maintains that during the time period that the alleged harassing behavior of Teddy and the customers occurred, "the manager there already knew .... How Teddy was acting with me, how the customers were." Seldomridge Deposition, at 111. After carefully reading through the record, this appears to be Seldomridge's sole basis for her respondeat superior claim. Because Seldomridge has admitted that she did not attempt to lodge a complaint with anyone in management at Uni-Marts, it appears that Seldomridge is arguing that Uni-Marts had constructive notice of the allegedly harassing conduct.

Under *Kunin,* an employer would have constructive notice in two situations: 1) where an employee provides a supervisor with enough information to raise the probability of sexual harassment in the minds of a reasonable employer or 2) where harassment is so pervasive and open that a reasonable employer would have had to be aware of it. *See id.* at 294 (citing *Zimmerman v. Cook County Sheriff's Dep't,* 96 F.3d 1017, 1018-19 (7th Cir.1996)). Even construing the facts in the record in the light most favorable to Seldomridge, the court cannot find that Uni-Marts had constructive notice of the alleged harassing conduct.

First, Seldomridge has provided no evidence in the

record to show that she provided her supervisor with enough information to raise a probability of sexual harassment in the minds of a reasonable employer. In *Kunin,* the employee claimed that by asking whether " 'cursing was allowed on the sales floor," ' she provided her employer with notice of sexual harassment. *Id.* There was also evidence in *Kunin* that the employee's supervisor heard rumors about "offensive language in his department but never investigated them." *Id.* The *Kunin* court held that this evidence could not establish that the employer had constructive notice of sexually harrasing behavior. *Id.* In particular, the court reasoned that because the employee's complaint did not communicate sexually offensive behavior and the evidence of rumor did not refer to gender-specific **harassment,** the employee had failed to establish that the employer was on constructive notice. *Id.* at 294-95. In this case, Seldomridge admits that she failed to even lodge a complaint with her supervisor about the **alleged harassment.** Also, as the court has already discussed, the **allegedly harassing** conduct was not gender specific.

**\*10** As for the second type of situation that can support a finding of constructive notice, Seldomridge simply has not **alleged** the type of open and pervasive **harassment** that would put a reasonable employer on constructive notice. Seldomridge has shown, at best, that she was **subjected** to off-hand teasing and that one co-worker and a customer failed to "believe her" about the Walsh **incident.** However, she has also clearly stated that all of her other co-workers believed her (including her supervisor) and were supportive of her regarding the **incident** with Walsh. Moreover, as the court has already noted, Seldomridge has not shown that this **harassment** was motivated by her gender. In light of these facts, Seldomridge cannot show that the conduct was so open and pervasive that a reasonable employer would have had constructive notice of a hostile working environment. *See Kunin,* 175 at 295 (holding management had little opportunity to discover the harassment because it was not open and pervasive).[FN16]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

FN16. Moreover, it would be unreasonable to hold Uni-Marts liable for the conduct of Teddy and certain customers in light of the record. It is undisputed that Seldomridge had already used Uni-Marts' sexual harassment policy regarding the Walsh incident. Thus, Seldomridge could have easily provided Uni-Marts with actual notice. *See Bishop,* 66 F.Supp.2d at 666-67 (holding that an employer could not be held liable for conduct of co-workers where there was a reasonable avenue for making a complaint available to the plaintiff, and the employer had no notice of co-worker's conduct).

Thus, because Seldomridge has failed to show that there are facts in the record which would show that Uni-Marts had either actual or constructive notice of the alleged harassing conduct, Seldomridge cannot establish that Uni-Marts is liable under a respondeat superior theory regarding the conduct of her co-worker, Teddy, and certain customers.

### B. Constructive Discharge

Seldomridge has also alleged that she was constructively discharged from her position at Uni-Marts.[FN17] In particular, Seldomridge alleges that following the Walsh incident, the harassing conduct of her co-worker Teddy and certain customers was so severe that it forced her to quit her job approximately one month after returning to work. After quitting, Seldomridge went to work at an establishment called the Eating Post.

FN17. In her complaint, Seldomridge alleges that she suffered from harassment resulting in a tangible employment action. *See* D.I. 1, ¶¶ 39-41. When a supervisor creates a hostile work environment and takes a tangible employment action against a victimized employee, the employer is not entitled to raise an affirmative defense. *See Faragher v. City of Boca Raton,* 524 U.S. at 777-78. In this case, Seldomridge argues that she suffered a tangible employment

action in that she was constructively discharged from her position at Uni-Marts. The Third Circuit has held that in certain instances, a constructive discharge can be a tangible employment action. *See Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 156 (3d Cir.1999) (declining to adopt a blanket rule that a constructive discharge constitutes a tangible employment action). Because the court has determined that Seldomridge cannot establish her hostile work environment claims, it need not address whether Uni-Marts would be entitled to assert an affirmative defense. However, the court will still address Seldomridge's constructive discharge claim because she has also alleged, as a separate and independent cause of action, that she was constructively discharged. See D.I. 1, ¶¶ 35-38.

A plaintiff who voluntarily resigns may maintain a case of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge. *See Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1075 (3d Cir.1996) (citing *Gray v. York Newspapers, Inc,* 957 F.2d 1070, 1079 (3d Cir.1992)). In determining if a constructive discharge has occurred the court should apply an objective test. *Id.* That is, whether " the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.* (quoting *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1084 (3d Cir.1996) and *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 888 (3d Cir.1984) ). Thus, a plaintiff must demonstrate that from an objective viewpoint, the employer condoned acts of discrimination which would violate Title VII. *See Maher v. Associated Services for the Blind,* 929 F.Supp. 809, 814 (E.D.Pa.1996). However, "the mere fact that the plaintiff feels uncomfortable or considers her working environment unduly stressful is an insufficient basis for a constructive discharge claim." *Id.* (citing *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985)); *see also McLaughlin v. Rose Tree Media School District,* 52 F.Supp.2d 484, 493 (E.D.Pa.1999) ("more than

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 13

Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

subjective perceptions of unfairness or harshness or a stress-filled work environment are required").

**\*11** Viewing the record in the light most favorable, the court concludes that Seldomridge cannot establish that she was constructively discharged as a matter of law. First, as the court has already explained with regard to her hostile work environment claim, Seldomridge has not shown that Uni-Marts intentionally made her working conditions intolerable, or even that Uni-Marts should have been aware of the teasing. Second, it would not be reasonable in this case to assume that Seldomridge had no other option but to quit. *See Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3d Cir.1993) (explaining that "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option"). In light of Seldomridge's prior use of the sexual **harassment** policy, it is clear that she could have again called the toll-free number that she used to complain about Walsh. Although Seldomridge **alleges** that she didn't know she could use the number for the purpose of complaining about her co-worker's conduct, her mistaken **belief** cannot negate the fact that Uni-Marts was neither aware of, nor responsible for, the conduct of her co-workers. Finally, as the court has already stated, Seldomridge's vague descriptions of the **allegedly harassing** conduct simply cannot be construed as "intolerable" to a reasonable person. Based on this record, no reasonable trier of fact could determine that Uni-Marts knowingly made Seldomridge's working conditions intolerable, or that her working conditions were so intolerable that a reasonable person would have been forced to quit. *See e.g., Williams v. Caruso,* 966 F.Supp. 287, 298 (D.Del.1997) (J. Schwartz) (holding that facts in the record did not support claim that employer knowingly permitted conditions of discrimination). FN18

FN18. In her complaint, Seldomridge also alleges that she is entitled to punitive damages as a separate cause of action. D.I. 1, ¶¶ 42-43. However, 42 U.S.C. § 1981a "does not, either expressly or impliedly, create an additional, separate and independent cause of action for employment discrimination plaintiffs, but merely adds to the damages available to such plaintiffs under Title VII." *West v. Boeing Co.,* 851 F.Supp. 395, 398 (D.Kan.1994). *See also Singh v. Wal-Mart Stores, Inc.,* No. Civ. A. 98-1613, 1999 WL 374184, \*8 (E.D. Pa. June 10, 1999). Thus, because Seldomridge cannot establish her Title VII claim, she is not entitled to punitive damages. *See also id.* at 399 ("section 1981a clearly 'adds to the damages available to a plaintiff who shows, under Title VII, that she was the victim of intentional discrimination in employment." ') (citing *Washington v.. Garrett,* 10 F.3d 1421, 1434 (9th Cir.1994) ).

## V. CONCLUSION

For the foregoing reasons, the court concludes that Uni-Marts is entitled to summary judgment because Seldomridge cannot establish her claims of hostile work environment harassment or constructive discharge as a matter of law.

For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:
1. Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, Uni-Marts' Motion for Summary Judgment (D.I.79) is GRANTED.
2. Summary Judgment be and hereby is ENTERED in favor of Uni-Marts and against Seldomridge on all claims in the complaint.

D.Del.,2001.
Seldomridge v. Uni-Marts, Inc.
Not Reported in F.Supp.2d, 2001 WL 771011 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

c
Walker        v.      Pepsi-Cola       Bottling
Co.D.Del.,2000.Only    the    Westlaw    citation   is
currently available.
United States District Court, D. Delaware.
Maurice A. WALKER, Plaintiff,
v.
PEPSI-COLA BOTTLING CO. and TEAMSTERS
LOCAL 830, Defendants.
No. CIV. A. 98-225-SLR, CIV. A. 99-748-JJF.

Aug. 10, 2000.

Maurice A. Walker, Wilmington, Delaware. Pro se.
Kathleen Furey McDonough, Esquire of Potter,
Anderson & Corroon, Wilmington, Delaware.
Counsel for Defendant Pepsi-Cola Bottling Co. Of
Counsel: Walter E. Johnson, Esquire and Amy R.
Walker, Esquire of Kilpatrick Stockton LLP,
Atlanta Georgia.
Clifford B. Hearn, Jr., Esquire, Wilmington,
Delaware. Counsel for Defendant Teamsters Local
830. Of Counsel: Stephen J. Holroyd, Esquire of
Sagot, Jennings & Sigmond, Philadelphia,
Pennsylvania.

MEMORANDUM OPINION
ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Maurice A. Walker filed this action *pro
se* on May 1, 1998 against defendants Pepsi-Cola
Metropolitan Bottling Co. ("Pepsi"), incorrectly
named in the complaint as Pepsi-Cola Bottling Co.,
and Teamsters Local 830 ("Teamsters") alleging
race, disability, and age discrimination in violation
of Title VII of the Civil Rights Act of 1964, 42
U.S.C. §§ 2000(e)-2 *et seq.* (1994), the Americans
with Disabilities Act ("ADA"), 42 U.S.C. 12112 *et
seq.* (1994), and the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. §§ 621-634
. Plaintiff also alleges a violation of the

Pennsylvania Human Relations Act ("PHRA"), 43
Pa. Cons.Stat. Ann. § 951 *et seq.* (West 2000), and
breach of contract. He filed a separate, but identical,
complaint in this court on November 4, 1999. *See*
99-748-JJF. Upon defendants' motion, these cases
were consolidated into a single civil action. (D.I.80)

Currently before the court are motions for summary
judgment filed by Pepsi and the Teamsters. (D.I.61,
63) In lieu of responding to these motions, plaintiff
filed his own motion for summary judgment.
(D.I.71) The court has jurisdiction over plaintiff's
federal claims by virtue of 28 U.S.C. § 1331 and
supplemental jurisdiction over plaintiff's state law
claims under 28 U.S.C. § 1367. For the following
reasons, the court shall deny plaintiff's motion for
summary judgment and grant both Pepsi's and the
Teamsters' motions.

II. BACKGROUND

Plaintiff is a thirty-four year old, African-American
male. Pepsi manufactures carbonated drinks at its
Wilmington, Delaware facility and distributes them
throughout Delaware, Pennsylvania, and New
Jersey. The Wilmington plant is organized into
various departments, and its 187 or so employees
are represented by defendant Teamsters. (D.I. 65,
McKinnon Aff., at A244) Plaintiff was a member of
the Teamsters.

Plaintiff's complaint arises out of various instances
of alleged discrimination and harassment during his
employment at Pepsi's Wilmington bottling facility.
Neither plaintiff's complaint nor his briefs in
support of his motion for summary judgment are
models of clarity. Indeed, it is not always clear what
actions form the basis of plaintiff's varied federal
and state charges or whether plaintiff's charges are
directed at both defendants or only one. For
example, plaintiff's complaint accuses "Defendant,"
in the singular, of various unlawful actions without
specifying which defendant is responsible.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A499**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff's uncooperative and evasive deposition testimony only further complicates the task of discerning his claims. (*See, e.g.,* D.I. 62, Walker Depo., at A138-48)

In spite of these obstacles, the following factual synopsis represents the court's best efforts to organize plaintiff's charges in a logical fashion. In doing so, the court relies primarily on undisputed documentary evidence, plaintiff's deposition testimony, and affidavits submitted by defendants. Plaintiff's allegations are organized into three categories: (1) Racial harassment related to plaintiff's initial January 1996 termination; (2) Discrimination in Pepsi's job bidding procedures; and (3) Discrimination resulting in his final July 1997 discharge.

### 1. Racial harassment and plaintiff's January 1996 termination

**\*2** Pepsi hired plaintiff on May 22, 1995 in the Wilmington plant's Operations Department. In January 1996, plant officials fired plaintiff. Apparently, they regarded plaintiff as a " probationary employee" and promptly fired him over charges of excessive absenteeism. (D.I. 65, Walker Depo., at A103-04; D.I. 72, Absentee Rep., Ex. F-1) The Teamsters interceded and successfully argued that, under the collective bargaining agreement then in force, plaintiff was not a probationary employee. (D.I. 62, Grace Aff., at A448) Pepsi reinstated plaintiff to his previous position with full seniority retroactive to his original hiring date.

Plaintiff contends that he was fired because Pepsi's Plant Manager (Richard Chominski) harbored racial animus toward him. In sole support of this contention, plaintiff claims that Chominski labeled him "ignorant" and a "scam artist" during a confrontation with plaintiff prior to his termination. (D.I. 71 at 8) On December 6, 1996, plaintiff filed a grievance with the Teamsters concerning Chominski's alleged harassment. The grievance did not accuse Chominski of racial harassment. The Teamsters concluded that the "grievance lack[ed] sufficient merit to justify submitting it to arbitration.

" (D.I. 62, 5/28/97 Grievance Response, at A415) It appears from plaintiff's complaint and supporting briefs that he believes that the Teamsters' refusal to arbitrate the grievance was motivated by racial discrimination.

### 2. Racial Discrimination in Pepsi's Job Bidding Procedures

After plaintiff's reinstatement to Pepsi's Operations Department, plaintiff bid on an "Extra Man" position [FN1] in the Sales Department of Pepsi's Wilmington plant. Under the Collective Bargaining Agreement [FN2] ("the Agreement") in force with the Teamsters, Pepsi must fill vacant "bargaining unit" positions through a bidding process. (D.I. 65, McKinnon Aff., at A245) Only union members are eligible to bid on vacant positions. The Agreement provides in pertinent part that:

> FN1. The "Extra Man" drives a sales truck and delivers Pepsi products when regular sales personnel are absent. (D.I. 65, McKinnon Aff., at A245)

> FN2. The collective bargaining agreement is part of the record at bar. (*See generally* D.I. 65 at A12-A43)

Preference in bidding will be given to employees in the Department in which the opening occurs. The job will be awarded based on the employee having pre-requisite qualifications within the Department with further consideration of the employee's seniority. For employees possessing equal skills and ability, the most senior employee shall be awarded the bid. If no employee within the Department qualifies, candidates from other departments who are qualified will be awarded the job based on Company seniority....

(D.I. 65 at A26-27) After the bidding process had closed in June 1996, Pepsi's Territorial Sales Manager (Joe Burns) determined that plaintiff had bidding preference for the Extra Man position. (D.I. 65, Burns Aff., at A248) Plaintiff then assumed the Extra Man position, although it is not apparent for how long. Following the award to plaintiff, another

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A500**

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

employee (Dan Cooney) filed a grievance claiming that he had seniority in the Sales Department and that he should have been awarded the Extra Man position. (D.I. 62, 9/11/96 Grievance, at A452; D.I. 65, 6/5/96 Cooney bid form, at A3) Upon investigation, Pepsi officials determined that Cooney had thirty days seniority in the Sales Department while plaintiff had none. Consequently, Pepsi removed plaintiff from the Extra Man position and awarded it to Cooney.

*3 Plaintiff disputes his lack of seniority and contends that his removal from the Extra Man slot was motivated by the racial animus of Joe Burns. According to plaintiff, Burns berated plaintiff for failing to deliver Pepsi products to a customer and peppered his tirade with vulgarities such as " fucking nigger." [FN3] (D.I. 65, Walker Depo., at A108-112, A114-118) This episode allegedly occurred prior to Cooney's grievance. Plaintiff also argues that, after replacing him with Cooney, Pepsi should have bumped a white employee with less seniority (Bob Seward) from an Extra Man position and given it to plaintiff in compensation for the Cooney incident. (D.I. 71 at 14) Pepsi responds that Seward was not an Extra Man until January 1997, well after Pepsi had resolved Cooney's grievance.

> FN3. Prior to his September 16, 1999 deposition, plaintiff never accused any of his supervisors of using racially derogatory language. In fact, plaintiff previously filed two charges with the Equal Employment Opportunity Commission ("EEOC") and testified before an arbitrator about his employment at Pepsi but never suggested that Burns or anyone else at Pepsi used racial slurs.

Around this time, plaintiff filed two grievances complaining about his removal from the Wilmington Sales Department. The grievances are vague, and it is difficult to determine whether plaintiff is complaining about the Cooney incident or the later Seward incident. Neither grievance mentions the alleged Burns tirade. (D.I. 62, 11/1/96 Grievance, at A409; 1/14/97 Grievance, at A432) In any event, the Teamsters declined to arbitrate either

grievance. (D.I. 62, 5/28/97 Grievance Responses, at A410, A433) Their refusal to arbitrate these (and other) grievances appears to form the basis of plaintiff's racial discrimination charges against the Teamsters. (D.I. 71 at 13-15)

In an attempt to mollify plaintiff, Pepsi offered him an Extra Man sales position in West Chester, Pennsylvania. Plaintiff refused, opting instead to remain in the Wilmington Operations Department. (D .I. 65, Burns Aff., at A249) Plaintiff filed still another grievance on December 6, 1996 claiming that he had a right to "Lead Man" pay at the Wilmington plant. (D.I. 62, 12/6/96 Grievance, at A417) At the time, the position was held by another employee (Edward Fisher) who, like plaintiff, is African-American. (D.I. 65, McKinnon Aff., at A245) According to Pepsi, the Lead Man designation is a semi-supervisory position awarded based the discretion of management and not according to the bidding provisions of the Collective Bargaining Agreement. (D.I. 65, McKinnon Aff., at A245) Pepsi refused to accord plaintiff Lead Man pay, and the Teamsters declined to arbitrate plaintiff's December 1996 grievance.[FN4] (D.I. 65, 5/28/97 Grievance Response, at A418)

> FN4. Plaintiff also filed another grievance on December 6, 1996 claiming harassment by one of his supervisors. (D.I. 62 at A420) The Teamsters obtained a settlement of this grievance that resulted in the removal of an insubordination warning from plaintiff's file. (D.I. 62, 5/28/97 Grievance Response, at A421)

Another bidding dispute arose when plaintiff attempted to bid on a "Bottle Line" position at the Wilmington plant. Pepsi ultimately awarded the position to a white employee (Dave Carson). Plaintiff filed a grievance on January 8, 1997 with the Teamsters claiming that he had seniority over Carson. (D.I. 62, 1/8/97 Grievance, at A423) The record indicates that Carson had a seniority date of May 3, 1995, whereas plaintiff's seniority date was May 22, 1995. [FN5] (D.I. 65, Employment Records, at A1-2) In spite of this documentary evidence, plaintiff insists that Carson's seniority

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A501

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

date was September 11, 1995 and that Plant Manager Chominski somehow altered the records and "put" Carson's seniority date "over" plaintiff's. (D.I. 71 at 16-17) The Teamsters declined to arbitrate this grievance. (D.I. 62, 5/28/97 Grievance Response, at A424)

> FN5. The Teamsters were apparently confused about these dates. In a July 16, 1997 letter to the EEOC, the Teamsters' legal counsel erroneously explained that Carson's seniority date was September 11, 1995. (D.I. 72, Ex. G, at 3)

*4 Immediately prior to bidding on the Bottle Line position, on December 19, 1996 plaintiff bid on, and was awarded, a second shift Pallet Repair position. (D.I. 65 at A5) After assuming the Pallet Repair position in early January 1997, plaintiff submitted a January 6, 1997 bid on an Extra Man position that opened in the Wilmington Sales Department. (D.I. 65 at A6) Pepsi denied plaintiff's bid because the Collective Bargaining Agreement prohibits successful bidders from rebidding for a second position until 180 days after placement in the job for which he or she previously had bid. (D.I. 65 at A27) Despite this explicit provision, plaintiff filed a grievance (D.I. 62 at A432), which the Teamsters declined to prosecute.[FN6] (D.I. 62, 5/28/97 Grievance Response, at A433)

> FN6. Plaintiff filed at least two other grievances with the Teamsters. (D.I. 62 at A426, A429) Plaintiff does not discuss them in any detail in his complaint or in the briefs supporting his motion.

### 3. Discrimination resulting in Plaintiff's July 1997 Discharge

Plaintiff continued at the Pallet Repair position for the remainder of his employment at Pepsi. On March 5, 1997, plaintiff allegedly strained his back while working on a pallet. It is unclear how much time plaintiff missed because of this injury. Plaintiff contends that he missed "approximately most of the month of April [and] part of the month of May."

(D.I. 65, Walker Depo., at A124) In May, Pepsi received conflicting physician reports concerning plaintiff's ability to work. One physician determined that plaintiff could return to work so long as he observed light duty work restrictions. (D.I. 65 at A69) Another doctor concluded that plaintiff suffered thoracic strain but "that his orthopedic examination was within normal limits" and that he could return to work without any restrictions. (D.I. 65 at A71-73)

Plaintiff returned to work on June 2, 1997 and was assigned to a palletizer machine.[FN7] Plaintiff complained to Plant Manager Chominski that the job exceeded his light duty restrictions because it required him to bend over a railing and retrieve soda cans jammed in the machinery. (D.I. 62, Walker Depo., at A105-06) Plaintiff contends that Chominski responded that, "if [he] wanted a job at Pepsi and if [he] wasn't 100 percent to do the job, [he] wouldn't have a job at Pepsi." [FN8] (D.I. 62, Walker Depo., at A106) Plaintiff contends his back began to bother him after several hours on the palletizer and that he called out sick from work at least twice that week. (D.I. 62, Walker Depo., at A106)

> FN7. No party explains exactly what a palletizer does or the degree of physical labor involved in operating it.

> FN8. Plaintiff filed a grievance concerning this incident. (D.I. 62, 6/20/97 Grievance, at A396) It does not appear that the Teamsters arbitrated the grievance.

He returned to work on Monday, June 9, 1997. At that time, plant supervisors ordered him to prepare the "pre-mix/post-mix" tanks, but plaintiff complained again that this task did not fall under his light duty work restrictions because it involved lifting. (D.I. 62, Walker Depo., at A109-10) Apparently, the task involved lifting small tanks and emptying them of stale syrup. [FN9] It appears that plaintiff called out sick later that week.

> FN9. Defendants do not dispute plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

account of preparing "pre-mix/post-mix" tanks. In his deposition, plaintiff explained that:

I had to prepare the tanks, prepare the tanks for refilling of soda products, which is syrup. And to prepare the tanks, 16 tanks come into a square pallet. Each tank stands approximately two feet tall. Part of the job was to relieve the pressure from the tanks, and if they had any stale product or old product in it, I was to empty the tanks and to place the tanks back into the pallet, ready for the day shift to refill them again. (D.I. 62 at A107-08)

In an attempt to determine the extent of plaintiff's work restrictions, Pepsi arranged for an independent medical examination of plaintiff. As plaintiff entered the plant on June 16, 1997, he was informed that he had an appointment with an independent medical examiner. (D.I. 62, Walker Depo., at A102-04) Although plaintiff initially agreed to submit to this examination, he later refused, citing the need for a union representative. (D.I. 62, Walker Depo., at A104) After refusing to attend the examination, it appears that plaintiff was assigned temporarily to other duties at the plant. (D.I. 62, Walker Depo., at A122)

**\*5** Later in the day on June 16th, Pepsi's Tri-State Market Unit Manager, Lynn Nowicki, allegedly observed plaintiff daydreaming while sitting on a forklift. She approached plaintiff and asked him what he was doing, but he did not answer her. Plaintiff claims that she surprised him and that, due to the shock of this surprise, he was unable to form coherent responses to her questions.[FN10] Later, in his deposition testimony, he denied the daydreaming charge and claimed that he was preparing to lift pallets with the forklift.

> FN10. Plaintiff's failure to respond is, perhaps, best explained in his own words: The actual, what Miss Nowicki asked, I do not recall because I was so dazed and surprised, you know, I have been in the military before, and someone to surprise me, I do not take that kindly.

(D.I. 62, Walker Depo., at A115)

After confronting plaintiff, Nowicki conferred with the Second Shift Supervisor (Larry Clayton) and the plant Human Resources Manager (Allison McKinnon). The latter two then met with plaintiff and handed him a disciplinary action form for failing to perform his assigned tasks.[FN11] (D.I. 62, Walker Depo., at A120-23) That form has not been made part of the record.

> FN11. Plaintiff later filed a harassment grievance against Nowicki, Clayton, and McKinnon over this incident. (D.I. 62, 6/20/97 Grievances, at A392, A394, A395) The grievances vaguely describe harassment related to their refusal to accommodate plaintiff's "physical capacities."

Following this incident, the events leading to plaintiff's termination become even more confused and bizarre. Apparently, after his disciplinary meeting, Clayton ordered plaintiff to first take a short break and then begin cleaning a certain section of the plant. (D.I. 62, Walker Depo., at 127) Plaintiff claims that he began to clean this section of the plant. (D.I. 62, Walker Depo., at A127-28) At some point in the shift, Clayton stopped plaintiff, who was on the way to the plant's locker room to get medication and to use the bathroom. (D.I. 62, Walker Depo., at A128) According to plaintiff, Clayton refused to allow him to use the plant's bathroom or to retrieve his medication from the plant locker room. Clayton then allegedly told plaintiff to leave. (D.I. 62, Walker Depo., at A128-31) Pepsi has submitted no affidavit or deposition testimony to refute plaintiff's account of Clayton's behavior.[FN12]

> FN12. Pepsi did submit a transcript of Clayton's prior sworn testimony in an arbitration hearing. (D.I. 65 at A207-243) Although this testimony contradicts plaintiff's account of that day, this prior testimony is hearsay and not admissible for purposes of summary judgment. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A503**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

Fed.R.Evid. 804(b)(1) (prior sworn testimony is admissible only where declarant unavailable); *see also Trustees of Univ. of Pa. v. Lexington Ins. Co.,* 815 F.2d 890, 905 (3d Cir.1987) (noting that, " [a]dmission of prior testimony through a court transcript, merely because the testimony was observed and recorded pursuant to duty imposed by law, would emasculate large portions of the hearsay rule").

Plaintiff left the plant and went immediately to a nearby Veterans' Administration Hospital to receive treatment for back pain. (D.I. 62, Walker Depo., at A132) From there, he allegedly called Clayton and informed him that he would not return to work to complete his shift and that he would be out of work the next day, June 17, 1997. (D.I. 62, Walker Depo., at A132) Plaintiff also missed work on June 18 and 19, 1997. Plaintiff testified that it was " highly unlikely" that he notified his supervisors in advance of his absence on the 18th. (D.I. 62, Walker Depo., at A138) As for his June 19th absence, plaintiff arrived at work long enough to retrieve his paycheck, and he claims that he informed the Human Resources Director (Allison McKinnon) that he would not be working that day. (D.I. 62, Walker Depo., at 138-39) Plaintiff apparently did not work on June 20th but nonetheless made an appearance at the plant to file grievances against various supervisors. (D.I. 62, Walker Depo., at A156)

Plaintiff was scheduled to work the following week from June 23-26, 1997. (D.I. 65, Work Schedule, at A7) Plaintiff did not work on any of these days and failed to notify anyone that he would be absent for at least two of these days. (D.I. 62, Walker Depo., at A159-60) Plaintiff claims that he did not show up for work because his name was not on the " manning sheet" for the week of June 23rd. (D.I. 62, Walker Depo., at A156-57) When confronted at his deposition with the manning sheet showing his name, plaintiff claimed that Pepsi officials falsified it. (D.I. 62, Walker Depo., at A157-58) Despite his absences that week, he appeared at the plant to retrieve his paycheck on June 26th and to discuss a pending harassment grievance with Plant Manager

Chominski. (D.I. 62, Walker Depo., at A159-61)

**\*6** On June 26, 1997, Plant Manager Chominski suspended plaintiff from work for violation of Pepsi's attendance and call-in policy. Pepsi's " Tri-State Absentee/Tardiness & Leave Early Policy" ("the Absentee Policy") states that:
Employees who will be late or absent are to call in to their immediate supervisor at least thirty (30) minutes prior to the start of their shift. Any employee who fails to follow this procedure and does not report to work or call in within two (2) hours of the start of his/her shift will be classified as "NO CALL-NO SHOW." Repeated incidents of " NO CALL-NO SHOW" will result in disciplinary action, up to and including discharge.

(D.I. 65 at All) In a July 3, 1997 letter to plaintiff, Chominski asked plaintiff to attend a meeting on July 10th to defend himself against charges that he repeatedly violated the Absentee Policy's call-in provisions. (D.I. 65 at A8) Plaintiff claims that he presented medical documents excusing his absences at the meeting. (D .I. 62, Walker Depo., at A167-69) Although these documents accounted for his underlying illnesses, they could not explain plaintiff's failure to notify his supervisors of his impending absences. Consequently, Chominski terminated plaintiff's employment.

Following his termination, plaintiff filed a grievance with the Teamsters. They protested plaintiff's termination, and the protest eventually prompted an arbitration hearing. Hearings were held on October 21, 1998 and April 21, 1999, and plaintiff was represented by legal counsel. The arbitrator upheld the termination but awarded plaintiff $1,000 for Pepsi's refusal to allow plaintiff to obtain a union representative during the disciplinary hearing with Chominski and McKinnon held after Nowicki observed plaintiff's "daydreaming" on a forklift. (D.I. 65, Arbitrator's Opinion and Award (6/29/99), at A87-98)

Plaintiff also filed two discrimination charges with the EEOC against Pepsi and one discrimination charge against the Teamsters with the Pennsylvania Human Relations Commission ("PHRC") and the EEOC. The first, filed prior to his termination on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A504**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

April 28, 1997, alleged that Pepsi had discriminated against him on the basis of race. He also filed this charge contemporaneously with the Delaware Department of Labor ("DDOL"). These allegations stemmed from plaintiff's unsuccessful bids for the Extra Man, Lead Man, and Bottle Line positions. He also accused Chominski of harassment and Pepsi of wholesale discrimination against African-Americans. (D.I. 65 at A44-45) The EEOC issued a right to sue notice on September 30, 1997. (D.I. 65 at A79)

The second charge, filed on the same day with the PHRC and the EEOC, alleged that the Teamsters discriminated against him because of his race by refusing to process his grievances. (D.I. 62 at A438) This second charge made no mention of Pepsi. The EEOC issued a right to sue notice on September 30, 1997. (D.I. 62 at A442) The PHRC declined to prosecute plaintiff's charge. (D.I. 62 at A440)

*7 Plaintiff filed his third discrimination charge with the EEOC on October 22, 1997. (D.I. 65 at A80) He did not file this charge with the DDOL. In this charge, he accused Pepsi of discriminating against him on the basis of his perceived disabilities and of retaliating against him for filing his first EEOC charge. (D.I. 65 at A80-81) He did not allege race discrimination. The EEOC issued a right to sue notice on August 3, 1999. (D.I. 65 at A99)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are ' genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life*

*Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### IV. THE TEAMSTERS' MOTION FOR SUMMARY JUDGMENT

As is evident from the foregoing factual analysis, plaintiff's claims against the Teamsters rest essentially on their failure to arbitrate several of his numerous grievances against Pepsi supervisors. Plaintiff appears to allege that the Teamsters discriminated against him because of his age, race, and alleged disabilities.[FN13] He also alleges that the Teamsters violated the collective bargaining agreement. The court shall construe this particular charge as a § 301 claim arising under the Labor Management Relations Act ("LMRA"). *See* 29 U.S.C. § 185. Finally, plaintiff appears to claim that the Teamsters violated the PHRA. *See* 43 Pa. Cons.Stat. Ann. §§ 951 *et seq.* (West Supp.2000).

> FN13. The use of the word "appears" is particularly appropriate because, as noted, plaintiff's complaint refers to both the Teamsters and Pepsi as "defendant" and does not delineate which is responsible for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A505**

Not Reported in F.Supp.2d

Page 8

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

what. Furthermore, his briefs in support of his cross motion discuss only his claims against Pepsi.

A. Plaintiff's Age Discrimination Claim

**\*8** Plaintiff's age discrimination claim against the Teamsters must fail because he is not in the class protected by the ADEA. The ADEA's protections apply only to individuals who are at least forty years of age. *See* ADEA, 29 U.S.C. § 631(a). Plaintiff testified in his deposition that he was born in 1966. (D.I. 62, Walker Depo., at A4) Thus, by virtue of his birth date, plaintiff falls outside the class protected by the ADEA. The court, therefore, shall grant the Teamsters' motion for summary judgment on plaintiff's age discrimination claim.

B. Plaintiff's Title VII Race Discrimination Claim

In his EEOC charge, plaintiff complained that the Teamsters refused to pursue his grievances against Pepsi "through the same number of steps (up to and including arbitration) through which it pursues grievances filed by [w]hite members." (D.I. 62, 4/28/97 EEOC charge, at A438) Although this charge does not appear in plaintiff's complaint or in his briefs, the court will construe the complaint broadly to include the fair representation claim raised in his EEOC charge. At issue is whether plaintiff has adduced sufficient facts to survive the Teamsters' motion for summary judgment.

To state a prima facie Title VII race discrimination claim against the Teamsters, plaintiff must establish (1) that the employer breached the collective bargaining agreement with respect to him; (2) that the union violated its duty of fair representation by permitting the breach to go unrepaired; and (3) that there is some indication that the union's actions were motivated by discriminatory animus. *See Webb v. Merck & Co.,* No. C.A. 99-413, 1999 WL 387122, at \*3 (E.D.Pa. May 20, 1999) (citing *York v. American Telephone & Telegraph,* 95 F.3d 948, 955-56 (10th Cir.1996); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 868 (7th Cir.1985)). If plaintiff makes a prima facie showing, the burden shifts to the Teamsters to establish a legitimate,

nondiscriminatory reason for failing to pursue plaintiff's grievances. If the Teamsters establish such a reason, plaintiff bears the burden of demonstrating that the Teamsters stated reasons are pretextual.

The court need not engage in an extensive burden shifting analysis because plaintiff has not presented facts sufficient to state a prima facie case. Specifically, the record lacks any evidence that plaintiff's race played a role in the Teamsters' decision to not arbitrate several of his grievances. In fact, plaintiff admitted that no Teamsters representative ever indicated that race played a role in the review of his grievances. (D.I. 62, Walker Depo., at A347-49) Furthermore, plaintiff admitted in his deposition that he simply did not know why certain of his grievances were not processed. (D.I. 62, Walker Depo., at A347) In lieu of evidence, plaintiff relies on mere speculation to support his charge that race played a role in the grievance process. Mere speculation, however, is no substitute for evidence raising an inference of race discrimination. Indeed, the evidence at bar raises precisely the opposite inference. The Teamsters investigated all of his grievances and pursued at least three with Pepsi, winning favorable results for plaintiff. (D.I. 62, 5/28/97 Grievance Responses, at A412, A421; Grace Aff., at A448 ¶ 6) Moreover, they protested his July 1997 discharge and brought the issue to arbitration even after plaintiff had filed his EEOC charge against them. (D.I. 62, Grace Aff., at A450 ¶¶ 18-21) In fact, due to plaintiff's pending EEOC charge against them, Teamsters officials worried that representing plaintiff at the arbitration could be a conflict of interest. So, at their own expense, they hired an independent attorney of plaintiff's own choosing to represent him at the arbitration. (D.I. 62, Grace Aff., at A450 ¶ 20) These extraordinary efforts belie plaintiff's race discrimination charges. Consequently, the court shall grant the Teamsters' motion for summary judgment on plaintiff's Title VII claim.[FN14]

FN14. To the extent that he raises a retaliation claim against the Teamsters, the absence of any evidence of retaliation requires that the court grant summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A506**

Not Reported in F.Supp.2d                                                          Page 9

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

judgment on this claim in favor of the Teamsters.

### C. Plaintiff's ADA Claim

**\*9** Plaintiff appears to allege that the Teamsters also discriminated against him because of his alleged disabilities. Courts examine ADA claims under the same burden-shifting framework employed in Title VII cases. *See Lawrence v. National Westminster Bank N.J.,* 98 F.3d 61, 70 (3d Cir.1996). Accordingly, the court first must determine whether plaintiff has established a prima facie case.

Setting aside the question of whether plaintiff is a qualified person with a disability under the ADA, plaintiff's ADA claim suffers from the same infirmity as his Title VII claim: namely, a lack of evidence of discriminatory animus on the part of the Teamsters. *See Webb,* 1999 WL 387122, at \*3 (requiring a showing of discriminatory animus in a prima facie Title VII case against a union). Plaintiff has offered no documentary evidence supporting his claim of discriminatory animus and, when given the opportunity at his deposition to offer factual support for such a claim, he could not name a single instance where Teamsters representatives exhibited discriminatory animus toward him because of his disability. (D.I. 62, Walker Depo., at A347-48) Moreover, as noted, there is ample evidence that the Teamsters investigated his grievances and won favorable results for plaintiff on at least three occasions. Because there are no facts supporting his ADA claim, the court shall grant summary judgment in favor of the Teamsters.

### D. Plaintiff's LMRA Claim

Plaintiff's allegation that the Teamsters breached the collective bargaining agreement, which plaintiff frames as a state common law claim, must be resolved under § 301 of the LMRA. *See* 29 U.S.C. § 185(c) (providing for federal jurisdiction over breach of collective bargaining contracts); *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.,* 369 U.S. 95, 103 (1962) (holding that federal labor law is paramount in disputes concerning collective

bargaining agreements). In the typical § 301 claim, the employee sues the union for breach of its duty of fair representation and the employer for breach of the collective bargaining agreement. *See Vadino v. A. Valey Eng'rs,* 903 F.2d 253, 260 (3d Cir.1990) . At this point, the court shall address only the Teamsters' motion for summary judgment on plaintiff's LMRA claim.

The Teamsters argue that plaintiff's LMRA claim is untimely. A § 301 claim must be filed within six months from the date of its accrual. *See* 29 U.S.C. § 160(b); *Vadino,* 903 F.2d at 260. The limitations period commences when "the plaintiff receives notice that the union will proceed no further with the grievance." *Vadino,* 903 F.2d at 260 (internal quotations and citations omitted). In his EEOC charge, plaintiff complained that the Teamsters failed to process grievances he filed between October 20, 1996 and January 14, 1997. (D.I. 62 at A438) On May 28, 1997, plaintiff received final notification that the Teamsters would not pursue these grievances. (D.I. 62 at A409-33) Plaintiff, however, did not file suit until December 30, 1997. Accordingly, plaintiff's LMRA claims against the Teamsters are time-barred.

**\*10** Even if the claims were timely, plaintiff has provided no evidence from which a reasonable jury could conclude that the Teamsters violated the duty of fair representation. The Teamsters investigated each of plaintiff's grievances and brought at least one to arbitration. They also secured favorable results for plaintiff on at least two occasions. Plaintiff's claim rests only on his contention that the Teamsters should have pursued all of his grievances to arbitration. It is settled, however, that unions enjoy considerable discretion in handling the grievances of their members. *See Air Line Pilots Ass'n v. O'Neil,* 499 U.S. 65, 67 (1999). This is sensible. Requiring a union to bring every grievance to arbitration would strain the union's resources and damage its credibility.

For these reasons, the court shall grant the Teamsters' motion for summary judgment on plaintiff's LMRA claim.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A507**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 10

### E. Plaintiff's PHRA Claim

Finally, plaintiff raises a claim under the PHRA. The PHRA essentially mirrors Title VII in its prohibition of discriminatory employment practices. In fact, Pennsylvania courts employ the same burden-shifting analytical model used in federal employment discrimination cases. *See Campanaro v. Pennsylvania Elec. Co.,* 738 A.2d 472, 476 (Pa.Super.Ct.1999), *appeal denied,* 751 A.2d 183 (Pa.2000). As noted in the court's Title VII and ADA discussion, plaintiff has failed to set forth a prima facie case of discrimination on the basis of his race or alleged disabilities. For the reasons stated therein, his PHRA claim also must fail.[FN15] To the extent that plaintiff raises a retaliation claim based on his filing of a complaint with the Pennsylvania Human Relations Commission ("PHRC"), that claim also must fail. The Teamsters received notice of plaintiff's filing with the PHRC on June 27, 1997. (D.I. 62 at A435) The majority of the alleged discriminatory practices predated notice of this filing. Moreover, plaintiff has adduced no evidence of retaliation after the Teamsters received notice of his filing. Consequently, the court shall grant the Teamsters' motion for summary judgment on this claim.

FN15. Plaintiff's PHRA claim also can be dismissed in light of the fact that plaintiff was not employed in, or a resident of, Pennsylvania at the time of the alleged discrimination by the Teamsters. At least one court has found that a plaintiff cannot invoke the PHRA where he lacked any contacts with the Commonwealth of Pennsylvania during the course of his employment. *See McCreary v. Sears Roebuck & Co.,* Civ. A. No. 85-5199, 1987 WL 13748 (E.D.Pa. Jul. 14, 1987). In that case, Sears terminated McCreary after he had worked for twenty years at a Wilmington, Delaware Sears store. *See id.* at *1. Like plaintiff at bar, McCreary was a Delaware resident and had never worked in Pennsylvania. Given these facts, the district court concluded that McCreary could not invoke the PHRA.

### V. PEPSI'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's claims against Pepsi are essentially identical to those leveled against the Teamsters. The court shall dismiss plaintiff's ADEA claim for the reasons discussed above. Furthermore, the court shall dismiss his PHRA claim against Pepsi because he failed to exhaust his administrative remedies by filing a charge with the PHRC naming Pepsi as a defendant.[FN16] *See* 43 Pa. Cons.Stat. Ann. § 959(a) (West Supp.2000); *Bailey v. Storlazzi,* 729 A.2d 1206, 1214 (Pa.Super.Ct.1999) (explaining that, "it is well settled [under the PHRA] that a plaintiff must exhaust all administrative remedies prior to seeking redress in court"). Plaintiff's remaining claims merit further discussion.

FN16. Plaintiff's charge with the PHRC named only the Teamsters. (D.I. 62 at A438)

### A. Plaintiff's Title VII Claims

Construed liberally, plaintiff's complaint alleges unlawful race discrimination, hostile work environment, and retaliation claims. The court shall address each in turn.

#### 1. Race Discrimination

*11 Plaintiff founds his race discrimination claims on several incidents. First, he claims that his initial January 1996 termination was motivated by racial animus. Next, he claims that Pepsi's recision of his Extra Man position was discriminatory. He also alleges that he was denied the Bottle Line position, a second Extra Man slot, and "Lead Man" pay because of his race. Finally, he contends that his July 1997 discharge was motivated by racial discrimination. Each of these accusations requires separate analysis.

Before reviewing these accusations, it is helpful to summarize the analytical framework applicable to Title VII claims. Plaintiff has no direct evidence of racial discrimination. That is, none of plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A508**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 11

evidence establishes racial discrimination without inference or presumption. *See Torre v. Casio, Inc.,* 42 F.3d 825, 829 (3d Cir.1994). Where, as here, a plaintiff offers circumstantial evidence of discrimination, the court must analyze the discrimination claims under the Supreme Court's burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Briefly summarized, the *McDonnell Douglas* analysis proceeds in three stages. First, the plaintiff must present a prima facie case of discrimination. There is no rigid formulation of the prima facie case, and the elements may vary depending on the factual circumstances of the case.[FN17] *See Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 938 (3d Cir.1997). If the plaintiff establishes a prima facie case, the burden shifts to the defendant " to articulate some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802. Finally, if the defendant carries this burden, the plaintiff then must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *See Jones v. School Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir.1999). The court shall apply this analytical framework to each of the alleged instances of race discrimination.

> FN17. For this reason, the court has tailored its formulation of the prima facie case to the specific instances of discrimination alleged by plaintiff.

i. The January 1996 Termination

The first alleged instance of racial discrimination occurred when Pepsi terminated plaintiff in January 1996. Pepsi contends that this claim is time-barred.

Title VII imposes time limits on when a plaintiff may file a complaint alleging discriminatory conduct. Where a plaintiff institutes discrimination proceedings pursuant to state law, that plaintiff must file a complaint with the EEOC within 300 days of the alleged discriminatory conduct.[FN18] *See* 42 U.S.C. §§ 2000e-5(e). Any acts that occurred prior to this 300 day period cannot support a Title VII

claim. Plaintiff should have filed a charge with the EEOC regarding his January 1996 termination well before April 28, 1997. Courts, however, recognize exceptions to the statutory time bar. Specifically, the Third Circuit recognizes a continuing violation exception to the timely filing requirement. *West v. Philadelphia Electric Co.,* 45 F.3d 744, 754 (3d Cir.1995). Under this theory, a "plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if [he] can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *Id.* In the interests of a full discussion of plaintiff's claims, the court shall assume plaintiff has alleged a continuing violation.

> FN18. Plaintiff did not include race discrimination allegations in his October 22, 1997 EEOC charge. (D.I. 65 at A80) Unlike his April 28, 1997 EEOC charge, he also did not file this later charge with the DDOL.

*12 Turning to the merits of plaintiff's claim, to survive summary judgment plaintiff first must establish a prima facie case of discrimination. Under *McDonnell Douglas,* plaintiff must show that (1) he is a member of a protected class, (2) that he was qualified for the job, (3) that he was fired despite those qualifications, and (4) after his termination, the job remained open and the employer sought applicants with the plaintiff's qualifications. *See McDonnell Douglas,* 411 U.S. at 802; *Matczak,* 136 F.3d at 938. Plaintiff has not come forward with sufficient evidence to satisfy the third and fourth prongs of his prima facie case. Pepsi rehired plaintiff after it terminated him. Further, plaintiff has submitted no evidence that his position remained open after his termination or that Pepsi sought applicants with plaintiff's qualifications.

Even assuming plaintiff has come forth with evidence sufficient to establish a prima facie case, Pepsi has offered a legitimate, nondiscriminatory reason for firing him. When it initially terminated him, Pepsi officials thought that plaintiff was a " probationary employee." Under the Collective

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 12

Bargaining Agreement, "the first ninety (90) working days shall be considered a trial period, and during such trial period, [Pepsi has] the unqualified right to dismiss such new employees." (D.I. 65 at A14) Plaintiff admitted during his deposition that Pepsi officials fired him because they found him in violation of the absentee policy. (D.I. 62, Walker Depo., at A51-52) Indeed, plaintiff's absentee record for the period June 5, 1995-January 13, 1996 indicates that plaintiff was late 34 out of 79 working days and that he had one unexcused absence. (D.I. 72, Absentee Rep., Ex. F1)

Plaintiff offers only a conclusory response to Pepsi's legitimate, nondiscriminatory reasons for firing him. Plaintiff simply claims that his termination was due to racial discrimination on the part of Plant Manager Chominski. (D.I. 62, Walker Depo., at A52) Plaintiff offers no evidence in support of this claim. Moreover, he has pointed to no evidence that would lead a rational fact finder to conclude that Pepsi's stated reasons for firing him were merely pretextual. Indeed, the fact that Pepsi rehired him with full seniority raises the opposite inference. For these reasons, the court shall grant Pepsi summary judgment on this claim.

### ii. The First Extra Man Position

In order to state a prima facie case with respect to alleged racial discrimination in Pepsi's decision to rescind the Extra Man position, plaintiff must demonstrate that (1) he is a member of a protected class, (2) that he applied for, was qualified for, and was removed from the position sought, and (3) under circumstances giving rise to an inference of discrimination. *See Stewart v. Rutgers, The State Univ.,* 120 F.3d 426, 432 (3d Cir.1997); *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 (3d Cir.1995).

At the time plaintiff bid for the Extra Man position, he was not "qualified" for it under the bidding procedures of the Collective Bargaining Agreement because he lacked the necessary seniority. The Collective Bargaining Agreement requires that preference be given to bidding employees having seniority within the particular department. (D.I. 65 at A27) The documentary evidence, which plaintiff

has not rebutted with admissible evidence, establishes that Cooney bid for the Extra Man position and that he was the most senior person in the Sales Department who had bid on the slot. Conversely, plaintiff had no seniority in the Sales Department. (D.I. 65, Bid Slip, at A3; McKinnon Aff., at A245 ¶¶ 4-5) Consequently, plaintiff cannot establish a prima facie case of discrimination related to the recision of the Extra Man position.

**\*13** Assuming, *arguendo,* that plaintiff could establish a prima facie case, Pepsi has rebutted the inference of discrimination by pointing to the Collective Bargaining Agreement's bidding provisions. The Agreement clearly requires that Pepsi award bids to the most senior bidder within a department. Cooney had more seniority than plaintiff in the Sales Department and, therefore, Pepsi had little choice but to award it to him. Having established a legitimate, nondiscriminatory reason for its decision to award the Extra Man position to Cooney, the burden now shifts back to plaintiff to establish pretext. *See Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). Plaintiff can demonstrate pretext by showing " 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact finder could rationally find them 'unworthy of credence." " *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994) (citations omitted)).

To this end, plaintiff contends that his sales supervisor (Joe Burns) orchestrated the recision because of his racial animus toward plaintiff. According to plaintiff, Burns berated him using racially derogatory language and ordered Cooney to submit a grievance seeking plaintiff's Extra Man position. (D.I. 65, Walker Depo., at A56) Other than his own conclusory assertion, there is no evidence that Burns' alleged racial animosity played a role in Pepsi's decision to rescind its award of the position to plaintiff. Even if Burns uttered racial epithets, this fact alone hardly constitutes evidence of an elaborate conspiracy to force plaintiff out of his Extra Man position. Other than his own unsupported opinion, there is no evidence indicating a connection between Burns' alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A510

Not Reported in F.Supp.2d                                                         Page 13

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

racial animosity and the filing of Cooney's grievance seeking plaintiff's position. Furthermore, there is no evidence that race played the slightest role in Pepsi's consideration of the merits of that grievance. Plaintiff must come forward with more than his own unsupported beliefs to defeat a motion for summary judgment. *See Liberty Lobby,* 477 U.S. at 256-57 (noting that the plaintiff must come forward with affirmative evidence).

In a further effort to cast doubt on Pepsi's proffered reason for the recision, plaintiff asserts that Cooney was ineligible to bid on the Extra Man position because he was a "new hire" and because he did not wait 180 days after starting his new job in the Sales Department to bid on the Wilmington Extra Man position. These arguments are without merit. First, the Collective Bargaining Agreement does not restrict a new hire's ability to bid on job openings. Second, the Agreement only prohibits successful "bidders" from rebidding "for second, equal, or lesser-rated position[s]" for 180 days. (D.I. 65 at A27) Cooney never bid on his prior Sales Department job. Instead, Pepsi hired him "off the street" under the Collective Bargaining Agreement's new hire procedures to fill a vacancy in the Sales Department. (D.I. 65, McKinnon Aff., at A245 ¶ 5) Thus, he was not a successful "bidder" for that prior Sales position and, therefore, was not constrained by the Collective Bargaining Agreement's 180-day bidding moratorium.

**\*14** In short, plaintiff has not pointed to any competent evidence of pretext. Because he has not produced evidence sufficient to establish a prima facie case or, in the alternative, evidence sufficient to rebut Pepsi's legitimate, nondiscriminatory reasons for rescinding the Extra Man position, Pepsi is due summary judgment on this aspect of plaintiff's race discrimination claim.

### iii. The Bottle Line Position, the Second Extra Man Slot, and the Lead Man Position

Plaintiff further premises his race discrimination claim on the denial of several positions at Pepsi's plant. Following the recision of his Extra Man position, plaintiff returned to Pepsi's warehouse and worked at a "route loading position." (D.I. 62, Walker Depo., at 75) Soon after his return, he bid on a Bottle Line position that Pepsi ultimately awarded to Dave Carson. On January 6, 1997, plaintiff bid on another Extra Man position in the Wilmington Sales Department. (D.I. 65 at A5-6) Pepsi denied this bid. Finally, plaintiff claims that Pepsi should have paid him at the "Lead Man" rate from November 1996 until approximately January 1997.

To establish a prima facie case of race discrimination arising out of these denials, plaintiff must establish (1) that he is a member of a protected class, (2) that he applied for, was qualified for, and was denied the position sought, and (3) under circumstances that give rise to an inference of discrimination. *See Stewart,* 120 F.3d at 432; *Waldron,* 56 F.3d at 494.

With respect to the Bottle Line slot, plaintiff cannot establish that he was qualified for that position. The Bottle Line position is subject to the Collective Bargaining Agreement's bidding provisions. Pepsi awarded the position to Carson because he was senior to plaintiff. Although plaintiff disputes this claim, the documentary evidence establishes conclusively that Carson's hiring date preceded plaintiff's by 21 days. (D.I. 65, Employment Records, at A1-2) Furthermore, there is no evidence suggesting that racial discrimination played a role in the rejection of his bid.

Similarly, plaintiff cannot demonstrate that he was qualified for the second Extra Man position. Plaintiff bid for the Extra Man position on January 6, 1997. (D.I. 65, Bid Sheet, at A6) This bid came only several days after Pepsi had awarded him a Pallet Repair position on which plaintiff had bid in late December 1996. (D.I. 65, Bid Awards, at A5) Article XVII of the Collective Bargaining Agreement prohibits successful bidders from bidding for "a second, equal, or lesser-rated position" for 180 calendar days after the bid. (D.I. 65 at A27) Thus, his prior Pallet Repair bid disqualified him from bidding on the Extra Man position.

Finally, plaintiff cannot establish that he qualified for Lead Man pay. According to Pepsi, the Lead

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Man position is awarded by the company without regard to the Collective Bargaining Agreement. It is awarded only to those with demonstrated leadership abilities. (D.I. 65, McKinnon Aff., at A245) Moreover, the Lead Man during the period in question was Edward Fisher, not plaintiff. (D.I. 65, McKinnon Aff., at A245) Plaintiff has not disputed these assertions with competent evidence, and he has no documentation to support his claim of entitlement to Lead Man pay. His bare assertion of entitlement, without more, is not sufficient to withstand summary judgment.

*15 Even if plaintiff could meet his prima facie case with respect to these adverse employment actions, he has failed to rebut Pepsi's legitimate nondiscriminatory reasons for not awarding him the various positions and designations. There is absolutely no evidence that racial animus tainted Pepsi's consideration of plaintiff's bids. Indeed, the Collective Bargaining Agreement afforded Pepsi little flexibility in awarding vacant positions. With respect to plaintiff's alleged entitlement to Lead Man pay, there is no evidence that plaintiff's race played any role in Pepsi's refusal to accord him Lead Man pay. Accordingly, the court shall grant Pepsi's motion for summary judgment as it relates to these allegations.

iv. Plaintiff's January 1997 Discharge

In order to state a prima facie case of discrimination arising out of his discharge, plaintiff must show (1) that he is a member of a protected class, (2) that he was fired, and (3) under circumstances that give rise to an inference of discrimination. *See Stewart,* 120 F.3d at 432; *Waldron,* 56 F.3d at 494. Although plaintiff satisfies the first two elements, he has offered no evidence to satisfy the third. The record reveals that Pepsi terminated plaintiff because he violated Pepsi's Absentee Policy. Other than plaintiff's unsupported allegations, plaintiff has offered no admissible evidence that racism played a role in his discharge.

Plaintiff also is unable to rebut Pepsi's legitimate, nondiscriminatory reasons for firing him. By plaintiff's own admission, he violated the Absentee

Policy's call-in procedures. (D.I. 62, Walker Depo., at A138, A159-60) Plaintiff claims that he did not call in his absences for the week of June 23, 1997 because his name was not on that week's work schedule. Pepsi has submitted a properly authenticated work sheet that contradicts this assertion. (D.I. 65, Work Schedule, at A7; McKinnon Aff., at A246 ¶ 10) Further, the court cannot countenance plaintiff's unsupported allegation that Pepsi falsified this work sheet. Because plaintiff has failed to rebut Pepsi's legitimate reasons for firing him, the court shall grant Pepsi's motion for summary judgment as it relates to plaintiff's race discrimination claim.

2. Hostile Work Environment

Plaintiff also complains of pervasive racial harassment at Pepsi's Wilmington facility. At issue is whether plaintiff has adduced sufficient facts to withstand Pepsi's motion for summary judgment. To state a Title VII claim premised on a hostile work environment, a plaintiff must show
(1) that he ... suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.

*Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996). Plaintiff has not met this standard.

*16 As noted, plaintiff has not established any racial discrimination related to his job bids or his eventual termination. The only blatantly racist incident occurred when Joe Burns allegedly used racially offensive language in reference to plaintiff. (D.I. 65, Walker Depo., at A108-112, A114-118) Judging by plaintiff's deposition and by the numerous grievances he submitted, Burns' epithet was the only incident during his employment where Burns (or any other Pepsi employee, for that matter) used racially derogatory language. One-time utterances of racial epithets simply do not rise to the level of racial harassment. *See Faragher v. City of*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 15

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*Boca Raton,* 524 U.S. 775, 787 (citing *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971)). The alleged racially offensive conduct must be pervasive and regular, not merely episodic as in the present case. *See id.* at 788. Moreover, the allegedly harassing conduct noted by plaintiff amounts, at worst, to rudeness. For instance, plaintiff alleged in his deposition that Plant Manager Chominski called him a "scam artist." Although Chominski's comment was rude, Title VII does not establish a " general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998).

Because plaintiff has failed to produce evidence of a regular and pervasive racial hostility, Pepsi is entitled to summary judgment on the hostile work environment claim.

### 3. Plaintiff's Retaliation Claim

It is unclear whether plaintiff alleges retaliation arising under Title VII or under the ADA or both. The court shall err on the side of liberality and construe plaintiff's complaint to include retaliation arising under both statutes. At this point, the court shall confine its analysis to plaintiff's Title VII retaliation claim.

In his complaint plaintiff claims that Pepsi fired him in July 1997 in retaliation for his April 28, 1997 EEOC charge against the company. (D.I. 2 ¶ 40) In his summary judgment briefs, he also argues that Pepsi fired him in retaliation for his numerous grievances. The court will assess both claims. To establish a prima facie claim of retaliation under Title VII, plaintiff must prove that:
(1) [he] engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against [him]; (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.

*Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1299 (3d Cir.1997).

With respect to his EEOC charge, the EEOC inexplicably sent its notice of plaintiff's charge to a Greg Horton at Pepsi's Philadelphia bottling facility. (D.I. 65, EEOC Notice, at A70) Horton was the Human Resources Director at Pepsi's Philadelphia facility. When the EEOC sent the notice, however, Horton had transferred to a Pepsi facility in Denver, Colorado. (D.I. 65, McKinnon Aff., at A245-46 ¶ 7) Because of this error, the Wilmington Human Resources Director, Alison McKinnon, did not receive the notice until "late July or early August 1997." (D.I. 65, McKinnon Aff., at A245 ¶ 7) Consequently, "[o]n July 10, 1997, when Wilmington management made the decision to terminate [plaintiff], [they] did not know that he had filed a charge of discrimination." (D.I. 65, McKinnon Aff., at A246 ¶ 7) Plaintiff has not rebutted these facts with admissible evidence. Consequently, there is no dispute that Pepsi management did not know of plaintiff's EEOC charge until well after it had fired him. To the extent that plaintiff's retaliation claim rests on his EEOC charge, it must fail.

*17 With respect to his grievances, not a single one alleged racial harassment. Although he complained bitterly of numerous injustices, none of his grievances mentioned racial harassment or discrimination. For this reason, the grievances were not protected activity under Title VII. *See Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 701-02 (3d Cir.1995) (finding that letter to employer expressing general dissatisfaction, but not specifically age discrimination, was not protected conduct for purposes of establishing prima facie case of retaliation). Accordingly, the court shall grant Pepsi's motion for summary judgment on plaintiff's Title VII retaliation claim.

### B. Plaintiff's ADA Claims

Plaintiff's complaint also alleges that Pepsi discriminated against him because he was disabled (or because Pepsi regarded him as disabled), that Pepsi failed to accommodate his disabilities, and that Pepsi retaliated against him for filing grievances complaining of Pepsi's disability discrimination. The court shall evaluate each of these allegations in turn.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A513**

Not Reported in F.Supp.2d                                                                 Page 16

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

1. Plaintiff's Disability Discrimination Claim

The ADA prohibits an employer from discriminating against a "qualified individual" with a disability. *See* 42 U.S.C. § 12112(a) (1994). In order to state a prima facie case under the ADA, the plaintiff must establish that he (1) has a disability, (2) is otherwise qualified to perform the essential functions of the job, with or without accommodations by the employer, and (3) has suffered an adverse employment action because of the disability. *See Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 142 (3d Cir.1998).

At issue is whether plaintiff has a disability. The ADA defines "disability" as:
(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
(B) a record of such impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The EEOC regulations [FN19] interpreting the ADA define both "substantially limited" and "major life activities." The regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working ." 29 C.F.R. § 1630.2(i) (1997). In determining whether a plaintiff is substantially limited in one or more of those activities, the regulations advise courts to consider the nature and severity of the impairment, the duration of the impairment, and the permanent, long-term impact resulting from the impairment. *Id.* § 1630.2(j)(2).

> FN19. Regulations issued by the implementing federal agency are entitled to substantial deference from courts. *See Deane,* 142 F.3d at 143 n. 4 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984)).

Plaintiff claims to suffer from the following disabilities: eczema, sinusitis, anxiety and depression, lumbosacral strain, and fibromyalgia.

With respect to eczema and sinusitis, these simply do not rise to level of physical impairments under the ADA. Plaintiff's alleged depression, anxiety, lumbosacral strain, and fibromyalgia, however, constitute "impairments" under the ADA. The court must determine whether these impairments substantially limit plaintiff in one or more major life activities.

*\*18* Plaintiff appears to argue that his impairments limit his ability to lift, walk, and work. Plaintiff has introduced absolutely no medical testimony in support of these claims. Instead, he relies entirely on his own assertions and various written diagnoses of his doctors.

With respect to the major life activity of lifting, plaintiff offers several diagnoses of thoracic strain and fibromyalgia. One diagnosis imposes a ten pound lifting restriction on plaintiff. (D.I. 72, 03/06/97 Report, Ex. B) Another report imposes a fifteen pound lifting restriction, while the most recent diagnosis imposes no restrictions on plaintiff. (D.I. 72, 5/15/97 Report; 5/21/97 Report, Ex. B) The Third Circuit has held that lifting limitations similar to plaintiff's do not substantially limit an individual's ability to lift. *See, e.g., Marinelli v. City of Erie,* 216 F.3d 354 (3d Cir.2000) (holding that ten pound lifting restriction did not constitute a disability). Accordingly, plaintiff's lifting restrictions (to the extent that he has any) do not substantially limit his ability to lift.

Plaintiff also claims that his physical impairments substantially limit his ability to walk. Again, there is no medical testimony to support this claim. The EEOC regulations define a person substantially limited in the major life activity of walking as one who "can only walk for very brief periods of time." *See* 29 C.F .R. app. § 1630.2(j). Plaintiff's medical records indicate that he can walk anywhere from up to one hour at a time to a total of four hours in a given day. (D.I. 72, 5/25/98 Medical Report, Ex. B) Plaintiff presented no evidence that he requires a cane or crutches to walk. The Third Circuit has recognized that comparatively mild walking restrictions (such as those imposed on plaintiff) are not disabilities. *See Kelly v. Drexel Univ.,* 94 F.3d 102, 106-08 (3d Cir.1996). Because plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A514**

Not Reported in F.Supp.2d                                                    Page 17

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

walking restrictions are comparatively mild, they do not substantially limit him in the major life activity of walking.

Finally, plaintiff argues that his physical and mental impairments render him disabled in the major life activity of working. No medical testimony exists to support this claim. Furthermore, the diagnostic reports offered by plaintiff only place broad restrictions on his ability to work. The medical reports do not specifically exclude him from any class of jobs. To be substantially limited from working, an individual must be unable "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630(j)(3)(i). Thus, to avoid summary judgment plaintiff must present more than mere general restrictions on his ability to work. He must present evidence of the class of jobs from which he is disqualified. The Third Circuit recently ruled on this very point. In *Marinelli v. City of Erie,* the Third Circuit held that the plaintiff could not avoid judgment as a matter of law under the ADA where he offered only evidence of a physician's general restrictions on his work (such as "light duty") rather than evidence of the class of jobs from which the plaintiff was disqualified. *See* 216 F.3d at 364-65. Because plaintiff has not submitted such evidence, he cannot defeat Pepsi's motion for summary judgment.[FN20]

> FN20. Because plaintiff cannot establish that he is a "qualified individual with a disability," he also cannot succeed on his claim that Pepsi failed to accommodate his disabilities. The ADA renders unlawful the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee...." 42 U.S.C. § 12112(b)(5)(A) (1994) (emphasis added).

2. Plaintiff's "Regarded As" Disability Claim

\*19 Plaintiff also argues that Pepsi officials discriminated against him because they regarded

him as disabled. *See* 42 U.S.C. § 12102(2)(C). The regulations consider an individual "regarded as" disabled if he or she:
(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
(3) Has none of the impairments defined in this section but is treated ... as having a substantially limiting impairment.

29 C.F.R. § 1630.2(1). As the United States Supreme Court recently noted, an individual falls within the definition of "regarded as" disabled if (1) an employer mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *See Sutton v. United Airlines, Inc.,* 119 S.Ct. 2139, 2149-50 (1999) (explaining that an employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting").

In support of his "regarded as" claim, plaintiff first points to a single, isolated comment by Plant Manager Chominski who allegedly implied that plaintiff was not physically "100%." (D.I. 62, Walker Depo., at A106) Second, plaintiff argues that Pepsi regarded him as disabled because they ordered him to appear for an independent medical examination so that his supervisors could evaluate his claims of disability. At most, these allegations establish that his supervisors were aware of his back pain complaints and that they attempted to secure independent medical verification of the genuineness of these complaints. Mere awareness of an employee's alleged physical impairments, however, is insufficient to demonstrate that Pepsi regarded plaintiff as disabled. *See Kelly,* 94 F.3d at 109. There is no evidence that Pepsi officials regarded him as having a disability that prevented him from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 18

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

performing his work. Indeed, they continued to schedule plaintiff for work and only terminated him after his repeated, unexcused absences and failures to "call in." Because there is no evidence that Pepsi officials regarded him as disabled, the court shall grant Pepsi's motion for summary judgment on plaintiff's "regarded as" claim.

### 3. Plaintiff's ADA Retaliation Claim

Lastly, plaintiff claims that Pepsi retaliated against him for filing grievances with the Teamsters about alleged disability discrimination. *See* 42 U.S.C. § 12203(a) (prohibiting discrimination against an employee when he "has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation ... under this Act"). There is no dispute that his grievances constituted protected activity under the ADA or that he suffered an adverse employment action (his dismissal) after filing grievances. Like his prior Title VII retaliation claim, his ADA retaliation claim also falters on the causation prong of his prima facie case.

**\*20** To state a prima facie case of retaliation, plaintiff must demonstrate "a causal connection between [his] participation in the protected activity and the adverse employment action." *Robinson,* 120 F.3d at 1299. As evidence of causation, plaintiff relies only on the temporal proximity of his July 7th termination to the filing of his disability-related grievances on June 20th. (D.I. 62, Grievances, at A392-96) As the Third Circuit has explained, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Id* . at 1302. Plaintiff has offered no other evidence that his grievances prompted Pepsi officials to fire him. Thus, without more, plaintiff cannot state a prima facie case of retaliation. Even if he could establish a prima facie case, the record is devoid of pretext to rebut Pepsi nondiscriminatory reasons for firing him. Accordingly, the court shall grant summary judgment on plaintiff's ADA retaliation claim.

### C. Plaintiff's Breach of Contract Claim

Finally, plaintiff claims that Pepsi breached the Collective Bargaining Agreement. As noted above, this claim arises under § 301 of the LMRA. *See* 29 U.S.C. § 185(c) (providing for federal jurisdiction over breach of collective bargaining contracts). In a typical § 301 action, the employee sues the employer for breach of the collective bargaining agreement and the union for breach of its duty of fair representation. *See Vadino,* 903 F.2d at 260. Such suits require the plaintiff to prove both the violation of the collective bargaining agreement and the breach of the union's duty of fair representation. *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6,* 493 U.S. 67, 83 (1989) (noting that "an allegation that the union had breached its duty of fair representation [is] a necessary component of the § 301 claim against the employer" ); *Felice v. Sever,* 985 F.2d 1221, 1226 (3d Cir.1993) (explaining that in a § 301 suit "the plaintiff will have to prove that the employer breached the collective bargaining agreement in order to prevail on the breach of duty of fair representation claim against the union and vice versa ").

In this case, the court has ruled that plaintiff's claims against the Teamsters are time-barred or, in the alternative, without evidentiary support. Therefore, plaintiff's § 301 claim fails because he cannot make the necessary showing that the Teamsters violated their duty of fair representation. Even if he could, plaintiff cannot show that Pepsi violated the Collective Bargaining Agreement. There is simply no evidence indicating that Pepsi violated the Agreement with respect to plaintiff. In fact, the evidence demonstrates that Pepsi rigidly followed the Agreement's provisions regarding job bidding and award procedures. Nor is there any evidence indicating that Pepsi violated the Agreement when it terminated plaintiff. Article XI of the Agreement specifically provides that Pepsi " may discharge employees for any reasonable cause." (D.I. 65 at A22) Plaintiff's repeated violations of the Attendance Policy's call-in provisions provided Pepsi with reasonable cause.

**\*21** For each of these reasons, then, the court shall

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A516**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

grant summary judgment on plaintiff's LMRA claim.

### VI. CONCLUSION

For the aforementioned reasons, the court shall grant the motions for summary judgment filed by the Teamsters and Pepsi. For the same reasons, it shall deny plaintiff's motion for summary judgment. Plaintiff also filed a "Motion to Enter Documents into Evidence," which amounts to nothing more than a list of names of potential trial witnesses. (D.I.53) Plaintiff never deposed any of these witnesses or procured affidavits from them. Accordingly, the court shall dismiss this motion as moot. An appropriate order shall issue.

D.Del.,2000.
Walker v. Pepsi-Cola Bottling Co.
Not Reported in F.Supp.2d, 2000 WL 1251906 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.